**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| **JAMES R. ROBINSON, individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 1938 Light Street | | |
| Baltimore, Maryland 21230 | * | |
| | | |
| And | * | Case No._____ |
| | | |
| **DUWAIN HEIM individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 2423 Annapolis Road | | |
| Baltimore, Maryland 21230 | * | |
| | | |
| And | * | |
| | | |
| **RICK GARDNER individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 3501 Elmore Avenue | | |
| Baltimore, Maryland 21213 | * | |
| | | |
| And | * | |
| | | |
| **VANESSA MACK individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 3000 Hallow Avenue | | |
| Baltimore, Maryland 21216 | * | |
| | | |
| And | * | |

**CALVIN WILSON individually,**              *
**and on behalf of all others**
**similarly situated,**                       *
4811 Norwood Road
Baltimore, Maryland 21212                     *

And                                           *

**MARYETTA BAQUOL individually,**            *
**and on behalf of all others**
**similarly situated,**                       *
2819 Pennsylvania Avenue
Baltimore, Maryland 21227                     *

**And**                                       *

**AMI LAWSO individually,**                  *
**and on behalf of all others**
**similarly situated,**                       *
4305 Ethland Avenue
Baltimore, Maryland 21207                      *

And                                           *

**KENNETH MCKENZIE individually,**           *
**and on behalf of all others**
**similarly situated,**                       *
3509 Rogers Avenue
Baltimore, Maryland 21215                      *

And                                           *

**JOSEPH JORDAN, III, individually,**        *
**and on behalf of all others**
**similarly situated,**                       *
1120 Cherry Hill Road, Apt. K
Baltimore, Maryland 21225                      *

And                                           *

**QUENTIN SAWYER, individually,**    *
**and on behalf of all others**
**similarly situated,**    *
3904 8th Street
Baltimore, Maryland 21225    *

        **Plaintiffs,**    *

            *

**v.**    *

**STATE OF MARYLAND DEPARTMENT**    *
**OF THE ENVIRONMENT and**
**ROBERT SUMMERS, in his official**    *
**capacity as Secretary of the Maryland**
**Department of Environment**    *
1800 Washington Boulevard
Baltimore, Maryland 21230    *

        Serve:    *
        Attorney General
        Douglas F. Gansler    *
        200 Saint Paul Place
        Baltimore, Maryland 21202    *

And    *

**MAYOR AND CITY COUNCIL OF**    *
**BALTIMORE**
**And STEPHANIE RAWLINGS-BLAKE,**    *
**in her official capacity as Mayor of**
**Baltimore City**    *
100 N. Holliday Street, Room 250
Baltimore, Maryland 21202    *

        Serve: George Nilson, Esq.    *
        Baltimore City Law Dept.
        100 N. Holliday Street, Suite 101    *
        Baltimore, Maryland 21202

                                                                    *

And
                                                                    *

**CBAC GAMING, LLC.**
One Caesars Palace Drive                                            *
Las Vegas, Nevada 89109
                                                                    *

        Serve: CSC-Lawyers Incorporating
               Service Company                                      *
               7 St Paul Street, Suite 1660
               Baltimore, Maryland 21202                            *

And                                                                 *

**BALTIMORE DEVELOPMENT**                                           *
**CORPORATION**
2537 St. Paul Street                                                *
Baltimore, Maryland 21218
                                                                    *

        Serve:  Mr. Clayton J. Powell, Jr.
                2537 St. Paul Street                                *
                Baltimore, Maryland 21218
                                                                    *
And
                                                                    *

**WHITING-TURNER CONTRACTING**
**COMPANY**                                                         *
300 E. Joppa Rd
Baltimore, Maryland 21286                                           *

        Serve: Mr. Willard Hackerman                                *
               300 E. Joppa Rd
               Baltimore, Maryland 21286                            *

And                                                    *

**ENVIRONMENTAL**                                      *
**PROTECTION AGENCY,**
**Agency of the United States**                        *
Arial Rios Building
1200 Pennsylvania Avenue, N.W.,                        *
Washington, D.C. 20460
                                                       *

      Serve: Michael Leavitt
      1200 Pennsylvania Avenue, N.W.,            *
      Washington, D.C. 20460
                                                       *
And                                                    
                                                       *

**URBAN GREEN**                                        *
**ENVIRONMENTAL, LLC**
1700 Beason Street                                     *
Baltimore, Maryland 21230
                                                       *

      Serve: Mr. James H. West
            409 Washington Avenue           *
            Suite 1010
            Towson, Maryland 21202          *

And                                                    *

**UNITED STATES DEPARTMENT OF**          *
**AGRICULTURE, NATURAL RESOURCES**
**CONSERVATION SERVICES**                     *
1400 Independence Ave, S.W.
Washington, District of Columbia 20250        *

      Serve: Eric Holder, Attorney General       *
            U.S. Department of Justice
            950 Pennsylvania Avenue, N.W.    *
            Washington, D.C. 20530

                                   *

      **Defendants.**

*    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW Plaintiffs, by and through their undersigned counsel and sue the Defendants and state in support of their claims:

### Parties

1.    At all times relevant to this dispute Plaintiff James R. Robinson resided at 1938 Light Street, Baltimore, Maryland, 21230. Plaintiff James R. Robinson is a member of the Westport-Cherry Hill Class defined in this Complaint.

2.    At all times relevant to this dispute Plaintiff Duwain Heim resided at 2423 Annapolis Road, Baltimore, Maryland, 21230. Plaintiff Duwain Heim is a member of the Westport-Cherry Hill Class defined in this Complaint.

3.      At all times relevant to this dispute Plaintiff Rick Gardner resided at 3501 Elmore Avenue, Baltimore, Maryland, 21213.  Plaintiff Rick Gardner is a member of the Westport-Cherry Hill Class defined in this Complaint.

4.      At all times relevant to this dispute Plaintiff Vanessa Mack resided at 3000 Hallow Avenue, Baltimore, Maryland, 21216.  Plaintiff Vanessa Mack is a member of the Westport-Cherry Hill Class defined in this Complaint.

5.      At all times relevant to this dispute Plaintiff Calvin Wilson resided at Norwood Road, Baltimore, Maryland, 21212.  Plaintiff Calvin Wilson is a member of the Westport-Cherry Hill Class defined in this Complaint.

6.      At all times relevant to this dispute Plaintiff Maryetta Baquol resided at 2819 Pennsylvania Avenue, Baltimore, Maryland, 21227.  Plaintiff Maryetta Baquol is a member of the Westport-Cherry Hill Class defined in this Complaint.

7.      At all times relevant to this dispute Plaintiff Ami Lawso resided at Ethland Avenue, Baltimore, Maryland, 21207.  Plaintiff Ami Lawso is a member of the Westport-Cherry Hill Class defined in this Complaint.

8.      At all times relevant to this dispute Plaintiff Kenneth McKenzie resided at 3509 Rogers Avenue, Baltimore, Maryland, 21230.  Plaintiff Kenneth McKenzie is a member of the Westport-Cherry Hill Class defined in this Complaint.

9.      At all times relevant to this dispute Plaintiff Joseph Jordan III resided at 1120 Cherry Hill Road, Baltimore, Maryland, 21225.   Plaintiff James R. Robinson is a member of the Westport-Cherry Hill Class defined in this Complaint.

10.     At all times relevant to this dispute Plaintiff Quentin Sawyer resided at 1938 3904 8th Street, Baltimore, Maryland, 21225.  Plaintiff Quentin Sawyer is a member of the Westport-Cherry Hill Class defined in this Complaint.

11.     Defendant State of Maryland, Department of Environment ("hereinafter "MDE") is an agency of the State of Maryland.

12.     Defendant Mayor and City Council of Baltimore (hereinafter "City") is a municipal corporation of the State of Maryland.

13.     Defendant CBAC Gaming, LLC, (hereinafter "CBAC Gaming") is a limited liability company organized under the laws of a state other than Maryland and maintains its principle place of business in Nevada.

14.     Defendant Baltimore Development Corporation (hereinafter "BCD") is a Maryland corporation with its principal place of business at 2537 Saint Paul Street, Baltimore, Maryland 21218.

15.     Defendant Whiting-Turner Contracting Company (hereinafter "WT") is a Maryland Corporation with its principal place of business at 300 East Joppa Road, Baltimore Maryland 21286.

16.     Defendant Environmental Protection Agency (hereinafter "EPA") is an executive agency of the United States government responsible for implementing the Clean Water Act.

17.     Defendant Urban Green Environmental, LLC, (hereinafter "Urban Green") is a limited liability company with its principal place of business at 1700 Beason Street, Baltimore, Maryland 21202.

18.     Defendant United States Department of Agriculture, Natural Resources Conservation Services (hereinafter "NRCS") is an executive agency of the United States government responsible for issuing permits to build on or near protected wetlands with in the United States.

19.     Defendant Stephanie Rawlings-Blake in her official capacity as Mayor of Baltimore City (hereinafter "Mayor") is the elected official charged with the responsibility for overseeing the operations of the government of the City of Baltimore, Maryland.

20.     Defendant Robert Summers in his official capacity as Secretary of the Maryland Department of the Environment (hereinafter "Secretary") is the appointed head of the Maryland agency that administers the Voluntary Cleanup Program.

**Jurisdiction and Venue**

21.     This Court has jurisdiction over this action in accordance with 28 U.S.C. §§ 1331 and 1343, in that this action, in part, arises under the Constitution

of the United States and the Laws of the United States, and asserts a violation of civil rights secured by the United States Constitution and by federal law.

22.    Venue is proper in this court in accordance with 28 U.S.C. § 1391(b) because the Plaintiffs causes of action arose within the District of Maryland.

## THE CLASS MEMBERS
## WESTPORT and CHERRY HILL COMMUNITIES

23.    In addition to the named Plaintiffs, there are approximately three thousand similarly situated individuals residing in close proximity to the Site in the Westport and Cherry Hill Communities in Baltimore City.

24.    The Named Plaintiffs bring this action on behalf of themselves and all others similarly situated, as representative members of the following proposed class.

a.    All residents that live in close proximity to the Site in the Westport and Cherry Hill Communities in Baltimore City where contaminants have been determined to exist.

25.    The members of the class are so numerous that joining the individual members would be impracticable.  Based upon publicly available information, it is believed that the class includes thousands of members.  Class members may be readily identified from information and records in possession and control of the Defendant City.

26.    There are questions of law and fact common to the class, which predominate over any question affecting only individual members of the class.  The

remedy sought is readily ascertained by resolving the common legal issues to all class members. Common issues include, but are not limited to, the following:

a.      Whether the Defendants CBAC Gaming, WT, City, MDE violated the class members civil rights by permitting the redevelopment of a brownfield adjacent to a predominantly poor, African-American community without performing the necessary remediation?

b.      Whether the Defendant MDE violated the Voluntary Cleanup Program and other laws as alleged herein?

c.      Whether the actions of the Defendants have created a public nuisance for the communities of Westport and Cherry Hill and other neighboring communities?

d.      Whether the actions of the Defendants violated the Plaintiffs and class members' Fourteenth Amendment Rights of Due Process and Equal Protection under the law?

e.      Whether the actions of the Defendants have damages Plaintiffs and the members of the class as alleged herein?

27.     The representative Plaintiffs' claims are typical to those of the members of the class and are based on the same legal theory.  Plaintiffs and all members of the class have sustained and/or will continue to sustain damages arising out of the conduct of the Defendants.

28.    The representative Plaintiffs have demonstrated that they can fairly and adequately assert and protect the interests of the members of the class.  The Plaintiffs' interests are not antagonistic to those of the other members of the class. Neither the representative Plaintiffs nor their counsel have any interest which might prevent them from actively and vigorously pursuing this action.

29.    A class action is superior to other available means for the fair and efficient prosecution of this action.  The prosecution of separate actions by individual members of the class and adjudication for individual members of the class would be dispositive of the interest of the other members of the class, or would substantially impair the ability of other members of the class to protect their interests.

30.    A class action will result in an orderly and expeditious administration of the class members' claims, and economies of time, effort and expense, and uniformity of decisions will be assured.

## Statement of Facts

31.    Defendant City is the fee simple owner of certain parcels of property in the Camden-Carroll Industrial Area of Baltimore City, located at 1501, 1525, and 1551 Russell Street (commonly referred to as the "Gateway South Phase I Properties") and 1501, 1601, 1629, 1633, and 1645 Warner Street, 2119 Haines Street, 2104 Worcester Street and 2102 Oler Street, (commonly referred to as the

"Warner Street Properties") (collectively the "Site" or the "Properties").  *See*
Exhibit A(1)-(12)

32.     The Properties are located near the communities of Westport and
Cherry Hill in Baltimore City.

33.     The Westport Community demographics consist of eighty six percent
(86%) African-American with an average annual household income of Twenty
Seven Thousand Four Hundred Fourteen Dollars ($27,414), and there are an
estimated twenty percent (20%) of the homes in the Westport neighborhood that are
vacant.  U.S. Census Bureau, 2010 Census Summary.

34.     The City acquired title to the Gateway South Phase I Properties on
September 28, 2005 for the purchase price of $3,476,000.00.

35.     The City acquired title to the Warner Street Properties on May 5, 2008
pursuant to its condemnation powers for the purchase price of $7,800,000.00.

36.     The Warner Street Properties abut the Middle Branch of the Patapsco
River and protected open spaces along the shoreline.  The Properties also contain
wetlands which provide water quality benefits to the adjacent Middle Branch
tributary and designated wildlife habitat areas for wintering waterfowl, which are
protected under the Maryland Critical Area Act, Title 8, Subtitle 18 of the Natural
Resources Article of the Maryland Annotated Code, and the Baltimore City Critical
Area Management Program, Baltimore, Maryland, Ordinance 02-350 (2002).

37.     The open space area abutting the Warner Street Properties (commonly called the "Waterfront Parcels") contains a portion of the Gwynns Falls Greenway, which is a recreational trail used by members of the public for biking and walking.

38.     Protecting the Middle Branch portion of the Patapsco River has been identified by Baltimore City's Comprehensive Master Plan as critical to achieving the overall Water Quality and Habitat required to restore the Baltimore Harbor to fishing and swimming standards established by the Clean Water Act.  *See* Exhibit B, p 59.

39.     The Middle Branch, as a portion of the Baltimore Harbor, and its adjacent tributaries are listed as degraded water bodies under federal and state law.

40.     The Patapsco River is a tributary to the Chesapeake Bay and is identified as one (1) of three (3) priority restoration rivers in the 2000 Chesapeake Bay Agreement.  *See* Exhibit C, p 3.

41.     On April 25, 2008 and June 4, 2009, Defendant City, through its agent Defendant Baltimore Development Corporation, submitted two Voluntary Cleanup Program (hereinafter "VCP") applications to Defendant MDE proposing to remediate the Gateway South Phase I Properties and Warner Street Properties, respectively, and requesting liability protection as an Inculpable Person upon completion (the "City VCP Applications").  *See* Exhibit D.

42.     Defendant City's VCP Applications relied upon eight (8) different Phase I or II Environmental Site Assessments (hereinafter "ESA"), which were completed between May 2007 and May 2009. These ESAs also referred to and/or attached a number of earlier ESAs conducted at and around the Properties from 2000 to 2009.  *See* Exhibit E.

43.     Defendant City contracted with KCI Technology to perform the testing and assessment of the site, and create the Phase I and Phase II Environmental Site Assessment required by the VCP.  *See* Exhibit G.

44.     Defendant City's VCP Applications and ESAs reveal a long history of industrial uses at the Properties which have released a complex mix of organic and inorganic contaminants in, on, and under the soil and groundwater which, as a consequence, creates the contaminant vapors at and from the Properties at levels exceeding state and federal cleanup standards. *See* Exhibit E.

45.     1501 Warner Street was initially developed in the 1890's and used as a warehouse.  Gordon Cartons, Inc. occupied the property from the 1940's until 1989 and used the facility to store material and products.  Most recently, the buildings were used by Second Chance, Inc. to store antiques and architectural structures.  *See* Exhibit H, p 60, ¶ 5-8.

46.     1601 Warner Street was initially developed in the 1890's by Baltimore Cedar Company and used as a machinery for woodworking, by 1901 a

Varnish and Color Company occupied the property and used it to store chemicals and petroleum products. Most recently, Baltimore Cycle Salvage occupied the property from 1989 until 2005 and used the facility to store motorcycle parts. The property has been vacant and unoccupied since 2005. *See* Exhibit H, p 61, ¶ 1-3.

47.     1629 Warner Street was developed in the early 1900's and used to store chemicals and petroleum products for a Varnish and Color Company. Sometime in the mid 1900's Gordon Carton, Inc. occupied the property and used the property to produce paper products. Most recently, Baltimore Cycle Salvage occupied the property from 1989 until 2005 and used the facility to store motorcycle parts. The property has been vacant and unoccupied since 2005. *See* Exhibit H, p 61, ¶ 3-4.

48.     1633 Warner Street was developed in the early 1900's and occupied by Prudent Company, a manufacturer of fire proof doors and windows. In 1952 Gordon Carton, Inc. occupied the property and used the property to store chemicals and solvents. From 1988-1995 Baltimore Paving occupied the property and used it to store materials, including petroleum products. Most recently, Baltimore Cycle Salvage occupied the property from 1995 until 2005 and used the facility to store motorcycle parts. The property has been vacant and unoccupied since 2005. *See* Exhibit H, p 61, ¶ 5.

49.     1645 Warner Street was developed in the early 1900's and occupied by Prudent Company, a manufacturer of fire proof doors and windows.  In 1952 the property was used by a Brass Foundry and Machinery company.  From 1972 to 2006 the property was occupied by a number of different companies including a Wharf Company, Ice Company, and Sun Oil Company.  *See* Exhibit H, p 62, ¶ 1.

50.     1501 Russell Street was developed in the early 1900's and occupied by American Cyanamid Company that produced and stored, *inter alia*, organochlorine pesticides.  Most recently, beginning from 1973 the property was occupied by Maryland Chemical Company for bulk chemical storage.  Historically, this property has been in continuous use as a chemical manufacture and storage facility.  *See* Exhibit H, p 62, ¶ 5-6.

51.     1525 Russell Street was developed in the mid-20th century and has been continually occupied by the Maryland Chemical Company and used to manufacture and store various chemicals.  *See* Exhibit H, p 63, ¶ 2.

52.     In the early 19000's 1551 Russell Street was and used as a factory and warehouse for Maryland Container Company.  In the 1940's the property was occupied American Cyanamid Company to manufacture and store various chemicals.  Most recently, Pheasant Warner Company, LLC, owned the property before selling it to Baltimore City.  *See* Exhibit H, p 63, ¶ 4.

53.     2119 Haines Street was undeveloped and used for storing irregular lumber, and most recently occupied by Second Chances, Inc. to store antiques.  *See* Exhibit H, p 63, ¶ 7.

54.     2110 Haines Street was an undeveloped parcel with a storage shed used to house logs and lumber, most recently the parcel was used by Greyhound Bus Terminal.  *See* Exhibit H, p 64, ¶ 2.

55.     2104 Worchester Street was developed in the mid 1900's by J.B. MacNeal Paints, Oils, and Varnish Company and used for "stripping" varnish and/or paint from furniture.  In 1972 Gordon Carton, Inc. occupied the parcel and used it as a warehouse and storage facility until it deteriorated beyond any usable condition. *See* Exhibit H, p 64, ¶ 3.

56.     2102 Oler Street was undeveloped until the 1950's at which time the parcel was used to store lumber.  In 1973 Gordon Carton, Inc. occupied the property and installed Underground Storage Tanks ("UST") near the Northwest border of the parcel.  Most recently, the parcel was used by Baltimore Restoration, Inc. for an undisclosed purpose.  *See* Exhibit H, p 64, ¶ 6.

57.     The contaminants identified at the Properties include arsenic, lead, chlorinated solvents (including trichloroethylene and vinyl chloride) and poly-aromatic hydrocarbons. Many of these contaminants are known and/or suspected human carcinogens.  *See* Exhibit E

58.     The said ESAs confirmed that contaminants at the Site are widespread and highly concentrated in soils at various depths and various locations throughout the Site (also known as "hot spots"). *See* Exhibit E

59.     The ESAs stated that KCI Technology was unable to access the Site to compete the testing that was proposed in the VCP Application and the Phase I assessment of the Site. *See* Exhibit F, ¶ 5.

60.     The ESAs also confirm that the groundwater underneath the Site, which is relatively shallow (in spots no more than five (5) feet below the surface), contains a number of the above-referenced contaminants and comes into contact with the contaminated soil on the Site. *See* Exhibit E.

61.     The ESAs confirm that the groundwater was tested in nine (9) locations and revealed trichloroethene (TCE), tetrachloroethene (PCE) and dichloroethene (DCE) concentration levels exceeding the MDE's cleanup standards. *See* Exhibit F

62.     The ESA conducted at the adjacent Waterfront Parcels to the south and east of the Site confirm that the contaminated groundwater from the upgradient Properties flows through, and contaminates, the Waterfront Parcels and then discharges into the Middle Branch of the Patapsco River. *See* Exhibit E.

63.     As mandated by § 7-506(d) of the Environment Article, Defendant MDE published notice of each of the City VCP Applications on its website shortly

thereafter, naming the Defendant Baltimore Development Corporation, on behalf of Baltimore City, as the "applicant" and issued a 30-day public comment period.

64.     Defendant MDE approved the City VCP Applications for the Gateway South Phase I Properties and Warner Street Properties on December 22, 2009 and March 18, 2010, respectively, confirmed the Defendant City's Inculpable Person Status under the VCP and directed Defendant City to develop a proposed Response Action Plan (hereinafter "RAP") for remediating the properties associated with each VCP application for MDE's review and approval.  *See* Exhibit I (RAP).

65.     On May 2, 2011, Defendant City submitted a "combined RAP" which proposed to address all the Properties associated with both VCP applications in one cleanup plan. *See* Exhibit H (Combined RAP).

66.     In an effort to satisfy the public notice and comment mandate in § 7-509 of the Environment Article, the Defendant City published notice of the proposed RAP for both VCP applications in the Baltimore Sun on May 14, 2011 and May 21, 2011.

67.     In an effort to satisfy the public participation mandate in § 7-509(c) of the Environment Article, Defendant MDE held a public information meeting on the Defendant City's combined RAP at the Harbor Hospital in Baltimore Maryland on June 1, 2011.

68.     Defendant City's "combined RAP" contained a cursory and incomplete analysis of the contamination at the Properties, prematurely selected "cleanup" methods which would be the least expensive and thus the most attractive to a future developer and failed to include an implementation schedule as mandated by § 7-508 of the Environment Article.  Defendant City justified these deficiencies by stating in the RAP's "Overview" that "the RAP is intended to be general enough so that a future developer can alter that approach and maintain appropriate environmental responses."

69.     Despite the deficiencies in the aforementioned RAP, Defendant MDE issued a final RAP Approval Letter to Defendant City on September 15, 2011 which approved the "combined RAP" submitted pursuant to Defendant City's VCP applications.

70.     Inconsistent with the requirements of the Environment Article §7-511(c), Defendant MDE's September 15, 2011 RAP Approval Letter erroneously stated that, among other things, "no further action will be required to accomplish the objectives set forth in the approved revised RAP other than those actions described therein."

71.     On or about July 31, 2012, the Maryland Video Lottery Terminal Facility Location Commission awarded Defendant CBAC Gaming a video lottery operation license, subject to several contingencies, for the purpose of developing

and operating the proposed Harrah's Baltimore Casino and ancillary facilities at the Properties.

72.     Pursuant to the contingencies associated with Defendant CBAC Gaming's license award, Defendant CBAC Gaming and Defendant City entered into a Ground Lease Agreement ("GLA") and Land Disposition Agreement ("LDA") for the Gateway South Phase I Properties and the Warner Street Properties, respectively. *See* GLA attached hereto as Exhibit I; *See* LDA attached hereto as Exhibit H.

73.     The GLA and LDA were approved by the Baltimore City Board of Estimates and executed by Defendant CBAC Gaming and Defendant City on or about October 31, 2012.

74.     Pursuant to the terms of the GLA and LDA, Developer CBAC Gaming agreed to buy or lease the Properties "as is," agreed to participate in the VCP, and acknowledged receipt of Defendant City's approved RAP which is represented as "providing a blueprint for conducting the required environmental remediation of the Property."

75.     The GLA and LDA authorize Defendant CBAC Gaming to modify the terms of Defendant City's approved RAP subject to the condition that "any modifications to the RAP must be negotiated between Developer and MDE."

76.     The GLA and LDA authorize Defendant CBAC Gaming to cap its costs for remediating the Properties to Two Million Dollars ($2,000,000.00). If Defendant CBAC Gaming's remediation costs exceed $2,000,000.00, Defendant City agreed to reduce Defendant CBAC Gaming's rental payments by one-half (i.e., up to $1,000,000.00).

77.     The GLA and LDA also authorize Defendant CBAC Gaming to terminate the Agreements if CBAC Gaming projected its remediation costs to exceed Four Million Dollars ($4,000,000.00).

78.     Defendant City, through the GLA and LDA, entered into an agreement with Defendant CBAC Gaming where the City had substantial financial motivation to ensure the remediation costs for the Site were minimalized.

79.     Defendant MDE permitted Defendants City and CBAC Gaming to bypass regulatory guidelines and statutory requirements to begin construction prior to any public inspection or comments to the plans for the Site and prior to the implementation of a final RAP.

80.     The actions of Defendants MDE and CBAC Gaming are a severe and abrupt deviation of established requirements as compared to other similarly situated VCP sites, such as the recent Harbor Point Development.

81.     Harbor Point Development was completed on previously under-utilized parcels of land that had been contaminated by decades of industrial use.

The site situated between the Inner Harbor and Fells Point had previously been used by Allied Shield, a chemical company that used the property to manufacture and store bulk chemicals.

82.     Defendant MDE required the developers of Harbor Point to fully remediate the contaminated area at a cost of approximately One Hundred Million Dollars ($100,000,000.00).  The remediation included a complete removal of all contaminated soil and groundwater as well as an underground concrete barrier to prevent any contaminants from seeping to the surface or into the Baltimore Harbor.

83.     Harbor Point is demographically opposite to Westport, Harbor Point is predominantly upper-middle/upper class Caucasian residents. Westport is predominantly low/low-middle class African-American residents.

84.     On July 7, 2012, Defendant CBAC Gaming submitted a VCP application to Defendant MDE which proposed to remediate the Gateway South Phase I Properties and Warner Street Properties and requested liability protection as an Inculpable Person upon completion.

85.     Defendant MDE failed to notify the public of Defendant CBAC Gaming's July 2012 VCP Application on its website as required by § 7-506 of the Environment Article.

86.     Defendant CBAC submitted Phase I and II ESAs along with the VCP application that were identical to the defective ESAs submitted by Defendant City three (3) years prior in 2008 and 2009.

87.     Despite no final RAP approval, Defendant CBAC gaming began construction and soil disturbance at the Site in March 2013.

88.     Despite the MDE's Guidance Document requirement for all VCP applicants to update ESAs that are "more than one year old," the only environmental assessments contained in Defendant CBAC Gaming's VCP application were copies of the ESAs prepared and submitted with Defendant City's VCP applications more than three (3) years prior in 2008 and 2009.

89.     Despite the MDE's Guidance Document's requirement for all VCP applicants to update all sampling data that is "more than one year old," Defendant CBAC Gaming's VCP application did not update the sampling data referenced in the ESAs.

90.     As part of its July 2012 submission, Defendant CBAC Gaming also submitted a proposed RAP for the Site entitled "Response Plan Amendment". Defendant CBAC Gaming's VCP application and proposed RAP stated that it intended to "use" and "build upon" the Defendant City's approved RAP as part of its VCP application and RAP submissions.

91.    Defendant CBAC Gaming did not request MDE approval to transfer Defendant City's RAP Approval Letter and did not propose to implement Defendant's City's RAP approved by Defendant MDE.  Rather, Defendant CBAC Gaming submitted a different proposed RAP prepared by its own environmental consultants, Defendant Urban Green Environmental, for MDE's review and approval by MDE.

92.    Defendant CBAC Gaming's proposed RAP contained extensive modifications to the cleanup criteria, cleanup approaches, and implementation and completion measures which were contained in the City's approved RAP and which provide the Plaintiffs, the public health and the environment with even less protections.

93.    The majority of the modifications contained in the Defendants CBAC Gaming RAP reduced its cleanup obligations in order to minimize its remediation costs.

94.    Defendant CBAC Gaming's RAP ignores the potential for dangerous toxins to migrate from the contaminated sites into neighboring properties, groundwater and/or the Middle Branch of the Patapsco River.

95.    Defendant CBAC Gaming's RAP merely provides for capping of the toxic soil with a layer of concrete, asphalt, or top soil as the sole remediation requirement.

96.     Defendant CBAC Gaming's RAP ignores the need for excavation and proper management of contaminated soil, avoids groundwater remediation, minimizes the standards required for covering the contamination at the Site and limits the construction of a necessary vapor barrier system to a nominal portion of the Site.

97.     Defendant CBAC Gaming's RAP does not account for adverse impacts associated with groundwater flow, velocity or contaminants transported off-site through leaching, migration, or construction created pathways.

98.     Defendant CBAC Gaming's RAP contains no remedy to prevent the contaminated groundwater at the Site from discharging into and contaminating the surrounding ecosystem, including, *inter alia,* the adjacent Waterfront Parcels, which contain sensitive habitat protection areas and wetlands, and the Middle Branch of the Patapsco River.

99.     Defendant CBAC Gaming's RAP ignores high levels of hazardous substances identified in the soils and fails to adequately investigate and analyze the appropriate level of cleanup that is necessary to protect human health and the environment.

100.    Soil samples taken at the Site establish the presence of "hot spots" which, if excavated, will be classified as "hazardous waste" under applicable federal and state laws; however, Defendant CBAC Gaming's RAP only proposes to cover

(or "cap") hot spots with standard construction materials (i.e., concrete, asphalt or landscaping). The RAP does not require the removal of the hazardous soil and/or the use of low permeability construction materials or construction techniques to prevent the movement of storm water into the hot spots and into the groundwater.

101. Although Defendant CBAC Gaming's development-related construction activities include installing certain below-grade utilities (e.g., water, storm water and sewer) at the Site, the RAP contains no measures to avoid disturbance of contaminated soil and infiltration of groundwater to prevent the adverse impacts associated with such installations at the Site and/or surrounding environment.

102. The incomplete and inadequate environmental investigations and remediation techniques proposed by Defendant CBAC Gaming, and authorized by MDE, fail to address and remedy the exposure of persons and ecosystems, including, but not limited to, wildlife, fish and other aquatic life in the surrounding area to contaminated soil, groundwater and vapor, and/or releases of hazardous substances into the surrounding environment, including the publically-used Waterfront Parcels and the degraded Middle Branch of the Patapsco River.

103. By letter dated August 10, 2012, Defendant MDE approved Defendant CBAC Gaming's VCP application for the Properties and affirmed Defendant CBAC Gaming's Inculpable Person Status.

104.    Defendant MDE's August 10, 2012 application approval letter also acknowledged receipt of Defendant CBAC Gaming's proposed RAP and stated that it would review the proposed RAP.

105.    Rather than requiring Defendant CBAC Gaming to take new soil and groundwater samples to complete its VCP application, as required by MDE's Guidance Document, MDE only required CBAC Gaming to prepare and submit sampling data for two limited purposes: evaluating groundwater contamination for light non-aqueous phase liquids and conducting supplemental vapor emission testing and analysis for heptachlor.

106.    Although Defendant MDE conducted several rounds of review and issued numerous comments on CBAC Gaming's proposed RAP which enumerated necessary Plan modifications, MDE did not issue a public notice and comment period or hold a public information hearing as required by § 7-509 of the Environment Article.

107.    In or around August 2012, Defendant MDE provided Defendant CBAC Gaming with written comments on its proposed RAP which included 14 enumerated modifications necessary to receive RAP approval. Defendant MDE stated in its written comments that, *inter alia,* "[t]he VCP understands that this [RAP] amendment is intended to supersede the previously approved RAP [submitted by Baltimore City] entirely" and directed Defendant CBAC Gaming to

"revise the Section 1.1 Purpose and Scope to state clearly that this will supersede the previously approved RAP...." *See* Exhibit M.

108.    After reviewing revised RAPs prepared and submitted by Defendant CBAC Gaming, Defendant MDE approved CBAC Gaming's proposed RAP dated November 2012, for the Properties and issued CBAC Gaming a final RAP Approval Letter dated November 27, 2012. *See* Exhibit O.

109.    Defendant CBAC Gaming did not publish notice of its proposed RAP as required by § 7-509(a) of the Environment Article and did not otherwise provide the public with notice of the Proposed RAP.

110.    Defendant MDE did not issue a public notice and comment period or solicit written comments on Defendant CBAC Gaming's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(b) of the Environment Article.

111.    Defendant MDE did not hold a public information meeting on Defendant CBAC's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(c) of the Environment Article.

112.    As a result of the above procedural deficiencies, Defendant MDE did not consider written comments submitted by the public regarding the contents of CBAC Gaming's RAP prior to issuing its November 27,2012 RAP Approval Letter as mandated by § 7-511(a) of the Environment Article.

113.    Defendant MDE failed to follow the procedure set forth in § 7-509 of the Environment Article to notify the public and open communication channels to consider public comments, and improperly permitted Defendant CBAC Gaming to begin construction at the Site on March 6, 2013.  *See* Exhibit K.

114.    Defendant MDE, as a result of allowing Defendant CBAC Gaming to commence construction prematurely, received numerous public complaints from environmentalists, lawyers, and concerned citizens, thereby resulting in the MDE reconsidering its position and conducting a public hearing.

115.    Defendant MDE conducted a public hearing regarding Defendant CBAC Gaming's RAP on April 11, 2013.

116.    Defendant MDE permitted Defendant CBAC Gaming to continue construction at all times before, during and after the public meeting, thereby making any public concern and/or comment a sham.   Such action by MDE permitted Defendant CBAC to release contaminants into the environment.

117.    Defendant MDE failed to permit the public to fully express concern at the public hearing by cutting the meeting short before many citizens were permitted to talk, claiming that the air conditioner in the room cuts off automatically two (2) hours after the start of the meeting.  See Exhibit N.

118.    Defendant MDE made a request to Defendant CBAC Gaming to make 15 amendments to the approved RAP, but MDE claimed that the amendments were

not substantial and, therefore, not subject to the public notification required by § 7-509 of the Environment Article, denying Plaintiffs their statutory right of notice and meaningful opportunity to participate in Defendant CBAC Gaming's VCP application. *See* Exhibit L.

119.    Defendant MDE's attempt to satisfy their statutory requirement by conducting a hearing after, and while, construction was ongoing fails to cure their previous violation of § 7-509 of the Environment Article.

120.    In furtherance of these construction goals, Defendant CBAC Gaming filed several permit applications with Defendant City to obtain approval to commence construction at the Site including an excavation permit application (COM2012-24074 or Project No. 2012-2121) which was filed on or about November 16, 2012.

121.    Pursuant to the terms of Defendant CBAC Gaming's approved RAP, CBAC Gaming must also submit final development plans for the Site and a "detailed implementation schedule" to Defendant MDE for review and approval as a "RAP Addendum" prior to initiating any activities under the RAP.

122.    Defendant CBAC Gaming submitted through its agent Defendant Urban Green, a Revised RAP that is deficient and deviated substantially from professional standards, Defendant MDE approved the aforementioned RAP while overlooking the numerous deficiencies in violation of the VCP.

123.   Defendant CBAC Gaming's RAP fails to provide for sufficient testing contamination controls and protections to the environment.

124.   Defendant CBAC Gaming's RAP attempts to suppress crucial data that is important to the extent of remediation needed at the Site by omitting factors from the body of the text of the RAP and using an incomprehensible appendix which generally requires professional training to sufficiently understand.

125.   Defendant CBAC Gaming's RAP makes conclusions based on incomplete or partial data that require factual inferences that are inconsistent with accepted standards.

126.   Defendant CBAC Gaming's RAP fails to account for the transmission or potential transmission of contaminated compounds into the environment and ecosystem, and focuses solely on the potential impact of future workers and patrons of the Site.

127.   Defendant MDE has approved a RAP that fails to require any remediation of an admittedly highly toxic Site.

128.   Remediation, as defined by environmental scientists, is the action of remedying, by reversing or stopping, the damage to the environment.

129.   Defendants CBAC Gaming, City, and MDE have failed to provide any meaningful plan to reverse or stop the environmental damage caused by the contaminated Site, thereby violating various State and Federal laws.

130.   Defendant Whiting-Turner ("WT") is the general construction manager and is responsible for oversight and implementation of the approved RAP to ensure compliance.

131.   Defendant WT and Defendant CBAC Gaming have established construction plans that are in violation of the MDE approved RAP, as well as State and Federal Law.

132.   Defendant WT's construction plans call for the removal of any standing water that occurs in any excavation area to be dewatered into portable tanks and discharged into sewer drains or directly into tidal waters.

133.   Defendant WT permitted workers to interact, handle, manipulate, inhale, and otherwise be exposed to contaminated soil and groundwater without protection.

134.   Defendant WT, through their actions and the actions of their agents, have contributed to the accelerated migration and flow of dangerous toxins and contaminants to neighboring properties and the environment.

135.   Defendant WT's construction plans call for the implementation of water, sewer and electrical infrastructure to be built below grade where the contaminated soil is present, and thereby creating a conduit to which contaminated materials may flow through the groundwater to neighboring properties and/or the Patapsco River.  *See* Exhibit N.

136.   Defendant WT's construction plans call for the construction of structures within protected tidal and non-tidal wetlands without prior permission from the United States Department of Agriculture, Natural Resources Conservation Services ("NRCS"), or Defendant Environmental Protection Agency ("EPA").  *See* Exhibit N

137.   Defendant MDE entered into a Cooperative Memorandum of Agreement ("MOA") with Defendant EPA that defined the responsibilities with respect to activities regarding the redevelopment of contaminated properties known as "brownfields".  The Site is considered a "brownfield."

138.   The MOA was entered into for the purpose of protecting the public health and environment from under-utilized sites where hazardous materials have been released.

139.   The MOA gives MDE authority to use their resources to assure an appropriate response action plan is established and implemented to protect the public health and environment.

140.   The EPA and MDE have concurrent power to regulate the redevelopment of "brownfields," and the MOA was signed to assure a cooperative plan to protect the public health and environment that are mutually complementary and are not duplicative.

141.   The MOA states that MDE would have authority over the redevelopment of "brownfields" if the site has not been listed on the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund") or listed on the National Priorities List ("NPL").

142.   The MOA states that the EPA would have authority over the redevelopment of "brownfields" that the EPA determines the site possess an imminent and substantial danger to an emergency situation, the site scores a 28.5 or higher using a CERCLA Hazard Ranking System, or is subject to corrective action under the Resources Conservation and Recovery Act ("RCRA").

143.   Defendant MDE failed to conduct any meaningful public discussion regarding the Gateway Redevelopment Project thereby violating the MOA with Defendant EPA.

144.   Defendant EPA failed to enforce the terms of the MOA by requiring that Defendant MDE to properly inform the public and open up communication channels prior to making any substantial decisions regarding the redevelopment of the Site.

145.   Defendants EPA and MDE have excluded a predominately poor, African-American community from any meaningful public participation in a brownfield redevelopment project that has the potential to cause serious and irreparable harm to their health and environment.

## COUNT I
(Declaratory Judgment)

124.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 123 as if fully set forth herein.

125.   This is an action for declaratory judgment for the purpose of determining a question of actual controversy between the parties and terminating uncertainty and controversy giving rise to this proceeding, as hereinafter more fully appears.

126.   Plaintiffs are residents of Baltimore City who live in close proximity to the Site and who use the trails and waterways, including the Middle Branch of the Patapsco River, adjacent to the Site.

127.   The Maryland General Assembly has specifically declared that it is the public policy of the State of Maryland that "The protection, preservation, and enhancement of the State's diverse environment is necessary for the maintenance of the public health and welfare and the continued viability of the economy of the State and is a matter of the highest public priority." *Maryland Annotated Code*, Natural Resources Art. § 1-302 (Repl. Vol. 2012).   The public policy of the State of Maryland further expressly mandates that "All State agencies must conduct their affairs with an awareness that they are stewards of the air, land, water, living and historic resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations." The General Assembly

has expressly recognized that "each person has a fundamental and inalienable right to a healthful environment, and each person has a responsibility to contribute to the protection, preservation, and enhancement of the environment." *Maryland Annotated Code*, Natural Resources Art. § 1-302 (Repl. Vol. 2012).

128.   The General Assembly of the State of Maryland has expressly stated the public policy of the State of Maryland and declared "that the natural resources and scenic beauty of the State of Maryland are in danger of irreparable harm occasioned by the use and exploitation of the physical environment.  It further finds that the improper use and exploitation constitute an invasion of the right of every resident of Maryland to an environment free from pollution to the extent possible." *Maryland Annotated Code*, Natural Resources Art. § 1-502 (Repl. Vol. 2012).

129.   The Maryland General Assembly has declared that "Because the quality of the waters of this State is vital to the public and private interests of its citizens and because pollution constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, and the problem of water pollution in this State is closely related to the problem of water pollution in adjoining states, it is State public policy to improve, conserve, and manage the quality of the waters of the State and protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish

and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses.  Also, it is State public policy to provide that no waste is discharged into any waters of this State without first receiving necessary treatment or other corrective action to protect the legitimate beneficial uses of this State's waters, ...."  *Maryland Annotated Code*, Environment Art. § 4-402.

130.    The RAP submitted by Defendant CBAC and approved by MDE demonstrates extensive contamination of the Site including the presence of arsenic and other metals and chlorinated solvents.  The RAP is insufficient to determine the full extent of the contamination of the Site and the full extent of the movement of the contamination through the soil and groundwater.  The construction activities at the Site, which have begun, include soil disturbance and subsurface activities that are disturbing the known contaminants at the Site.  The RAP contains several errors and omissions about the level of arsenic and other contaminants when compared with prior Site assessments performed in or around 2000.  The RAP improperly fails to consider the site assessments performed in 2000 and results in a faulty conclusion concerning the extent of the contamination of the Site.  The RAP relies upon partial data from investigations performed in 2007 and 2009 at different locations at the Site than the investigations in 2000 that revealed severely elevated levels of arsenic and other contaminants.  The result of the inadequate investigation relied upon in the RAP is a misleading conclusion that the Site has less contamination and thus

misstates the amount and type of remediation necessary to contain the known contamination at the Site.

131.    Defendant MDE failed to its own adhere to applicable mandates that require a RAP to include data and investigation that is no more than one (1) year old.

132.    The RAP approved by Defendant MDE does nothing to protect the environment, ecosystem, wildlife, plant life, and people using the Middle Branch of the Patapsco River and the park and trails adjacent to the Site.

133.    The construction plans for the Site call for disturbance of the contaminated soil five feet from the surface which will impact the existing groundwater at the Site and any contamination has a strong likelihood of entering the groundwater and traveling to adjacent properties and into the Middle Branch of the Patapsco River.

134.    In their own construction plans, Defendant CBAC Gaming has instructed its workers to remove potentially contaminated water and to dump the same into the sewers and/or tidal waters.  *See* Exhibit Q.

135.    The failure to properly contain the known contamination will impact the Patapsco River by increasing the level of contamination in the River.  The failure to property contain the known contamination at the Site will impact the Plaintiffs' health in raising the contamination in the fish in the Patapsco River that are eaten

by the Plaintiffs.  The paths and wetlands adjacent to the Site will be exposed to higher contamination as the contamination enters the groundwater and rises to the surface and the Plaintiffs using the paths will be exposed to contamination.

136.   In order to prevent the known contaminants from traveling from the Site into the groundwater and into the Middle Branch of the Patapsco River, construction must be halted and more extensive testing performed at the Site.  A revised RAP is necessary to delineate the extensive contamination and map the groundwater to prevent the spread of the known contaminants and other revisions to the RAP to prevent the risk of contaminants entering the Patapsco River and adversely affecting the health of the Plaintiffs and the health of the environment.

137.   Defendants contend that the RAP is sufficient and provides for sufficient to containment of the known contamination at the Site.  As set forth above, Plaintiffs contend that the RAP is misleading and fails to adequately evaluate the risk of spreading the known contamination during the course of construction.

138.   Plaintiffs are entitled to a declaration from this Court as to the validity and sufficiency of the RAP and the rights and obligations of the Defendants in containing the known contamination during construction and having additional investigations performed to evaluate the locations set forth in the 2000 investigations that were ignored by the RAP and to declare the rights of the Plaintiffs

in connection with the risk of contamination spreading to the Patapsco River and other areas adjacent to the Site that are used by the Plaintiffs.

139.   There exists an actual controversy of a justiciable issue between Plaintiffs and Defendants within the jurisdiction of this Court, involving the rights and liabilities of the parties.  This action challenges Defendants' approval, funding and construction at the Site without proper investigation, and request testing of the Site to determine the level of contamination and the risk of movement of the contamination off the Site.

140.   Antagonistic claims are present between the parties.  These claims indicate imminent and inevitable litigation.

141.   A declaratory judgment by this Court will terminate this controversy.

WHEREFORE, Plaintiffs move this Honorable Court:

A.      to determine and adjudicate the rights and liabilities of the parties with respect to the RAP, VCP and the Site and the containment and remediation of the known contaminants at the Site;

B.      to declare that the  RAP is insufficient and that the Site requires further investigation and testing to determine the proper method of containment and remediation of the known contamination at the Site;

C.      That this Honorable Court award to Plaintiffs their reasonable attorneys' fees and the costs of these proceedings; and

D.     That this Honorable Court award to Plaintiffs such other and further

relief as their cause may require.

## COUNT II
(Violation of Title VI of the Civil Rights Act of 1964)

142.    Plaintiffs incorporate by reference the allegations set forth in

Paragraphs 1 through 141 as if fully set forth herein.

143.    Title VI of the Civil Rights Act of 1964 is codified at 42 U.S.C. §

2000d and provides in pertinent part that "no person in the United States shall, on

the ground of race … be subjected to discrimination under any program or activity

receiving Federal financial assistance."

144.    The VCP program utilized by Defendant Baltimore City that involves

the Site receives Federal financial assistance.

145.    Defendant Baltimore City has a pattern of intentional discrimination

in the siting of undesirable industry that causes toxic contamination near

predominantly African-American communities within the boundaries of Baltimore

City, such as the Site at issue in this case.

146.    Defendant MDE, by approving and permitting RAPs for the VCP of

such contaminated sites within the boundaries of Baltimore City near predominately

African-American communities without requiring proper investigation of the

contaminated sites and remediation of the contaminated sites is engaging is a pattern

of intentional discrimination against those predominantly African-American communities.

147.    Plaintiffs are African-American and reside in the predominantly African-American communities of Westport and Cherry Hill in Baltimore City.

148.    Defendants MDE and Baltimore City pursued a plan to prevent public comment and participation of Plaintiffs in discussions concerning the RAP for the Site at a meaningful point in the process.

149.    The approval of the deficient RAP has a disparate impact on the predominantly African-American communities of Westport and Cherry Hilland in particular upon Plaintiffs and other similarly situated members of the predominantly African-American communities of Westport and Cherry Hill.

150.    The submission of the deficient RAP by Defendants CBAC Gaming and approval of the Defendants RAP by Defendants MDE and Baltimore City and allowance of construction without proper investigation of the Site constitutes an ongoing intentional violation of Title VI of the Civil Rights Act of 1964. Defendants MDE, City and CBAC Gaming, by their regulations, custom and actions have failed and refused to terminate and abolish such discriminatory practices.  The injury to Plaintiffs is continuous, great and irreparable; is calculated to affect and does affect, their health, rights and privileges as citizens of the United States.

151.   By this suit and proceeding, Plaintiffs seek to redress the deprivation by Defendant Secretary Summers in his official capacity as director of MDE, and as an officer of the State of Maryland, Defendant Rawlings-Blake in her official capacity as Mayor, City and CBAC Gaming, under color of state law and of regulation, custom, or usage of Plaintiffs civil rights, privileges, and immunities secured to them by the laws of the United States.

152.   Defendants MDE, City and CBAC Gaming's conduct, as aforesaid, is illegal, and is in violation of Plaintiffs' rights and privileges, as guaranteed by the Constitution of the United States and the Civil Rights Act, and in pursuance of their unlawful conduct to injure and oppress Plaintiffs herein in the free exercise and enjoyment of their rights and privileges as secured and guaranteed to them as citizens of the United States by the Constitution of the United States, as particularly provided under the Fourteenth Amendment, and under the said Civil Rights Act. Plaintiffs are entitled to such equal protections, advantages and privileges, and to equal treatment and rights with other persons of the United States, in the use and enjoyment of lands and waterways adjacent to the Site and near their community free from contamination and to the equal protection of the laws in their use and enjoyment of said privileges as provided and afforded to other persons.

153.   This action is brought on behalf of Plaintiffs and other persons of African-American descent, all citizens of the United States of America, residing in

close proximity to the Site in the communities of Westport and Cherry Hill.  The questions involved in this proceeding are those of a common and general interest, the parties numerous, and it is impractical to bring all of them before the court. Therefore, the Plaintiffs sue for the benefit of all.

154.    This action is brought under the provisions of the Judicial Code of the United States, 28 U.S.C. § 1343, to prevent the Defendants from unlawfully interfering with the Plaintiff's rights to the equal protection of the laws and to due process of law, and under the provisions of the Civil Rights Act.

155.    Plaintiffs have no plain, speedy or adequate remedy at law.  Plaintiffs are suffering great and irreparable damages, for the reasons herein alleged.

WHEREFORE, Plaintiffs move this Honorable Court:

(a)     To enter an Order that would grant Plaintiffs a temporary restraining order restraining and enjoining Defendants CBAC, LLC, Mayor Rawlings-Blake in her official capacity as Mayor of Baltimore City, Baltimore City, Secretary Summers in his official capacity as Director of the Maryland Department of the Environment, and Maryland Department of the Environment and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off

the site and into the groundwater and until further Order of the Court is entered permitting further construction; and

(b)     Issue an Order granting a preliminary injunction restraining and enjoining Defendants CBAC, LLC, Mayor Rawlings-Blake in her official capacity as Mayor of Baltimore City, Baltimore City, Secretary Summers in his official capacity as Director of the Maryland Department of the Environment, and Maryland Department of the Environment and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off the site and into the groundwater and a revised RAP is prepared and approved after full public comment; and

(c)     That the requirement of a surety or other security for bond be waived; and

(d)     Grant Judgment in favor of Plaintiffs against Defendants CBAC, LLC, and Baltimore City, in the amount of $100,000,000.00, plus interest and costs.

(e)     Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT III
(Violation of the Civil Rights Act § 1983)

156.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 155 as if fully set forth herein.

157.    42 U.S.C. § 1983 provides in pertinent part "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress…."

158.    The Defendants MDE, City and CBAC Gaming, by their regulations, custom and actions have failed and refused to terminate and abolish such discriminatory practices.   The injury to Plaintiffs is continuous, great and irreparable; is calculated to affect and does affect, their health, rights and privileges as citizens of the United States.

159.    By this suit and proceeding, Plaintiffs seek to redress the deprivation by Defendant Secretary Summers in his official capacity as director of MDE, and as an officer of the State of Maryland, Defendant Rawlings-Blake in her official capacity as Mayor, City and CBAC Gaming, under color of state law and of

regulation, custom, or usage of Plaintiff's civil rights, privileges, and immunities secured to them by the laws of the United States.

160.   Defendants' conduct, as aforesaid, is illegal, and is in violation of Plaintiffs' rights and privileges, as guaranteed by the Constitution of the United States and the Civil Rights Act, and in pursuance of their unlawful conduct to injure and oppress Plaintiffs herein in the free exercise and enjoyment of their rights and privileges as secured and guaranteed to them as citizens of the United States by the Constitution of the United States, as particularly provided under the Fourteenth Amendment, and under the said Civil Rights Act.   Plaintiffs are entitled to such equal protections, advantages and privileges, and to equal treatment and rights with other persons of the United States, in the use and enjoyment of lands and waterways adjacent to the Site and near their community free from contamination and to the equal protection of the laws in their use and enjoyment of said privileges as provided and afforded to other persons.

161.   This action is brought on behalf of Plaintiffs and other persons of African-American descent, in such communities, all citizens of the United States of America, residing in close proximity to the Site in the community of Westport and Cherry Hill.   The questions involved in this proceeding are those of a common and general interest, the parties numerous, and it is impractical to bring all of them before the court.   Therefore, the Plaintiffs sue for the benefit of all.

162.    This action is brought under the provisions of the Judicial Code of the United States, 28 U.S.C. § 1343, to prevent the Defendants from unlawfully interfering with the Plaintiffs rights to the equal protection of the laws and to due process of law, and under the provisions of the Civil Rights Act.

163.    Plaintiffs have no plain, speedy or adequate remedy at law.  Plaintiffs are suffering great and irreparable damages, for the reasons herein alleged.

WHEREFORE, Plaintiffs move this Honorable Court:

(a)    to enter an Order that would grant Plaintiffs a temporary restraining order restraining and enjoining Defendants CBAC Gaming, LLC, Mayor Rawlings-Blake in her official capacity as Mayor of Baltimore City, Baltimore City, Secretary Summers in his official capacity as Director of the Maryland Department of the Environment, and Maryland Department of the Environment and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off the site and into the groundwater and until further Order of the Court is entered permitting further construction; and

(b)    Issue an Order granting a preliminary injunction restraining and enjoining Defendants CBAC Gaming, LLC, Mayor Rawlings-Blake in her official capacity as Mayor of Baltimore City, Baltimore City, Secretary Summers in his

official capacity as Director of the Maryland Department of the Environment, and Maryland Department of the Environment and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off the site and into the groundwater and a revised RAP is prepared and approved after full public comment; and

(c)     That the requirement of a surety or other security for bond be waived; and

(d)     Grant Judgment in favor of Plaintiffs against Defendants CBAC Gaming, LLC, and Baltimore City, in the amount of $100,000,000.00, plus interest and costs.

(e)     Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT IV
(Violation of the Fourteenth Amendment)

164.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 163 as if fully set forth herein.

165.    The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the

privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

166.    The Defendants MDE and Baltimore City by their regulations, custom and actions have failed and refused to terminate and abolish such discriminatory practices.  The injury to Plaintiffs is continuous, great and irreparable; is calculated to affect and does affect, their health, rights and privileges as citizens of the United States.

167.    By this suit and proceeding, Plaintiffs seek to redress the deprivation by Defendant Secretary of MDE herein as officer of the State of Maryland, and Defendant City under color of state law and of regulation, custom, or usage of Plaintiffs' civil rights, privileges, and immunities secured to them by the laws of the United States.

168.    Defendants' conduct, as aforesaid, is illegal, and is in violation of Plaintiffs' rights and privileges, as guaranteed by the Constitution of the United States and the Civil Rights Act, and in pursuance of their unlawful conduct to injure and oppress Plaintiff herein in the free exercise and enjoyment of their rights and privileges as secured and guaranteed to them as citizens of the United States by the Constitution of the United States, as particularly provided under the Fourteenth Amendment, and under the said Civil Rights Act.  Plaintiffs are entitled to such

equal protections, advantages and privileges, and to equal treatment and rights with other persons of the United States, in the use and enjoyment of lands and waterways adjacent to the Site and near their community free from contamination and to the equal protection of the laws in their use and enjoyment of said privileges as provided and afforded to other persons.

169.   This action is brought on behalf of the Plaintiffs and other persons of lower income and/or African-American descent, all citizens of the United States of America, residing in close proximity to the Site in the community of Westport and Cherry Hill.  The questions involved in this proceeding are those of a common and general interest, the parties numerous, and it is impractical to bring all of them before the court.  Therefore, the Plaintiffs sue for the benefit of all.

170.   This action is brought under the provisions of the Judicial Code of the United States, 28 U.S.C. § 1343, to prevent the Defendants from unlawfully interfering with the Plaintiffs rights to the equal protection of the laws and to due process of law, and under the provisions of the Civil Rights Act.

171.   Plaintiffs have no plain, speedy or adequate remedy at law.  Plaintiffs are suffering great and irreparable damages, for the reasons herein alleged.

WHEREFORE, Plaintiffs moves this Honorable Court:

(a)     To enter an Order that would grant Plaintiffs a temporary restraining order restraining and enjoining Defendants CBAC Gaming, LLC, Mayor Rawlings-

Blake in her official capacity as Mayor of Baltimore City, Baltimore City, Secretary Summers in his official capacity as Director of the Maryland Department of the Environment, and Maryland Department of the Environment and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off the site and into the groundwater and until further Order of the Court is entered permitting further construction; and

(b)     Issue an Order granting a preliminary injunction restraining and enjoining Defendants CBAC Gaming, LLC, Mayor Rawlings-Blake in her official capacity as Mayor of Baltimore City, Baltimore City, Secretary Summers in his official capacity as Director of the Maryland Department of the Environment, and Maryland Department of the Environment and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off the site and into the groundwater and a revised RAP is prepared and approved after full public comment; and

(c)     That the requirement of a surety or other security for bond be waived; and

(d)     Grant Judgment in favor of Plaintiffs against Defendants Maryland Department of the Environment and Baltimore City, in the amount of $100,000,000.00, plus interest and costs.

(e)     Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

**COUNT V**
**Violation of the Clean Water Act, 33 U.S.C. 1251 et. seq.**
**(Against Defendants City, CBAC Gaming, and MDE)**

171.    Plaintiffs incorporate by reference and re-alleges the allegations contained in Paragraphs 1 through 170, as if fully set forth herein below.

172.    Section 301 of the Clean Act ("CWA"), 33 U.S.C. § 1311, prohibits any person from discharging a pollutant into navigable waters from any point source, except in compliance with certain sections of the Act, including Section 301 of the Clean Water CWA § 402.

173.    The Defendants are defined as "persons" under § 502(5), 33 U.S.C. § 1362(5), of the CWA, as CBAC Gaming and WT are registered corporations in the State of Maryland, and MDE is an agency of the State, respectively.

174.    Defendants through their actions or omissions have continuously and continue to discharge toxins into the Middle Branch of the Patapsco River. Defendants have been discharging contaminated soil, groundwater, and surface

water are "pollutants" under CWA § 502(6), 33 U.S.C. § 1362(6) because it is a solid waste discharged into water, i.e. the Middle Branch, and wetlands.

175.   The daily and continual activity at the Site has caused the "discharge of pollutants" under CWA §§301 and 402, 33 U.S.C. §§ 1311 and 1342, respectively, because it results in the "addition" of pollutants to the Middle Branch of the Patapsco River, groundwater, and wetlands.

176.   The Middle Branch of the Patapsco River is tributary of the Chesapeake Bay and is "navigable waters" under CWA § 502(7), 33 U.S.C. § 1362(7), and "water[s] of the United States" under 40 C.F.R. § 122.2, as they: (1) can be used by interstate or foreign travelers for recreational purposes; (2) are part of an intrastate stream, the "use, degradation or destruction of which would affect or could affect interstate or foreign commerce" by virtue of the Middle Branch's connection to the Patapsco River and the Chesapeake Bay; and (3) are tributaries of both the Patapsco River and the Chesapeake Bay, both of which are interstate waters capable of use in both commerce and recreation.

177.   The wetlands within and surrounding the Site constitute "navigable water" under CWA § 502(7), 33 U.S.C §1362(7), and a "water of the United States" under 40 C.F.R. § 122.2, as it: (1) can be used by interstate or foreign travelers for recreational purposes, and (2) is adjacent to Middle Branch of the Patapsco River and its tributaries, which are navigable waters.

178.    The Clean Water Act prohibits any point source pollutant from being discharged into the waters of the United States.  The Site is a "point source" under CWA § 502(14), 33 U.S.C. § 1362(14), because it is a discernible, confined, and discrete conveyance that directs the contaminated soil, heavy metals and chlorides from the construction area in the direction of the Middle Branch of the Patapsco River.

179.    CWA § 402, 33 U.S.C. § 1342, governs the issuance of National Pollution Discharge Elimination System ("NPDES") permits, which are required for the lawful discharge of pollutants into navigable waters from a point source.

180.    Neither Defendants CBAC Gaming, MDE, nor WT has obtained an NPDES permit under CWA § 402, 33 U.S.C. § 1342, for the discharge of pollutants from a point source into the Middle Branch and the wetlands.

181.    The Defendants have violated CWA §§ 301 and 402, 33 U.S.C. §§ 1311 and 1342, respectively, because they have discharged a pollutant from a point source into navigable waters without an NPDES permit.  The violation has cause Plaintiff and the public in general to suffer substantial and irreparable harm to their health the health of the environment.

182.    Without adequate testing, remediation, and redesign the Site cannot operate without discharging a pollutant into navigable waters.

183.   There is a reasonable likelihood that the Defendants will continue to operated the construction site in violation of CWA § 301 and 402, 33 U.S.C. § 1311 and 1342, respectively, because the Site has not been properly tested for contaminated pathways, remediated, and/or redesigned.

WHEREFORE, Plaintiff respectfully requests this Court to grant the following relief:

A.   Declare Defendants CBAC Gaming, LLC, and Whiting-Turner Contracting Co. to have violated the Clean Water Act, 33 U.S.C. §§1311 and 1342;

B.   Enjoin Defendants EPA and MDE to comply with their respective regulatory mandate by requiring Defendant CBAC Gaming, LLC, and Whiting-Turner Contracting Co. to obtain the proper permit to discharge pollutants into navigable waters, and properly oversee the construction activities to ensure compliance with the Clean Water Act.

C.   Cease the unauthorized discharge of contaminated soil, surface water, and groundwater into the Middle Branch of the Patapsco River.

D.   Cease the illegal collection of standing water from excavation area, and the subsequent discharge into local storm drains or directly into the tidal waters of the Middle Branch of the Patapsco River.

E.   Issue an Order granting a preliminary injunction restraining and enjoining Defendants CBAC Gaming, LLC, Baltimore City, Maryland Department

of the Environment and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off the site and into the groundwater and a revised RAP is prepared and approved after full public comment; and

F.      Grant Judgment in favor of Plaintiffs against Defendants CBAC Gaming, LLC, and Baltimore City, in the amount of $10,000,000.00, plus interest and costs;

G.      Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT VI
## Public Nuisance
### (Against Defendants City, CBAC, MDE, Dept. Agri., and WT)

184.    Plaintiffs incorporate by reference and re-alleges the allegations contained in Paragraphs 1 through 183, as if fully set forth herein.

185.    The Properties owned, operated, maintained and regulated by Defendants have caused dangerous chemical compounds to be released into the Middle Branch of the Patapsco River, portions of the Gwynns Falls Greenway, and neighboring communities exposing the Plaintiffs, and the public in general, to

harmful and toxic quantities of  arsenic, lead, chlorides, hydrocarbons and other carcinogens.

186.   Defendants City, CBAC Gaming, WT and MDE had actual knowledge that the toxins were present prior to choosing the site, and had actual knowledge that disturbing the soil through demolition, grading, and excavation posed a serious and substantial threat to public health and the environment.

187.   Defendants City, CBAC Gaming, WT and MDE failed to take reasonable measures to reduce and/or eliminate the exposure to the environment, Plaintiffs, and public in general as to the toxins, by failing to remediate the Site of contaminated soil and groundwater, failing to properly treat the contaminated soil and groundwater, by failing to accurately notify the public as required by statute, the Defendants acted in an unreasonable manner.

188.   The actions and/or inactions of Defendants City, CBAC Gaming, WT and MDE are a direct and proximate cause of interfering with the environment, the Plaintiffs, and general public.

189.   The Plaintiffs, and public in general have a right to access the waterways of the Chesapeake Bay and its tributaries, including the Patapsco River.

190.   The public in general has a right to access the protected open spaces of the Gwynns Falls Greenway, including the trails and walkways.

191.    The Public in general has a right to healthy and safe environment in which to live and work.

192.    The Plaintiffs are among the class of people that were foreseeably harmed as a direct and proximate cause of the Defendants' unreasonable acts or omissions constituting a public nuisance.

WHEREFORE, the Plaintiffs demand judgment in the amount of One Hundred Million Dollars ($100,000,000.00) against Defendants, jointly and severally, and request this Honorable Court grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT VIII
### (Fraudulent Misrepresentation)

193.    Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1 through 124, as if fully set forth herein.

194.    Defendants CBAC Gaming, City and MDE represented to the public, of which Plaintiffs are a foreseeable class, that VCP Application, Phase I and II ESAs, and Final RAP of the Gateway Redevelopment Project sufficiently and effectively address and remediate volatile and dangerous toxins present at the Site. Defendants devised a scheme that circumvented the statutory public notification requirement of the VCP, and the cooperative agreement between the MDE and EPA.

Furthermore, Defendants CBAC and Urban Green failed to properly report the findings from their ESA in the RAP submitted to the MDE for approval.  Defendant Urban Green's ESA failed to disclose the extent, nature, and levels of contaminates in their report, instead attempting to bury the information in various appendices that require specialized training and expertise to discover.  Defendant MDE possess the specialized training and expertise to discover the deficiencies in the RAP but failed to uphold their public duty and permitted an obviously defective, incomplete and partial RAP to be approved.

195.   Defendant MDE represented to the public that it would hold a hearing to discuss and accept comments from the public regarding the Gateway Redevelopment project.   However, Defendant MDE had permitted Defendant CBAC and WT to begin construction a month prior to holding a public hearing. Defendant MDE failed to provide the Plaintiffs or the public in general the fair and equitable opportunity to express concern regarding the Gateway Redevelopment Project.

196.   Defendants MDE, City, CBAC Gaming, and WT had actual knowledge of the dangerous levels of contaminates present at the Site prior to selecting the Site for redevelopment.  Defendant MDE received ESAs in 2000, 2007, 2008, and 2009 that reported levels of contamination that far exceed the

recommended safe levels as delineated by the EPA and MDE, American Testing and Measurement Society (ATMS).

197.   Defendant City selected a known contaminated Site for development of a casino and represented in a GLA that the location only required a minimum of redial measures before becoming safe for the public health and environment.

198.   Defendant CBAC submitted a RAP that failed to address the remediation needs of the Site and represented to the Plaintiffs and public in general that measures addressed would sufficiently remediate the Site as required in the GLA.

199.   Defendant WT started construction at the Site and began discharging contaminates to the groundwater, wetlands, and Middle Branch of the Patapsco River prior to the completion of the statutory requirements of the VCP were complete, and without proper permits.

200.   Defendant MDE approved the plans under the VCP thereby misrepresenting to the Plaintiffs and public in general that the plans sufficiently accounted for the contaminates present at the Site and established proper remediation methods to protect the public health and environment.

201.   The Defendants participated in the misrepresentation to deprive the Plaintiffs and the general public of a proper remediation plan that removes

dangerous and contaminated soil, surface water, and groundwater from the environment.

202.    The Defendants intentional misrepresentation created an improper financial gain at the expense of the Plaintiffs, the general public, and environment. As a result of the misrepresentation of the Defendants the Plaintiffs suffered substantial harm to their property and health.

WHEREFORE, Plaintiffs respectfully request this Honorable Court grant judgment against Defendants City, MDE and CBAC Gaming LLC, Urban Green, jointly and severally, in the amount of One Hundred Million Dollars ($100,000,000.00), plus punitive damages in the amount of One Hundred Million Dollars ($100,000,000.00), and grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT IX
### Negligence

203.    Plaintiffs incorporate by reference and re-allege the allegations contained in Paragraphs 1 through 202, as if fully set forth herein.

204.    Defendants City, CBAC Gaming, MDE, Urban Green and WT had a duty to properly inspect, assess, plan, and remediated the Site at Gateway Redevelopment Project to contain and/or remediate the dangerous and toxic contaminations.

205.   Defendants City, CBAC Gaming, MDE, Urban Green and WT knew or should have known that the failure to properly remediate the Site prior to beginning construction would result in the release of dangerous contaminants into the environment.  Defendants City, CBAC Gaming, MDE, Urban Green and WT knew or should have known that the release of dangerous and toxic contaminates into the environment would cause real and substantial harm to the public in general.

206.   Defendants City, CBAC Gaming, MDE, Urban Green, and WT deviation from their standard of care is the direct and proximate cause of the Plaintiffs injuries.

207.   It is foreseeable the Plaintiffs would suffer injury as a result of the Defendants' deviation from the applicable standard of care would suffer substantial and pecuniary harm.

WHEREFORE, Plaintiffs respectfully request this Honorable Court grant judgment against Defendants City, MDE and CBAC Gaming LLC, Urban Green, jointly and severally, in the amount of One Hundred Million Dollars ($100,000,000.00), and grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT X
## Breach of Memorandum of Agreement ("MOA") between the MDE and EPA

208.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1 through 207, as if fully set forth herein.

209.   Defendants MDE and EPA entered into a cooperative agreement (MOA) to delineate regulatory authority over the redevelopment of "brownfields".

210.   Defendant MDE breached the conditions of the MOA by failing to provide necessary information to the key stakeholders to allow for informed decision making.

211.   Plaintiffs are, or expected, third party beneficiary of the MOA between the MDE and EPA.

212.   Defendant MDE breach of the MOA is the direct and proximate cause of dangerous toxins entering the environment causing severe and extensive damage to the Plaintiffs and the environment.

WHEREFORE, Plaintiffs respectfully request this Honorable Court grant judgment against Defendants City, MDE and CBAC Gaming LLC, Urban Green, jointly and severally, in the amount of One Hundred Million Dollars ($100,000,000.00), and grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT VII
**Civil Conspiracy**

213.   Plaintiffs incorporate by reference and re-allege the allegations contained in Paragraphs 1through 212, as if fully set forth herein below.

214.   The City and CBAC entered into a written agreement (GLA) to redevelop the above referenced land and convert the location into a casino. The casino project is projected to provide the City with an annual revenue of Two Hundred Eighty Two Million Dollars ($282,000,000.00).

215.   Within the GLA is a provision that the CBAC Gaming would be limited to a maximum of Four Million Dollars ($4,000,000.00) in remediation costs. The City included this provision in the GLA with full and complete knowledge that the Site would require far more remediation measures to comply with national and MDE health and safety requirements.

216.   Defendant MDE has deviated substantially from their statutory mandates, and their own procedural guidelines, by rapidly approving the ESAs of CBAC and the City, failing to properly notify the public and permit public comment on the project, and failing to require additional testing when preliminary testing and research clearly, by all recognized and prudent scientific measures, merit further investigation.

217.   The explanation for the circumstances that led to the City contracting with CBAC Gaming to place a casino on a known contaminated Site with an

agreement to severely limit the cost of remediation is that there was an agreement between the City, MDE, and CBAC that required MDE regulatory oversight would be *de minimus*.

218.    Defendant Urban Green participated in the furtherance of the conspiracy in the preparation of the deficient RAP for CBAC with knowledge of CBAC and the City's intentions and with knowledge of the RAP deficiencies.

219.    As a result of the Defendants' conspiracy, Plaintiffs have suffered severe economic injury totaling $100,000,000.00.

WHEREFORE, Plaintiffs respectfully request this Honorable Court grant judgment against Defendants City, MDE and CBAC Gaming LLC for One Hundred Million Dollars ($100,000,000.00), jointly and severally, and grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## **COUNT XI**
### (Injunctive Relief)

220.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 219 as if fully set forth herein.

221.    Defendant MDE failed to adhere to the required guidelines in approving the RAP and failed to provide for meaningful public comment as required by the Environment Article of the Maryland Code.

222.    Defendant CBAC, in submitting the deficient and misleading RAP,

failed to adhere to the requirements of the VCP.

223.    As a result of the known contamination at the Site and the failure of Defendants to prepare an adequate plan to contain the contamination and the failure of Defendants to perform proper and adequate testing of the entire Site, Plaintiffs are at a significantly heightened risk to be adversely affected by the movement of the known contamination into the groundwater and into the Middle Branch of the Patapsco River, as well as at a significantly higher risk of exposure to the known contamination through their use of the trails adjacent to the Site.

224.    Plaintiffs fish in the Patapsco River and eat the fish caught as part of their regular diet.  Plaintiffs are regular users of the trails and pathways adjacent to the Site and are at a high risk of exposure to the contaminants at the Site as those contaminants invade the groundwater.  Unless the adequate testing of the entire Site is performed, Plaintiffs' health is at a significantly higher risk to be adversely affected by the known contamination and the movement of the known contamination and Plaintiffs will be irreparably harmed.

225.    The actions of Defendants are an attempt to circumvent the terms of the VCP and the obligations to adequately investigate the location and extent of the known contamination at the Site and to utilize adequate controls to contain the known contamination at the Site and are an attempt to minimize the cost of containment without concern for damage to the Plaintiffs' health, damage to the

environment, damage to wildlife and damage to the ecosystem of the Middle Branch of the Patapsco River.

226.   The actions of Defendants are a violation of law and an interference with Plaintiffs' Constitutional rights for which a temporary restraining order and preliminary injunction is appropriate to prevent further irreparable harm to Plaintiffs.

227.   The requirements for a RAP, in accordance with Section 7-508 of the Environment Article, Annotated Code of Maryland, and MDE Guidance (MDE, 2006; Voluntary Cleanup Program Guidance Document – see section 6), include:

(i)   Demonstrate the applicability and effectiveness of the selected technologies to significantly reduce the toxicity, mobility, or volume of contamination at the site;

(ii)   Provide supporting documents such as design tests, pilot tests, case studies and literature surveys;

(iii)   Discuss additional work that may be necessary to develop a remedial design; and

(iv)   Propose post-remediation requirements (such as long term monitoring).

228.   The RAP does not reduce the toxicity, mobility or volume of contamination at the Site.  The RAP basically proposes to leave the contamination

(in soil and groundwater) in place. The RAP acknowledges that construction activities at the Site may mobilize known contaminants into the air, i.e., dust, and includes monitoring for that contingency, but the RAP completely ignores the very significant risk that the construction activities will also mobilize contaminants underground, i.e., groundwater, and provides no monitoring or contingencies for such situation.

229.   The excavation activities at the Site, installation of caissons and underground utilities may create additional pathways for contaminant migration. For example, caissons that support the foundations may 'puncture' low permeability layers that are serving as barriers to contaminant migration. The RAP should include monitoring, i.e., sampling of groundwater between the Site and the Patapsco River.

230.   Defendant Urban Green's entire attempted demonstration that the proposed measures will be effective is the following statement (page 17 of the November RAP):

*Based on professional judgment of Urban Green, LLC and generally accepted professional practices and standards of care exercised by reputable companies …… will be protective for the future intended commercial use.*

There is no evidence that a Professional Engineer has evaluated the RAP and the statement about professional judgment is completely unsupported and is far below industry standards for such a cleanup plan.

231.   The proposed monitoring in the RAP is insufficient.  Page 19 of the

RAP says that air quality monitoring inside the building will only be performed for the first 60 days following enclosure of the building space, and that if the concentrations are above the specified limit, until they get two consecutive samples that meet the criteria.  That is completely inadequate. The monitoring should be performed for at least a full year after the casino begins operating, with at least quarterly sampling, to be followed by annual confirmatory sampling thereafter. If the monitoring shows that the air quality criteria are exceeded, then the subslab system needs to be upgraded, for instance from passive to active, or the capacity of blowers increased.

232.   Plaintiffs have identified, and/or are in the process of identifying, numerous deficiencies, errors and omissions in the RAP, the inadequate testing of the Site and the significantly high potential for a failure of containment of the known contaminants at the Site.  If construction is immediately halted, the proper testing of the Site may be completed and the results fully analyzed by all parties to this action, and Plaintiffs will be in a position to minimize the harm to them and will ultimately benefit the Defendants by having the compliance with the VCP that is required by law and will result in a plan for containment at the Site that will protect Plaintiffs from harm and protect Defendants from liability for exposure to the known contaminants.

233.   Plaintiffs will suffer irreparable harm as result of the deficient RAP

and implementation of the deficient proposed containment actions of Defendants, including but not limited to the exposure to extensive contamination such as chlorinated solvents and arsenic from the Site, and the loss of their health, and the loss of substantial Constitutional rights.  Once the contaminants are disturbed and enter the groundwater, the contaminants will enter the Middle Branch of the Patapsco River and other areas and the ability to contain the known contaminants at the Site will be irretrievably lost.

234.    This Court has the power to grant a temporary restraining order enjoining the construction at the Site. It is within this Court's discretion to enter such an order upon specific facts shown by affidavit or other statement under oath demonstrating that immediate, substantial, and irreparable harm will result to the person seeking the order before a full adversary hearing can be held on the propriety of preliminary of final injunction.  As evidenced by the Affidavit of Dr. Jan Kool and the record herein, Plaintiffs respectfully submit that immediate, substantial, and irreparable harm will occur in the absence of the relief sought, including but not limited to those set forth above. Plaintiffs respectfully submit that this Court should intervene to enjoin Defendants from further construction at the Site until further testing of the entire Site is performed and a proper and adequate containment plan is developed for the containment of the known contaminants at the Site.

235.    As evidenced by the record herein, Plaintiffs respectfully submit that

immediate, substantial, and irreparable harm will occur in the absence of the relief sought. Plaintiffs respectfully submit that this Court should intervene to enjoin the actions of Defendants and to enjoin continued construction and disturbance of soil and groundwater at the Site.

236. With respect to the issue of bond, Plaintiffs suggest that the bond should be waived. Defendants will suffer no harm in the issuance of a temporary restraining order and will ultimately receive a benefit from the proper testing of the Site. Plaintiffs are people who live in the vicinity of the Site and are of modest means.

237. A Temporary Restraining Order is necessary to preserve the status quo while further testing of the entire Site is conducted and the results of those tests are analyzed, and a full evidentiary hearing is held relating to the believed unlawful actions of Defendants, and to prevent the accrual of irreparable harm to Plaintiffs.

238. The public interest is best served by the granting of this temporary restraining order and injunction as demonstrated by the express public policy of the State of Maryland. The benefits to Plaintiffs and the environment in obtaining an injunction are equal to or outweigh the potential harm which Defendants would incur were the injunction granted. Plaintiffs are likely to succeed on the merits of the case.

239. The notice pursuant to Federal Rule of Civil Procedure 65 is expected

to be given to Defendants by delivering copies of the Complaint by electronic mail, facsimile, or other immediate delivery, prior to Plaintiffs presenting this Complaint and accompanying Motion for Temporary Restraining Order to the Court for ruling.

240.   The Plaintiffs request that the Court dispense with the requirement of surety or other security for a bond because under the circumstances the Plaintiffs should not be required to provide surety or other security for the bond, substantial injustice would result if an injunction does not issue and this case is one of extraordinary hardship considering all of the facts and circumstances relating to this proceeding and the prior events leading up to the filing of this Complaint relating to the actions of Defendants and the attempt to circumvent the VCP and required containment of the known contaminants at the Site.  Moreover, Defendants will suffer no prejudice if this Court waives the bond requirement in that Defendants are not likely to suffer any damages as a result of the temporary injunction.

WHEREFORE, Plaintiffs move this Honorable Court:

(a)   Enter an Order that would grant Plaintiffs a temporary restraining order restraining and enjoining Defendants CBAC Gaming, LLC, and The Whiting Turner Contracting Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off

the site and into the groundwater and until further Order of the Court is entered permitting further construction; and

(b)      Issue an Order granting a preliminary injunction restraining and enjoining Defendants CBAC Gaming, LLC, and The Whiting Turner Construction Company from further construction and development of the Site until further testing and investigation of the Site is performed to determine the levels of known contamination and the risk of movement of the known contamination off the site and into the groundwater and a revised RAP is prepared and approved after full public comment; and

(c)      That the requirement of a surety or other security for bond be waived; and

(d)      Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

_____ /s/
Anuj Sud  Fed. Bar No. 17126
Sud Law Firm
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
(301) 277-0304
Fax: (301) 277-0305
anuj@sudlawfirm.com


_____ /s/
Walter W. Green  Fed. Bar No. 15007
Law Office of Walter W. Green
7309 Baltimore Avenue, Suite 115
College Park, MD 20740
(301) 927-3100
Fax: (301) 927-3542
wgreen@GreensLaw.com

Attorney for Plaintiffs


## __DEMAND FOR TRIAL BY JURY__

Plaintiffs demand trial by jury on all Counts of their Complaint.