IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES R. ROBINSON, et al.,                    *
                                              *
                Plaintiffs,                   *
                                              *
v.                                            *      Case No.: 1:13-cv-02234-RDB
                                              *
STATE OF MARYLAND DEPARTMENT                  *
OF THE ENVIRONMENT, et al.                    *
                                              *
                Defendants.                   *
                                              *

**OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY AND PERMANENT
INJUNCTIVE RELIEF**

## <u>TABLE OF CONTENTS</u>

<u>Page No.</u>

FACTUAL BACKGROUND ........................................................................................................3

ARGUMENT .............................................................................................................................9

I. No Grounds Exist To Enjoin Construction Activities, Which Are Not
Dependent Upon The Existence Of An Approved RAP ...........................................................9

II. Plaintiffs Do Not Satisfy The Requirements For Issuance Of A Temporary
Restraining Order or Preliminary Injunction ........................................................................12

    A. Plaintiffs Are Not Likely To Succeed On The Merits .......................................................13

        1. Plaintiffs Have Not Demonstrated that the RAP is Deficient. .....................................14

        2. Contrary To Plaintiffs' Allegations, Proper Notice Was Provided Of
           CBAC's Application To The VCP. ..........................................................................15

        3. Defendants MDE and CBAC Have Complied With The Notice, Hearing
           And Public Comment Requirements Of Environment Article § 7-509
           Pertaining To A Response Action Plan. ..................................................................16

           (a) MDE Properly Interpreted § 7-509 As Not Requiring Additional
               Public Participation In 2012 On CBAC's Amended RAP ...................................18

           (b) MDE's Interpretation Of Environment Article § 7-509 Is Consistent
               With The Plain Language Of The Statute And Its Legislative
               History ...............................................................................................................20

    B. Plaintiffs Will Not Suffer Irreparable Harm if the Preliminary Injunction is
       Denied. ...............................................................................................................21

    C. The Balance Of Equities Favors Defendants Because The Economic Harm
       To CBAC, Whiting-Turner, And The City Is Significant. ...............................................24

    D. The Public Interest Favors Defendants .......................................................................28

    E. Plaintiffs Should Be Required to Post a Bond. .............................................................31

CONCLUSION .........................................................................................................................31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES R. ROBINSON, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| v. | * | Case No.: 1:13-cv-02234-RDB |
| STATE OF MARYLAND DEPARTMENT | * | |
| OF THE ENVIRONMENT, et al. | * | |
| Defendants. | * | |
| | * | |

## OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

CBAC Gaming, LLC ("CBAC"), by and through its undersigned counsel, herein files this Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief ("TRO Motion") filed by James R. Robinson; Duwain Heim; Rick Gardner; Vanessa Mack; Calvin Wilson; Maryetta Baquol; Ami Lawso; Kenneth McKenzie; Joseph Jordan III; and Quentin Sawyer (hereinafter "Plaintiffs").

Plaintiffs' eleven count Complaint seeks a declaratory judgment, injunctive relief, and compensatory and punitive damages under a host of theories. The underlying premise of the Complaint is that the Maryland Department of the Environment ("MDE") failed to provide adequate opportunity for public comment on the Response Action Plan ("RAP") for the cleanup of historic contamination of the site of the proposed Horseshoe Casino in Baltimore City and that the RAP MDE approved, and that is presently being implemented, is inadequate. *See* Compl. ¶¶ 92-102, 106, 109-115, 118, 122-120. Plaintiffs allege that they are harmed by the ongoing

construction activity at the site because they live in "close proximity" in the Westport and Cherry Hill neighborhoods of Baltimore City.  Compl. ¶ 24.a.

The Complaint in this action repeats many of the factual allegations asserted against CBAC, MDE and the Mayor and City Council of Baltimore ("City") in *Sherrill, et al. v. Maryland Department of the Environment, et al.,* No. 24-c-13-001000 pending in the Circuit Court for Baltimore City.  In the *Sherrill* case, the court denied a temporary restraining order to stop construction of the casino[1] and it is currently considering defendants' motions to dismiss. *See* **Ex. 1**, March 14, 2013 Order Denying TRO.  Plaintiffs' claims also overlap those asserted against the City in *Richardson v. Mayor and City Council of Baltimore,* Case No. 24-C-13-003180, pending in the Circuit Court for Baltimore City (asserting taxpayer standing to enforce State water pollution law), and in *Myers, et al. v. Mayor and City Council of Baltimore,* Civil Action No. 13-1924, pending in the United States District Court for the District of Maryland (a citizen suit against Baltimore City under the Clean Water Act).  Rather than providing the 60-day notice that is required before one can initiate a citizen suit to assert violations of federal environmental laws[2], Plaintiffs assert that they are entitled to a temporary restraining order under civil rights laws against two *private* parties, CBAC and Whiting-Turner, to enjoin construction at the casino site.  Plaintiffs also assert that they are representative of a class of plaintiffs who will be affected by activities at the site.  Compl. ¶¶ 23-30.

---

[1] On May 23, 2013, the Maryland Court of Special Appeals also denied temporary injunctive relief during the pendency of the appeal of Judge Tanner's March 2013 order denying the TRO.  *See* **Ex. 2,** *Ruth Sherrill, et al., v. Maryland Department of the Environment, et al.*, No. 71, Sept. Term 2013 (Md. Ct. Spec. App. May 23, 2013).  The *Sherrill* plaintiffs and a 501(c)(3) entity known as the Inner Harbor Stewardship Foundation ("IHSF") have also filed administrative appeals of permits and approvals issued by the City to CBAC.  In addition, their counsel, Rich and Henderson, has also provided notice of their intention to file a citizen suit under the Resource Conservation and Recovery Act.  These litigation efforts are financed by an anonymous donor to IHSF, which was created shortly after a gaming license was awarded to CBAC.  *See* **Ex. 3**, Charles Korman and Timothy Wheeler, *Residents sue over Westport casino site*, Baltimore Sun, Feb. 21, 2013, at 12A.

[2] *See* Comprehensive Environ. Resp., Compen. & Liab. Act of 1980 ("CERCLA"), § 310, 42 U.S.C. § 9659; Federal Water Pollution Control Act ("Clean Water Act"), § 505, 33 U.S.C. § 1365; Resource Conservation and Recovery Act ("RCRA"), also known as the Solid Waste Disposal Act, § 7002, 42 U.S. C. § 6972.  Failure to provide this notice bars Count V of Plaintiffs' Complaint.

Under no circumstances are Plaintiffs entitled to the temporary restraining order or preliminary injunction they seek.  As shown in Argument Section II, Plaintiffs do not satisfy the four-part test that the Fourth Circuit has held must be met to support Plaintiffs' request for injunctive relief.  More fundamentally, however, Plaintiffs are not entitled to the injunctive relief they seek because their allegations do not support the terms of the injunction they request.  As discussed in Argument Section I, even if MDE failed to follow proper procedures and even if the RAP for the casino project was inadequate, assertions that CBAC denies, Plaintiffs would not be entitled to stop CBAC from carrying out construction activities.

<u>FACTUAL BACKGROUND</u>

The claims in this case relate to MDE's Voluntary Cleanup Program ("VCP"), which was adopted by the Maryland General Assembly in 1997 and is administered and implemented by the MDE.  The VCP was devised as a way to address unused and abandoned urban properties that are contaminated or perceived to be contaminated with hazardous substances from current or past industrial or commercial use, commonly referred to as "brownfields" sites.  The thrust of the VCP is to encourage development of sites that have already been polluted, rather than developing uncontaminated properties, or "greenfields."  Before implementation of the VCP, many former industrial properties in Maryland, such as the ones at issue in this case, were unusable or underutilized.  Ownership came with almost certain State, federal and third party liabilities, including extensive costs associated with removal and cleanup of contamination, as well as potential civil liability.  Accordingly, lenders were unwilling to loan money to purchase or redevelop these contaminated properties.  *See* **Ex. 4**, Floor Report, SB 340, Brownfields – Voluntary Cleanup and Revitalization Program, 1997; **Ex. 5**, Floor Report Bill Summary, SB 340, Brownfields – Voluntary Cleanup and Revitalization Program, 1997.

3

The Maryland General Assembly acted to limit the risks associated with these contaminated sites and encourage lenders to finalize the purchase of, and developers to redevelop, such properties.  The objective was to (1) encourage investigation of properties with perceived contamination, (2) protect public health and the environment, (3) accelerate cleanup of eligible properties and (4) provide predictability and finality to the cleanup of eligible properties. Md. Code Ann., Envir. § 7-503 (2012).  In order to do this, the VCP directs participants to investigate contamination at the site and then remediate the contamination to a level that protects human health and the environment based on the future use of the site.  *Id.* at §§ 7-506 through 7-513.

Prospective purchasers (and future successors in interest) receive immunity from State and federal enforcement actions for the existing contamination at the property if they clean up the properties as required by MDE.  *See* Md. Code Ann., Envir. §§ 7-513(b), 7-514(f); 42 U.S.C. § 9628(b).  A recognized goal of the VCP is to encourage parties who are not otherwise responsible for contamination of a site to remediate such properties and return them to productive use in accordance with an MDE-approved RAP.

A person who has not caused or contributed to contamination at a VCP-eligible property and has no ownership interest in the property when it applies to the VCP, is called an "Inculpable Person" ("IP").  Md. Code Ann., Envir. § 7-501(j).  A person seeking IP status must submit an affidavit affirming that they have not caused or contributed to contamination at an "eligible property" and that they have no past or current ownership in such property at the time the affidavit is submitted.  *Id.*  This affidavit can be submitted either before or contemporaneously with a VCP application.  The law recognizes that multiple parties may seek IP status for the same

parcel and provides for reduced fees for subsequent applicants on the same property.  *Id.* at § 7-506(a)(2).

Contrary to the assertions of the Complaint, none of the Plaintiffs live in close proximity to the site of the future Horseshoe Casino.  *See* **Ex. 6**, Affidavit of Denise Sullivan ("Sullivan Aff."), and **Ex. 6-I** attached thereto.  Only one Plaintiff lives in the neighborhood known as Westport and one in the neighborhood known as Cherry Hill.  *Id.*, ¶¶ 23, 30.  None of the Plaintiffs lives within .86 miles of the site.  Prior to the initiation of this lawsuit, Plaintiffs did not demonstrate any interest in the cleanup of the property on which the future Horseshoe Casino is to be located and failed to participate in the public participation process required for all RAP approvals.  *See* **Ex. 7**, Affidavit of Richelle Hanson filed in *Sherrill* proceedings ("Hanson Aff.-*Sherrill*"), ¶¶ 10, 21, and sign in sheet attached thereto.  Plaintiffs now challenge the RAP approval process applicable to the parcels that make up the site, referred to collectively as the Gateway South Phase I Properties and the Warner Street Properties (hereafter the "Site").  Compl. ¶ 31.  The properties are located in what is known as the Carroll-Camden Industrial Park.  *See* Plaintiffs' Complaint, Ex. I – Executive Summary at i.  These properties have been in the VCP program since early 2010 and the subject of repeated study for the last 15 years.  Hanson Aff.-*Sherrill*, ¶¶ 4-7; Sullivan Aff., ¶ 33-34.  Over the past three years, the public has been provided multiple opportunities to participate in, and comment on, the VCP process.  *See* Hanson Aff.-*Sherrill*, ¶¶ 7, 10, 13, 21.  In addition, the public has been provided with opportunities to participate in numerous other State and local approval processes, including those for zoning, grading permits, floodplain permits, and discharge permits.  Counsel for Plaintiffs acknowledges that Plaintiffs failed to avail themselves of any of those opportunities.

The parcels that make up the Site were acquired by the City in 2005 and 2008 and the Baltimore Economic Development Corporation, later known as the Baltimore Development Corporation ("BDC"), applied to the VCP on the City's behalf.  Compl. ¶¶ 34, 35, 41.  In 2007, the Maryland General Assembly proposed an amendment to the State Constitution that provided that the site for any casino located in Baltimore City is limited to property owned by the City on the date the application for a video lottery operation license is submitted, in a non-residential area, situated within one-half (1/2) mile of Interstate 95 and MD Route 295, and not located within one-quarter (1/4) of a mile of property that is zoned and used for a residential dwelling.  *See* 2007 Sp. Sess., ch.5, ratified Nov. 4, 2008, adding Maryland Constitution, Art. XIX, Sec. 1(c)(3)(v).  The Site is the only location in the City that meets those criteria and is of sufficient size to accommodate the casino.  *See* **Ex. 8**, *In the Matter of the Petition of Stanley Fine for CBAC Gaming, LLC,* Baltimore City Board of Municipal and Zoning Appeals, Appeal Nos. 2013-16 & 2013-17, at p. 5.

Plaintiffs assert no facts to suggest that BDC's VCP applications were improperly noticed or that the public was not provided a right to comment on them.  Compl. ¶¶ 66, 67.  Plaintiffs did not comment on either BDC application.  *See* Hanson Aff.-*Sherrill*, ¶ 10.  On December 22, 2009 and March 18, 2010, following comments from MDE and additional environmental assessments, each property was accepted into the VCP and the City received IP status.[3]  Compl. ¶ 64.

BDC submitted the proposed RAP for the Site on May 2, 2011.  Compl. ¶ 65.  In accordance with § 7-509, public notice of the RAP was provided in the Baltimore Sun and, on

---

[3] "Inculpable person" means a person who:  (i) Has no prior or current ownership interest in an eligible property at the time of application to participate in the Voluntary Cleanup Program; and (ii) Has not caused or contributed to contamination at the eligible property at the time of application to participate in the Voluntary Cleanup Program.  *See* Md. Code. Ann., Envir. § 7-501(j).

June 1, 2011, MDE held a public informational meeting on the proposed RAP at Harbor Hospital. Compl. ¶¶ 66-67. No members of the public submitted written comments or attended the 2011 public meeting and Plaintiffs have not alleged any fault in the public participation process for the BDC's RAP. *See* Hanson Aff.-*Sherrill*, ¶ 10. Following several rounds of review and comments by MDE, the proposed BDC RAP was approved on September 15, 2011. *Id.* at ¶ 7. The City acquired and assembled these parcels and obtained RAP approval so that the Site would be readily available for future development by a private party through a request for proposal ("RFP") process. Plaintiffs' Complaint, Ex. E at 1.[4]

And that is exactly what happened. On July 31, 2012, following an RFP process, the State of Maryland Video Lottery Facility Location Commission awarded CBAC a video lottery operational license for the purpose of developing and operating a casino at the Site. Compl. ¶ 71. CBAC submitted its own VCP application and a "RAP Amendment" to the VCP, as was contemplated in the approved BDC RAP, on or about July 7, 2012. Compl. ¶ 84.

CBAC posted a sign at the Site on July 9, 2012, which contained all of the information required concerning its application and the public comment period. *See* Hanson Aff.-*Sherrill*, ¶ 13; Sullivan Aff., ¶ 8. Similarly, MDE provided notice of the application on its own website. *See* Hanson Aff.-*Sherrill*, ¶ 13. No written comments were received on the application or the RAP Amendment. *Id.* The application was approved and IP status granted to CBAC on August 10, 2012. Compl. ¶ 103. The sign remained on the Site until demolition of the former Maryland Chemical building began on or about February 2013. *See* Sullivan Aff., ¶ 8. MDE commented

---

[4] At some point the City also acquired what are sometimes referred to as the "Waterfront Parcels", which is 5.3 acres of contaminated property located between the Gateway South I parcels and the Middle Branch. *See* MDE, *Facts About Warner Street Wetlands (Brownfields Site)*, available at http://www.mde.maryland.gov/programs/Land/MarylandBrownfieldVCP/mapping/Documents/www.mde.state.md.us/assets/document/brownfields/Warner%20Street%20Wetlands.pdf. Some of the early environmental studies of the Site also studied the Waterfront Parcels. Sullivan Aff., ¶ 34. However, this property is not part of the Casino Site and is not subject to a RAP. *Id.* It is the parkland referred to in paragraph 13 of the Affidavit of Jan Kool, attached to Plaintiffs' TRO Motion.

on the RAP Amendment and CBAC responded to those comments.  *Id.* at ¶ 9; Compl. ¶ 107.

MDE subsequently approved the RAP Amendment on November 27, 2012.  Compl. ¶ 108.

Three months later, on February 20, 2013, six residents of Baltimore City filed a Complaint for Writ of Mandamus, Declaratory Judgment and Injunctive Relief in the Circuit Court for Baltimore City, alleging that they were denied the opportunity to comment on CBAC's RAP Amendment because of defects in the public participation process.  *See Sherrill, et al. v. Maryland Department of the Environment, et al.,* Case No. 24-c-13-001000 (Md. Cir. Balt. Cty. filed Feb. 20, 2013).  Shortly thereafter, on March 1, 2013, the Sherrill plaintiffs filed a Motion for a Temporary Restraining Order and Preliminary Injunction, which was denied, after a hearing before Judge Tanner, on March 14, 2013.  *See* Ex. 1.  In an affidavit submitted in the *Sherrill* proceedings, Robert M. Summers, Secretary of the Maryland Department of the Environment, stated that "[t]he Department believes it has fully discharged its duty in the actions taken to approve the RAP at the subject site," but that the agency was nevertheless willing to provide public notice and receive public comments "in light of the public interest recently expressed by Plaintiffs, and in the interest of transparent and open process."  *See* **Ex. 9,** Affidavit of Robert M. Summers ("Summers Aff."), ¶ 3.  At the Secretary's direction, the staff of the VCP was to "take all steps necessary to comply with the directives of Environment Article § 7-509, Public Participation, with reference to a Response Action Plan submitted by participant CBAC Gaming, whether these steps have already been taken or not."  *Id.*

In accordance with Secretary Summers' directive, CBAC published notice of the CBAC RAP Amendment on March 23, 2013 and March 30, 2013 in the Baltimore Sun.  *See* **Ex. 10**, Affidavits of Sun Media Group; § 7-509(a)(1).  A public informational meeting was held on April 11, 2013 at the Maryland Department of the Environment offices in Baltimore City, which

Plaintiffs failed to attend. *See* Hanson Aff.-*Sherrill*, ¶ 21 and MDE sign-in sheet attached thereto; *see also* MDE Calendar[5]; § 7-509(c). Extensive comments were submitted to MDE on the last day of the public comment period on behalf of the *Sherrill* plaintiffs. Hanson Aff.-*Sherrill*, at ¶ 23. MDE considered those comments and advised CBAC in writing on May 6, 2013, that the RAP Amendment should be further amended to address certain of the public's concerns. *See* Hanson Aff.-*Sherrill*, ¶¶ 25, 27; Sullivan Aff., ¶¶ 18, 19. CBAC responded to MDE's comments on May 10, 2013. Sullivan Aff., ¶ 20. This additional public process resulted in a new MDE approval of the RAP Amendment on May 23, 2013. *See* Plaintiffs' Complaint, Ex. O.

More than four months after MDE provided additional public participation on the CBAC RAP and five months after CBAC commenced construction in March of 2013 (Compl. ¶ 113), Plaintiffs filed this action and a Motion for Temporary Restraining Order and Preliminary Injunction. Plaintiffs' motion should be denied because the VCP process is voluntary and CBAC is not required to remediate the property independent of its participation in the VCP. Plaintiffs' motion should also be denied because they have not satisfied any element the four-part test for the granting of injunctive relief. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

<u>ARGUMENT</u>

I.      <u>No Grounds Exist To Enjoin Construction Activities, Which Are Not Dependent Upon The Existence Of An Approved RAP.</u>

Plaintiffs ignore the defining characteristic of the VCP – it is a ***voluntary*** cleanup program, meaning that a landowner or developer, such as CBAC, is under no obligation to participate in the VCP. If CBAC chooses to proceed with development of the Site without availing itself of the protections afforded by the VCP and completion of a MDE-approved RAP,

---

[5] Available at http://www.mde.maryland.gov/aboutmde/mdecalendar/pages/calendar.aspx.

it is free to do so.  Plaintiffs vaguely assert that the opportunities for public comment provided on the CBAC RAP were deficient, but they have said – and can say – nothing about why they would be entitled to stop CBAC from proceeding with construction activities that are not dependent upon its having an approved RAP.

The failure to adhere to the VCP's statutory process could result in owners and prospective purchasers of contaminated properties ***not*** receiving immunity from State or federal enforcement in the event they develop property without an approved RAP.  Md. Code Ann., Envir. §7-513(b).  However, Plaintiffs cite no authority that suggests that such a failure prohibits one from developing the property that is the subject of the application outside the purview of the VCP if one chooses to do so.

Plaintiffs fail to allege that any of the State and City construction permits or approvals currently in place are dependent upon the existence of an ***approved*** RAP.  Similarly, no "construction-related activities" are contingent upon CBAC's having IP status or an approved RAP.  Even if every one of Plaintiffs' allegations were accepted as true, therefore, Plaintiffs would not be entitled to the injunction they seek.  It is well established that "[a]n injunction 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.'" *Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) (*quoting Consolidation Coal Co. v. Disabled Miners*, 442 F.2d 1261, 1267 (4th Cir.), *cert. denied*, 404 U.S. 911 (1971)); *Virginia Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("[a]n injunction should be carefully addressed to the circumstances of the case."); *Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003) (vacating injunction because it "was far broader than necessary to provide [Plaintiffs] with complete relief" and "did not carefully address only the circumstances of the case"); *JTH Tax, Inc. v. H &R Block Eastern*

*Tax Services, Inc.,* 28 Fed. Appx. 207, *8 (4th Cir. 2002) ("the essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation").

In *Hayes,* the Fourth Circuit vacated the part of a lower court's injunction that prohibited all use of racially-based criteria by the City of Charlotte in its employment decisions because the only policy challenged by the Plaintiffs was the police department's sergeant promotion policy. 10 F.3d at 217. Because the injunction went beyond the extent of the established violations, the Fourth Circuit vacated the injunction and remanded "for the issuance of an injunction properly tailored to the wrong found in this case: the use of racial preferences as criterion for promotions to the rank of [police] sergeant." *Id.*

Similarly, in *Kentuckians for Commonwealth Inc. v. Rivenburgh*, the Fourth Circuit vacated an injunction preventing the Army Corps of Engineers district office from issuing any further CWA § 404 permits approving valley fills for waste disposal at mining sites within an area covering five states. 317 F.3d at 426. Plaintiffs, a citizens group, all lived within the state of Kentucky and alleged injury only in connection with the § 404 permit issued for one mining site in Kentucky. The Court held that an injunction covering five states and addressing anticipated injury from future permits was far broader than the scope of injury for which Plaintiffs sought relief. *Id.*

Here, the alleged harm is approval of an inadequate RAP without sufficient public participation. CBAC's construction activities at the Site and issuance of construction permits related to the Site, insofar as they are not dependent upon having an approved RAP, are unrelated to the alleged harm. Moreover, a preliminary injunction should be no broader than necessary and "should be carefully addressed to the circumstances of the case." *Kentuckians for*

11

*Commonwealth*, 317 F.3d at 436 (*quoting Virginia Soc'y for Human Life,* 263 F.3d at 393).

Accordingly, Plaintiffs' motion for a preliminary injunction to halt construction at the Site

should be denied.

II.   Plaintiffs Do Not Satisfy The Requirements For Issuance Of A Temporary Restraining
      Order or Preliminary Injunction.

Although certainly not entitled to the injunction[6] they seek, Plaintiffs are not entitled to

injunctive relief based on the evidence they have provided to the Court.[7]   A preliminary

injunction is a drastic and "extraordinary remedy" that should only be granted in exceptional

circumstances.   *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008); *Mazurek v.

Armstrong,* 520 U.S. 968, 972 (1997); *Real Truth About Obama, Inc. v. Federal Election

Comm'n*, 575 F.3d 343, 345-46 (4th Cir. 2009), *vacated as moot*, 130 S. Ct. 2371 (2010),

*reissued in part on remand*, 607 F.3d 355 (4th Cir. 2010).   To obtain a TRO or preliminary

injunction, the Plaintiffs must establish **each** of the following four requirements:

1)   they are likely to succeed on the merits;

2)   they are likely to suffer irreparable harm in the absence of preliminary relief;

3)   the balance of the equities favors the Plaintiffs; **and**

4)   an injunction is in the public interest.

*Winter*, 555 U.S. at 20; *Dewhurst v. Century Aluminum Co.,* 649 F.3d 287, 290 (4th Cir. 2011);

*Real Truth About Obama*, 575 F.3d at 346; *Torres Advanced Enter. Solutions LLC v. Mid-Atl.

Professionals Inc.,* PWG-12-3679, 2013 WL 531215, *3 (D. Md. Feb. 8, 2013).   As a

preliminary injunction is "an extraordinary remedy ... [it] may only be awarded upon a clear

---

[6] A preliminary injunction is distinguished from a temporary restraining order only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co.,* 452 F.3d 275, 281 n. 1 (4th Cir. 2006).   Therefore, the substantive standards for a preliminary injunction and a temporary restraining order are identical.
[7] Inexplicably, Plaintiffs' TRO Motion not only fails to articulate the standard for issuance of preliminary relief in the Fourth Circuit, but fails to cite any case law in support of its allegations.

showing that the plaintiff is entitled to such relief." *Winter,* 555 U.S. at 22; *Real Truth About Obama*, 575 F.3d at 346.

Plaintiffs have the burden of producing evidence to satisfy all four requirements and, as shown below, they have not and indeed cannot. The failure to satisfy that burden as to even one of the four requirements will defeat the motion. *See Real Truth About Obama,* 75 F.3d at 347 (4th Cir. 2009).

A.    Plaintiffs Are Not Likely To Succeed On The Merits

Plaintiffs seeking injunctive relief must make a "clear showing" that they are likely to succeed on the merits at trial. *See Real Truth About Obama*, 575 F.3d at 345; *Winter*, 555 U.S. at 20. The Fourth Circuit emphasized that a plaintiff must "clearly demonstrate that it will *likely succeed* on the merits", rather than present a mere "grave or serious *question* for litigation." *Id.* at 346-47 (emphasis in original); *see also Judicial Watch, Inc. v. Department of Commerce*, 501 F. Supp. 2d 83 (D.D.C. 2007) (holding that in the TRO context it is critical that the moving party demonstrate a substantial likelihood of success on the merits, because otherwise, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review") (internal quotations omitted).

Yet despite this "heavy burden," *Real Truth About Obama*, 575 F.3d at 349, Plaintiffs' TRO Motion contains only one conclusory sentence on the likelihood of success on the merits, stating, "There exists a strong likelihood that Plaintiffs will succeed on the merits of their claim." *See* TRO Motion at ¶ 9. This statement is woefully inadequate to meet Plaintiffs' burden or to demonstrate Plaintiffs' likelihood of success on its claims. At least four of the Counts outlined in Plaintiffs' Complaint, for which Plaintiffs seeks a temporary restraining order and/or

preliminary injunction, will be immediately dismissed for jurisdictional defects.[8]  Similarly, the

Plaintiff is highly unlikely to succeed on its claims that:

- Defendants must stop construction because the RAP is deficient;

- MDE and CBAC violated the Environment Article § 7-506(d) by allegedly failing to post notice that CBAC had submitted an application to the Voluntary Cleanup Program in July, 2012;

- MDE and CBAC violated Environment Article § 7-509 by not sending out a public notice, holding a public information meeting or providing an opportunity for written comments to be submitted in connection with the CBAC RAP Amendment.

Therefore, Plaintiffs' TRO Motion must be denied.[9]

      1.    <u>Plaintiffs Have Not Demonstrated that the RAP is Deficient.</u>

      The Plaintiffs ask this Court to grant an injunction based solely on the affidavit of

Jan Kool, a Virginia based hydrogeologist who never visited the Site and who has no apparent

voluntary cleanup experience in Maryland or any other state.  Plaintiffs provided Dr. Kool with

only a handful of the dozens of reports and analyses performed on the properties at issue in this

case, apparently failed to provide him with the most current RAP for the Site, and failed to

provide him the VCP's most current guidance.  Sullivan Aff., ¶ 34.  Not surprisingly, Dr. Kool's

---

[8] Plaintiffs' Count V, violation of the CWA (Comp. ¶¶ 171-183), will be immediately dismissed because Plaintiffs failed to file 60-day notice of their intent to file suit, as required by the Act.  *See* 33 U.S.C. § 1365(b).  Failure to give proper notice 60 days before bringing a claim under the CWA is a jurisdictional defect, requiring dismissal. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 629 F.3d 387, 399 (4th Cir. 2011) (compliance with the CWA citizen suit notice provisions "is a mandatory condition precedent to filing suit under the Act"); *Chesapeake Bay Found. v. Bethlehem Steel Corp.,* 608 F. Supp. 440, 450 (D. Md. 1985) ("defendant must be given 60 days' notice of alleged violation before suit may be brought in the district court").  Count II alleges violations of Title VI of the Civil Rights Act which prohibits discrimination only by "any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000(d).  Defendants CBAC and Whiting-Turner do not receive any federal funding; therefore, they are not proper defendants until Title VI and this Count must be dismissed with respect to CBAC and Whiting-Turner.  *See Kitchings v. Mitchell*, 2002 WL 31720746, *4 (D. Md. Dec. 3, 2002); *see also Powers v. CSX Transp., Inc.,* 105 F. Supp. 2d 1295, 1311 (S.D. Ala. 2001).  Similarly, Counts III and IV, alleging violation of § 1983 of the Civil Rights Act and the Fourteenth Amendment will likely also be dismissed as to non-governmental parties CBAC and Whiting-Turner.  These counts will be fully addressed in a Motion to Dismiss.
[9] Because Plaintiffs has not clearly shown a likelihood of success on the merits, the remaining preliminary injunction factors need not be examined.  *Chattery Int'l, Inc. v. JoLida, Inc.,* CIV. WDQ-10-2236, 2011 WL 1230822 (D. Md. Mar. 28, 2011) (*citing Kalos v. Greenwich Ins. Co.,* No. 10–1959, 2010 WL 5129880, at *1 (4th Cir. Dec. 14, 2010)).

opinion suffers from his general lack of knowledge about the complete and extensive history of the environmental investigations conducted at the property and about the requirements of the VCP.[10]

Conversely, CBAC expert, Denise A. Sullivan, is a professional engineer who has worked on 50 VCP applications over the last 13 years. *Id.*, ¶ 11. Ms. Sullivan's affidavit provides a point by point rebuttal to Dr. Kool's opinions and, along with the affidavits of MDE VCP staff, submitted by MDE, shows that Plaintiffs have failed to demonstrate that the MDE-approved RAP is deficient.

>          2.      Contrary To Plaintiffs' Allegations, Proper Notice Was Provided Of
>                  CBAC's Application To The VCP.

There is no merit to the Plaintiffs' allegation that MDE and CBAC failed to post notice of CBAC's submission of a VCP application. Compl. ¶ 85. CBAC placed a notice at the Site (the Gateway South Phase I and Warner Street Properties) on July 9, 2012 and submitted its application on or about July 7, 2012. Sullivan Aff., at ¶¶ 5, 8. The notice clearly comports with the requirements of Environment Article § 7-506(d) which sets forth the statutory notice requirements.

MDE then posted notice of the received application on its website. Hanson Aff.-*Sherrill* at ¶ 13. This notice provided all the information required in § 7-506(d) except for the time period during which the MDE would receive written comments.[11]

---

[10] Rule 702 of the Federal Rules of Evidence provides that an expert's opinion may be admitted if, among other factors, "the testimony is based on sufficient facts or data." Kool's affidavit is clearly based on insufficient facts and data, which would justify its exclusion. *See, e.g., Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530 (D. Md. 2002), where the court stated that pursuant to Rule 702 of the Federal Rules of Evidence, "[e]ven if a witness is qualified to offer an expert opinion, that opinion can be excluded if it is based on inadequate facts or flawed methodology." *Id.* at 536; *Casey v. Geek Squad*® *Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334 (D. Md. 2011), where the court excluded an expert's testimony because it was not based upon sufficient facts or data and instead was a "variety of unsupported assumptions." *Id.* at 343-344; *see also Mooreforce, Inc. v. U.S. Dept. of Transp.*, 243 F.Supp.2d 425, 438 (M.D. N.C. 2003) (in deciding a motion for preliminary injunction "a court may exclude testimony from a qualified expert whose testimony is not sufficiently reliable because of invalid assumptions or lack of inquiry into the relevant facts").

Even if the public notice provided in 2012 were to be found deficient, *additional* public notice was provided in March of 2013 following the filing of the *Sherrill* complaint. Hanson Aff.-*Sherrill*, ¶¶ 18-20. Yet Plaintiffs failed again to attend the public informational meeting held on April 11, 2013, or submit written comments during the 30-day comment period. *Id.*, ¶ 21, and sign in sheet attached thereto. Plaintiffs' lack of interest in the VCP process before filing this lawsuit mirrors the *Friends of Iwo Jima* plaintiffs. *See Friends of Iwo Jima*, 176 F.3d at 774-75 (noting that before filing a lawsuit, plaintiff "never even became involved in the siting process despite the numerous instances of adequate notice . . . attended none of the meetings and submitted no comments"). As in *Friends of Iwo Jima,* Plaintiffs' requested relief should be denied.

        3.        Defendants MDE and CBAC Have Complied With The Notice, Hearing And Public Comment Requirements Of Environment Article § 7-509 <u>Pertaining To A Response Action Plan.</u>

Plaintiffs are again wrong when they claim that MDE failed to give proper public notice, hold a public hearing or receive public comments regarding the RAP for the Site. Compl. ¶ 106. Pursuant to the MDE's long-standing policy and implementation of the VCP, an amendment to a RAP that was earlier approved by MDE does not require further public notice and can be vetted by MDE alone. If MDE determines that an amendment to an already approved RAP complies with applicable standards and will protect the health and well-being of Maryland residents, it approves the amended RAP without further public participation.

That is precisely what happened in this case. In May 2011, the City submitted a RAP pertaining to the Site. MDE followed the procedures prescribed by Environment Article § 7-509

---

[11] There is no suggestion that this minor omission was in any way prejudicial to the Plaintiffs, who bear the burden of proving such prejudice. *See Friends of Iwo Jimo v. Nat'l Planning Comm'n*, 176 F.3d 768, 774 (4th Cir. 1999) (party not entitled to relief as there was no showing that outcome would have differed had notice been at its meticulous best.) If a party fails to carry that burden, the agency's decision must be upheld. *Id. (citing Sierra Club v. Slater,* 120 F.3d 623, 637 (6th Cir. 1997).

and provided notice, a hearing, and the opportunity for the public to submit written comments regarding that RAP. Hanson Aff.-*Sherrill*, ¶ 7. No members of the public attended the June 1, 2011 public information meeting on the City's RAP and no written comments were submitted. *Id.* at ¶ 10. On September 15, 2011, the MDE approved the City RAP, which stated explicitly that it was subject to amendment by the then-unknown entity that would later purchase, remediate and develop the property. *See* MDE RAP Approval Letter, attached as Ex. 6, *see also* Approved City RAP, Plaintiffs' Ex. K, at p. 1 (stating that it was "intended to be general enough so that a future developer [could] alter" it, that "[a] final development plan will be submitted to the VCP as an amendment to this RAP"). With its July 7, 2012 application to the VCP, CBAC submitted a "RAP Amendment" to MDE (the "RAP Amendment" or "2012 RAP"). Sullivan Aff., ¶ 5. CBAC's application stated "this Response Action Plan Amendment is intended to incorporate fully the remedies identified within the MDE-approved Response Action Plan." *See* **Ex. 11,** VCP Application excerpt at 1. The RAP Amendment stated that its purpose was "to provide an update of the previously submitted and MDE-approved RAP" and that it "intended to incorporate the remedy" of the RAP. *Id.* at 1.

By letter dated August 10, 2012, Defendant MDE approved CBAC's application to the VCP and affirmed CBAC's Inculpable Person status. *See* **Ex. 12,** MDE Approval Letter. MDE's August 10, 2012 application approval letter also acknowledged receipt of CBAC's proposed RAP and stated that, with the submission of certain replacement soil and gas data, it would review the proposed RAP. *Id.*

From August 2012 through October 2012, MDE issued comments on CBAC's proposed RAP Amendment. Compl. ¶ 89; Sullivan Aff., ¶ 9. MDE approved CBAC's RAP Amendment and issued CBAC a final RAP Approval Letter on November 27, 2012. *See* **Ex. 13**, RAP

Amendment Approval Letter.  Following the filing of the *Sherrill* complaint, MDE voluntarily provided the public with notice, a public informational meeting, and an opportunity to submit written comments on the CBAC RAP.  Hanson Aff.-*Sherrill*, ¶¶ 17-23.  The agency directed revisions to the RAP in response to public concerns.  *Id*., ¶ 25.  Plaintiffs failed to attend the meeting or provide comments.  *Id*., ¶ 21 and sign-in sheet referred to therein.  Nonetheless, Plaintiffs now assert that the public participation process was a "sham" and that the additional round of public participation cannot "cure" MDE's failure to provide an opportunity for public comment on the Amended RAP submitted by CBAC.  Compl. ¶¶ 116, 119.  Plaintiffs' motion provides no legal authority to support its claim that the RAP must be voided as a result of procedural defects.

(a)   MDE Properly Interpreted § 7-509 As Not Requiring Additional
      Public Participation In 2012 On CBAC's Amended RAP

Section 7-509 of the Environment Article requires that notice be published and a public information meeting be held on a "proposed" RAP, a term not defined in the VCP statute.  Since the inception of the VCP/Brownfields program, MDE has consistently interpreted the law to require public notice and an opportunity for public comment on only the original RAP submitted in conjunction with any given property.  Thus, it has been the agency's practice for fifteen years not to hold a public hearing on every subsequent RAP amendment.  To do otherwise, would be counter to the intent of the Legislature to quickly return Brownfield sites to productive use.  *See* Ex. 4, Ex. 5; *see also* Md. Code Ann., Envir. § 7-503.[12]

---

[12] The legislature demonstrated its support for the rapid return of contaminated properties to productive use by requiring MDE to spend no more than 75 days reviewing a proposed response action plan.  § 7-511(a).  It would be nonsensical for MDE to delay the rapid reuse of contaminated properties by requiring that *every* change to an approved RAP be required to undergo further public participation, adding six weeks of delay every time there is a change to the RAP, regardless of its significance.

18

Since the inception of the VCP program, informational meetings were held only on an *initial proposed* RAP. Such meetings have not been afforded as a matter of right on *amended* RAPs, a distinction the Plaintiffs ignore. Sullivan Aff., at ¶¶ 13, 14; Hanson Aff.-*Sherrill*, at ¶ 9.

MDE's VCP Guidance Documents confirm that public participation is not required for amendments to approved RAPs. The Guidance refers to post-approval amendments as "RAP Addendum" and makes no provision for additional comment. *See* **Ex. 14**, 2003 Voluntary Cleanup Program Guidance, at 32; **Ex. 15**, 2006 Voluntary Cleanup Program Guidance, at 47. This is consistent with MDE's treatment of the modification of *proposed* RAPs, which MDE's 2003 and 2006 Guidance clearly indicate can be modified *after* the public comment period closes without further public input.[13] *See* Ex. 14 at 10-13; Ex. 15 at 13-16.

MDE is entitled to deference in its interpretation so long as its interpretation is reasonable. *National City Bank of Indiana v. Turnbaugh,* 463 F.3d 325, 331-332 (4th Cir. 2006). It has been MDE's consistent unchallenged practice for 15 years *not* to provide public information meetings on amended RAPs and the agency's interpretation should not be readily set aside. *Bosley v. Dorsey,* 191 Md. 229, 239, 60 A.2d 691, 695 (1948). This deference is warranted because it effectuates the real and actual intent of the Legislature when it created the Voluntary Cleanup Program.

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.

---

[13] When the Maryland General Assembly intends to require public participation in the event of an *amendment* of a prior approval, they know how to say so. *See, e.g.* Md. Code Ann., Envir. § 9-234.1(b) (expressly requiring a public hearing before approval of an amendment to a permit for sewage sludge structure); *Id.* at § 9-503(d) (expressly requiring a public hearing before approval of a revision or amendment of county plan); *Id.* at § 9-648(b) (expressly requiring a public hearing before approval of creation of service area or boundary change thereto).

***

> *In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense.*

*Bd. of Educ. Of Prince George's Cnty. v. Marks-Sloan*, 428 Md. 1, 18-19, 50 A.3d 1137, 1147-48 (2012), *citing Bd. of Cnty. Comm'rs v. Marcas,* 415 Md. 676, 685-86, 4 A.3d 946, 951-52 (2010) (*quoting Lockshin v. Semsker,* 412 Md. 257, 274-76, 987 A.2d 18, 28-29 (2010)) (emphasis added).

> (b)   MDE's Interpretation Of Environment Article § 7-509 Is Consistent With The Plain Language Of The Statute And Its Legislative History.

The 1997 legislative history for SB 340, which created the Brownfields-Voluntary Cleanup and Revitalization Program, is replete with references to the Legislature's intention to "accelerat[e] the cleanup of eligible properties", "expedite[] review", and "streamlin[e] the process by which environmental contamination is addressed". **Ex. 4** at 1, 4-5; **Ex. 5** at 12. This accelerated process is consistent with the law's primary purpose, which is to enhance economic development by returning abandoned brownfields to productive use and to thus reduce sprawl to "greenfields", or undeveloped suburban land. **Ex. 4** at 4-5.

The VCP statute is clear that, once the initial comment opportunity passes, MDE is free to modify the proposed RAP without any further public involvement. Md. Code Ann., Envir. § 7-511; *see also* **Ex. 15** at 13-16. Furthermore, the statute recognizes that MDE's approval of a RAP can be "reopened" in a variety of circumstances, none of which are subject to public participation. *Id.* at § 7-514. MDE's handling of amendments to previously approved RAPs is completely consistent with the intentions of the Maryland legislature when it enacted the VCP.

20

B.      Plaintiffs Will Not Suffer Irreparable Harm if the Preliminary Injunction is Denied.

The purpose of a TRO or a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 525 (4th Cir. 2003).  Therefore, after clearly demonstrating a likelihood of success on the merits, Plaintiffs must also make a clear showing that they are likely to suffer irreparable harm in the absence of preliminary relief. *See Real Truth About Obama*, 575 F.3d at 351 (citing *Winter*, 555 U.S. at 22).  To prove this element, Plaintiffs must establish (1) that they are suffering actual and imminent harm, not just a mere possibility of harm in the future, and (2) that their harm is truly irreparable, meaning that it cannot be remedied at a later time with money damages. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991); *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir. 1994) (finding that "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate."); *see also Winter*, 555 U.S. at 22 (stating that a preliminary injunction will not be issued based only on the possibility of some remote future injury).

Plaintiffs allege that they are irreparably harmed "as a result of the deficient RAP and implementation of the deficient proposed containment actions of Defendants, including [sic] but not limited to the exposure to extensive contamination such as chlorinated solvents and arsenic from the Site, and the loss of their health, and the loss of substantial Constitutional rights." *See* TRO Motion at ¶ 12.  However, the individual Plaintiffs have submitted neither affidavits nor a verified complaint in support of their motion that explains how they are personally injured by the casino construction.  "Under the Federal Rules of Civil Procedure, a motion for a temporary restraining order must be supported by specific facts shown by verified complaint or sworn affidavit." *Suss v. JP Morgan Chase Bank, N.A.*, 2009 WL 2923122, *6 (D. Md. Sept. 10, 2009)

(denying plaintiff's TRO motion after considering plaintiff's amended complaint and defendant's opposition because plaintiff failed to file a sworn affidavit); *see also Henley v. Byars*, 2011 WL 5024159 (D.S.C. Sept. 12, 2011) (Mag. J. Hendricks) ("Rule 65 of the Federal Rules of Civil Procedure requires a showing of 'specific facts in an affidavit or a verified complaint [that] clearly show that [plaintiff will suffer] immediate and irreparable injury, loss or damage' in order for a temporary restraining order to issue").  Here, none of the ten named Plaintiffs filed sworn affidavits and therefore failed to establish that they will suffer immediate and irreparable harm in the absence of a TRO.

While paragraph 126 of the Complaint makes the unsubstantiated allegation that "Plaintiffs are residents of Baltimore City who live in close proximity to the Site and who use the trails and waterways, including the Middle Branch of the Patapsco River adjacent to the Site," at least part of that claim is demonstrably false as the supposedly "representative" Plaintiffs clearly do **not** live in close proximity to the Site.  *See* Compl. ¶¶ 1-10, showing only two plaintiffs in the same zip code as the proposed casino (21230), and Sullivan Aff., ¶¶ 22-31 and figure attached as Ex. 6-I, showing no named plaintiff living within 0.83 miles of the property.  Similarly, paragraph 135 of the Complaint and paragraph 4 of Plaintiffs' Motion make the unsupported allegation that Plaintiffs eat fish from the Patapsco River.  However, there is no allegation that any of the representative Plaintiffs fish from any point in the 39 mile long Patapsco River or that **any** Plaintiff catches fish in the Middle Branch of the Patapsco.

The only affidavit provided by Plaintiffs is that of Dr. Kool and that affidavit is inaccurate and deficient for all the reasons stated in the affidavit of Denise E. Sullivan, P.E. attached hereto as Ex. 6, and for the reasons stated in the affidavits of MDE VCP staff.  As described in Ms. Sullivan's affidavit, Dr. Kool was provided with so few of the extensive

investigation reports for the Site that he is in no position to express opinions about the present state of contamination, whether it is migrating offsite, or whether contamination reaches the Middle Branch.  Kool was also not provided with, or did not review, all the studies available on the contaminated property that lies between the Gateway South I parcels and the Middle Branch. Nor was he provided with the worker safety plan for the Site, so his opinions on the impact on workers' health are unsubstantiated.  *See* Kool Aff., ¶ 8.G, which indicates he was likely provided with the superseded 2012 RAP that was provided to the Court as Plaintiffs' Ex. H, but not provided with Appx. E to that RAP, the Site Specific Health and Safety Plan Guidance Document, referenced on page iii of Ex. H.  Furthermore, since none of the Plaintiffs are alleged to be workers or visitors at the Site, Kool's expression of opinions about impact to *future* casino workers and visitors (Kool Aff., ¶¶ 9.f, g, & h), none of whom are Plaintiffs in this action, provides no support for a claim of irreparable harm.  Kool is simply incorrect in paragraphs 9.a and 9n. about the dewatering plans for the Site.  *See* Sullivan Aff., ¶¶ 36 and 48.  Kool's opinions on air quality during construction (par. 9.b) are completely speculative whereas CBAC has been monitoring air quality at the Site since construction began.  Sullivan Aff., ¶ 37.

To prove irreparable harm, Plaintiffs must also show that that they are likely to suffer immediate and irreparable injury that cannot be remedied at a later time with money damages. *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir. 1994).  Yet paradoxically, Plaintiffs' Complaint repeatedly requests significant monetary damages in addition to injunctive relief, demonstrating that Plaintiffs believe monetary damages can adequately address any damages proved by Plaintiffs.  *See e.g.,* Compl. ¶¶ 155, 163, 171, 183 (requesting as remedies for violations of Counts II, III, IV, and V, a TRO and/or

Preliminary Injunction against Defendants as well as damages in the amount of $100 million, plus interest and costs).

Plaintiffs' Complaint makes it appear as if this property was placed in the VCP at the eleventh hour following minimal environmental assessment and concealed from the public. Nothing could be further from the truth.  The Gateway South and Warner Street Properties have been in the VCP program since early 2010.  Over the past three years, Plaintiffs and the general public have been provided multiple opportunities to participate in, and comment on, the VCP process.

Plaintiffs make unsubstantiated claims that the public participation process for the 2012 CBAC RAP was deficient but their attorneys acknowledged before the Court on August 1 that the Plaintiffs failed to attend the public information meeting held on April 11, 2013 or to submit written comments during the 2013 public comment period.  *See also* Hanson Aff.-*Sherrill*, ¶ 21 and sign-in sheet referred to therein.   In light of the Plaintiffs' failure to use the public participation opportunities clearly afforded in 2013, they cannot now claim to have suffered irreparable harm from supposed defects in the public participation process.

C.   The Balance Of Equities Favors Defendants Because The Economic Harm To CBAC, Whiting-Turner, And The City Is Significant.

A preliminary injunction will result in monetary and other damage to CBAC, Whiting-Turner, the City, the State, and the surrounding community.  Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *See Winter,* 555 U.S. at 24 (internal quotation omitted).  Economic harm is indeed a factor in considering the balance of equitable interests. *See, e.g., Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987) (concluding that where asserted environmental injury was "not at all probable," economic interest was properly given more weight); *Earth Island Inst.*

*v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (holding that the district court did not err in concluding that balance of harms did not tip in environmental organization's favor where a Forest Service project would result in significant timber sales and "provid[e] a boost to the local economy by creating jobs in the local logging industry").

Plaintiffs inaccurately state that "Defendants will suffer no harm in the issuance of a temporary restraining order." *See* TRO Motion at ¶ 15. This statement could not be further from the truth and ignores the substantial harm that Defendants will suffer if the Court enters a temporary restraining order or preliminary injunction. *See Montrose Parkway Alternatives Coal. v. U.S. Army Corps of Eng'rs*, 405 F. Supp. 2d 587, 600-01 (D. Md. 2005) (denying preliminary injunction when defendant would incur substantial costs if court enjoined construction).

It is Plaintiffs' burden to demonstrate the balance of harms weighs in its favor. Plaintiff simply states that the harm to Plaintiffs is greater, without explaining why, and blatantly ignores the obvious costs associated with stopping an ongoing large-scale construction project. As the analysis below and accompanying affidavit demonstrate, the balancing of hardship strongly favors CBAC because CBAC will suffer significant financial hardship and inconvenience if the temporary restraining order or preliminary injunction is granted.

The financial effects of delaying all construction-related activities and operations at the Casino are staggering and significant. As described in **Ex. 16**, Affidavit of Chad Barnhill ("Barnhill Aff."), the costs of delays far exceed those in *Montrose Parkway,* 405 F. Supp. 2d at 600 (defendant demonstrated it would incur costs of over $1 million if preliminary injunction was issued).

CBAC's costs associated with delay are far from speculative. CBAC estimates that it will suffer free cash flow losses totaling $4.12 million in the event of a one month delay and

$24.32 million in the event of a six month delay.  *See* Barnhill Aff., at ¶¶ 8, 9.  In addition, CBAC's affiliate, Caesars Entertainment Corporation, which is not a party to this action, will suffer "cross market play" losses of $1.01 million from a one month delay and $5.95 million from a six month delay.  *Id.* at ¶¶ 10 and 11.

Further, the management company for the Casino, Caesars Baltimore Management Company, Inc., which is also not a party, will lose $1.34 million in management fees due to a one month delay.  *Id*. at ¶ 12.  A six month delay would result in losses equal to $7.89 million.  *Id.*

The estimated tax losses to the City and State total $15.4 million from a one month delay and $86.66 million from a six month delay.  Barnhill Aff., at ¶ 17.  Additionally, the City would lose $840,000 in lease revenue from a one month delay and $4.71 million from a six month delay.  *Id.* at ¶ 18.  Furthermore, approximately 44 percent of the proceeds of video lottery terminals and 20 percent of the proceeds from table games will be paid to the State's Educational Trust Fund.  *See* Md. Code Ann. State Gov't §§ 9-1A-27(a)(8), (d)(2) (2012 Supp.).  Money in the Educational Trust Fund shall be used to "provide funding for public elementary and secondary education . . . provide funds to construct public school buildings and provide public school capital improvements . . . provide funds for capital projects at community colleges and public senior higher education institutions; and provide funds to expand public early childhood education programs in the State." *Id.* at § 9-1A-30(c).

Five and a half percent of the proceeds of video lottery terminals at the Baltimore City facility will fund local impact grants.  *See* Md. Code Ann. State Gov't §§ 9-1A-27(a)(3); 9-1A-31 (2012 Supp.).  Approximately 82 percent of the local impacts grants will be distributed to the local jurisdictions where video lottery facilities are located.  *Id.* at § 9-1A-31(a)(1)(i).  In

Baltimore City, local impact grants shall be used for improvements in the communities in immediate proximity to the video lottery facilities and may be used for infrastructure improvements, public safety, facilities, sanitation, economic and community development including houses, and other public services and improvements. *Id.* at § 9-1A-31(b)(3).

One and a half percent of the proceeds of video lottery terminals at the Baltimore City facility will be allocated to the Small, Minority, and Women-Owned Businesses Account established under § 9-1A-35. *See id.* at § 9-1A-27(a)(6). At least 50 percent of the funds from this account will be allocated to small, minority, and women-owned businesses in the South Baltimore community surrounding the Casino. *Id.* at § 9-1A-35(c)(3).

As demonstrated by the affidavit submitted by co-Defendant Whiting-Turner, a temporary restraining order or injunction would result in significant costs including but not limited to direct costs for idled construction contractors, demobilization and remobilization of equipment or crews, and contractual penalties for delay.

Finally, in addition to the losses described above, jobs will be lost or delayed by an injunction. Construction of the Casino has been underway since March 2013 and will continue into 2015. There are currently 180 employees on site and there are expected to be 425 employees at the peak of construction. Barnhill Aff., at ¶ 19.

Following construction, operation jobs will exist and these will be lost or delayed by an injunction. CBAC estimates 1482 positions in the first month of operations, based on a projection of 82% full time and 18% part time employees. *Id*. at ¶ 20. Additionally 300 jobs are projected for third party employers such as the food service company. *Id*. The number of jobs will fluctuate over the first 3 years of operations but are projected at the 3 year point to be 1479

CBAC jobs and 307 third party jobs. *Id.* The positions would not begin as planned if an injunction was entered and would be delayed by the period of the injunction. *Id.* at ¶ 20.

> D.    The Public Interest Favors Defendants.

A preliminary injunction will result in substantial harm to the public, Baltimore City, and the State. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter,* 555 U.S. at 24 (*quoting Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312 (1982)). The Court must consider whether the public would be better served by enjoining the requested action or permitting the action. *Winter,* 555 U.S. at 26 (holding that public interest in conducting Navy training exercises under realistic conditions plainly outweighs the interests advanced by Plaintiffs); *see also Western Watersheds Project v. Bureau of Land Management*, 774 F. Supp. 2d 1089, 1103-04 (D. Nev. 2011) (denying motion for TRO/preliminary injunction and finding a strong public interest in a proposed wind energy facility that would generate 220 new jobs for Nevada residents, millions in property tax revenues, and further the State's clean energy goals). Injunctions are routinely withheld or limited when contrary to government interests. *Winter*, 555 U.S. at 24.

In this case, Plaintiffs' requested injunction far exceeds the bounds of permissible relief and disregards the significant interest of the State and City in implementation of the approved RAP, redevelopment of underutilized contaminated property, and returning the site to the tax rolls.

The public interest favors the voluntary cleanup of contaminated brownfields under MDE supervision and in accordance with MDE-approved cleanup plans. The VCP statute does not provide the public with the right to challenge the remedial measures in a Response Action Plan approved by MDE. In determining whether to grant injunctive relief against voluntary cleanup,

of preeminent importance is the public interest in community redevelopment, environmental remediation, and job creation. All of these interests are directly implicated when an injunction threatens to delay a $400 million plus redevelopment project. Barnhill Aff., at ¶ 3.

Plaintiffs must prove that the public interest will *not* be harmed by the issuance of the injunction. *See Winter*, 555 U.S. at 27-28, 32-33 (potential adverse impact to the public interest in national defense warranted denial of the injunction regardless of the plaintiff's likelihood of success on the merits or the likelihood of irreparable harm). Plaintiffs argue that "the public interest is best served by the granting of this injunction as, among other things, the protection of the environment and the express public policy of the State of Maryland, the rights granted by the Constitution of the United States, as well as the United States Code, are matters of the public interest." TRO Motion at ¶ 22. It defies logic that the public and the environment will be better off if this court enjoins the voluntary cleanup of contaminated property. Issuance of a preliminary injunction is against the public interest because it will result in continuing harm to the environment from the historic contamination at the Site and delay the benefits to the surrounding community of remediation.

Implementation of CBAC's MDE-approved RAP, and construction of the Casino, will greatly benefit the public. This Site has documented contamination and CBAC has an MDE-approved RAP that will result in measurable beneficial impacts to the local economy, the environment, and to the public. *See generally*, Barnhill Aff., Ex. 16. All Defendants, including MDE, have a strong interest in completing the project to remedy current environmental harms and to return the site to productive use. *Montrose Parkway Alternatives Coal.,* 405 F. Supp. 2d at 600-01 (denying preliminary injunction when, *inter alia*, it would result in continuing harm to the environment because the construction project was expected to have a beneficial impact on

degraded and sensitive areas); *East 63rd Street Association v. Coleman*, 414 F. Supp. 1318, 1331 (S.D.N.Y. 1976), *aff'd by order*, 538 F.2d 309 (2d Cir. 1976) (denying citizen group's request for a preliminary injunction because the primary public interest lay with the rapid completion of a subway). The Casino must complete the project by June 25, 2015 (Barnhill Aff., ¶ 13); however CBAC must complete the remediation and construction process well before that deadline. Every day that the Casino is delayed is another day of lost revenue for CBAC, the City, and the State.

Plaintiffs also ignore the fact that the Defendants CBAC and the City are Inculpable Persons, meaning they are not responsible for the release of hazardous substances at the Site, or the cleanup of the Site. If Defendants' construction activities exacerbate existing contamination, the statutory remedy is an MDE enforcement action. If a third party suffers actual injury, it can bring a tort claim.

Without providing any factual support, Plaintiffs allege that the MDE-approved RAP "completely ignores the very significant risk that the construction activities will also mobilize contaminants underground, i.e. groundwater" and "Plaintiffs are at a significantly heightened risk to be adversely affected by the movement of the known contaminant into the groundwater and into the Middle Branch . . ." TRO Motion at ¶¶ 3, 8. None of the Plaintiffs live within 0.83 miles of the Site and none have provided affidavits explaining how they will be harmed. *See* Sullivan Aff., at ¶¶ 21-32, and Figure I attached thereto.

Furthermore, Plaintiffs have not demonstrated that if construction continues, it will no longer be possible to address their concerns. To the contrary, Plaintiffs suggest that the "proper environmental testing" they seek could be performed after the proposed cap at the Site is complete, albeit with "substantial destruction to the proposed cap." TRO Motion at ¶ 25.

Besides failing to demonstrate that speculative harms will occur, Plaintiffs have not demonstrated that the performance of CBAC's RAP will make it impossible to remedy contamination down the road, if it should occur.

      E.      <u>Plaintiffs Should Be Required to Post a Bond.</u>

A court may not issue a preliminary injunction unless a bond has been filed.  Under Rule 65(c) of the Federal Rules of Civil Procedure, a party seeking an injunction must post security "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." On its face, Rule 65(c) provides no exceptions.  A request for waiver of bond must be supported by an affidavit or testimony under oath stating the grounds for entitlement to the waiver.  Yet Plaintiffs' fail to submit affidavits as to their financial resources and counsel represents only that "Plaintiffs are people who live in the vicinity of the Site and are of modest means."  TRO Motion at ¶ 15.  Plaintiffs do not live in the vicinity of the Site and have provided no evidence suggesting they are of modest means.

Plaintiffs have retained experienced counsel to represent them in this litigation as well as an experienced hydrogeologist.  Plaintiffs clearly have the resources to post a bond to cover CBAC's projected losses.

CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief should be denied.

Respectfully submitted,

VENABLE LLP


_____/s/_____

**Kenneth L. Thompson**
Thomas M. Lingan
M. Rosewin Sweeney
750 East Pratt Street - Suite 900
Baltimore, Maryland  21202
(410) 244-7400

*Attorneys for Defendant CBAC Gaming, LLC*

6988190-v5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES R. ROBINSON, et al.,     *
               *

    Plaintiffs,     *

v.             *  Case No.: 1:13-cv-02234-RDB

STATE OF MARYLAND DEPARTMENT *
OF THE ENVIRONMENT, et al.
               *
    Defendants.
               *

## **ORDER**

Upon consideration of Plaintiffs' Motion for Temporary Restraining Order and

Preliminary and Permanent Injustice Relief, and of Defendants' responses thereto, it is this

___ day of August 2013, by the U.S. District Court for the District of Maryland:

ORDERED that the Plaintiffs' Request for a Temporary Restraining Order and

Preliminary and Permanent Injustice Relief is DENIED.

_____
Judge Richard D. Bennett

cc:  All parties

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of August, 2013, the foregoing Opposition to

Plaintiffs' Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive

Relief was served on the following via ECF:


Walter W. Green
Law Office of Walter W. Green
7309 Baltimore Avenue, Suite 115
College Park, Maryland 20740
wgreen@greenslaw.com

*Counsel for Plaintiffs*

Anuj Sud
Sud Law Firm
7309 Baltimore Avenue, Suite 117
College Park, Maryland 20740
anuj@sudlawfirm.com

*Counsel for Plaintiffs*


And on the following via email:

Matthew Zimmerman
Assistant Attorney General
Maryland Dept. of the Environment
Office of the Attorney General
1800 Washington Boulevard
Baltimore, MD  21230-1718
mzimmerman@mde.state.md.us

*Counsel for Maryland Department of
the Environment*

Thomas C. Valkenet
Ian T. Valkenet
Young & Valkenet
600 Wyndhurst Avenue, Suite 230
Baltimore, Maryland 21210

*Counsel for Defendant Whiting-
Turner Contracting Company*

Jay West
West & Gaarder, LLC
409 Washington Avenue, Suite 1010
Baltimore, Maryland 21204
Jay.West@westgaarder.com

*Counsel for Defendant Urban Green
Environmental*

Matthew W. Nayden
Chief of Litigation
Baltimore City Law Department
100 N. Holliday Street
Baltimore, MD 21202
matthew.nayden@baltimorecity.gov

*Counsel for Mayor and City Council
of Baltimore*


_____/s/_____
Kenneth L. Thompson