IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | |
|---|---|
| JAMES R. ROBINSON, et.al., | |
| Plaintiff | Case No.: 1:13 CV 02234 RDB |
| v. | |
| State of Maryland Department of the Environment, et. al., | |
| Defendants | |

**OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

The Whiting-Turner Contracting Company, through its attorneys, opposes the Plaintiffs' motion for temporary restraining order, and says:

**I.  Summary of argument.**

The Plaintiffs cannot meet the heightened standards of proof required in this court for a temporary restraining order that enjoins Whiting Turner's construction activities. The Plaintiffs cannot show a likelihood of success on the merits. More importantly, the irreparable and devastating harm visited on Whiting-Turner should a TRO be issued far outweighs the scant benefits sought by the Plaintiff—additional public comment under the VCP program, and testing for potential, imagined and inchoate conditions.

**II.     Discussion.**

  **A. The Fourth Circuit's heightened TRO standard.**

The Plaintiffs must "…make a clear showing that [they] will likely succeed on the merits at trial." *Real Truth about Obama, Inc. v. Federal Election Com'n,* 575 F.3d 342, 346 (4th Cir. 2009). This element may no longer be balanced among the other requirements for a temporary restraining order- it must be separately satisfied even before the Court attempts to balance the relative hardships of the parties:

> [T]he Supreme court in *Winter*, recognizing that a preliminary injunction affords relief before trial, requires that the plaintiff make a clear showing that it will likely succeed on the merits at trial. [citation omitted] Yet in *Blackwelder*, we instructed that the likelihood-of-success requirement be considered, if at all, only after a balancing of hardships is conducted and then only under the relaxed standard of showing that "grave or serious questions are presented" for litigation. [citation omitted]. The *Winter* requirement that the plaintiff clearly demonstrate that it will succeed on the merits is far stricter than the *Blackwelder* requirement that the plaintiff demonstrate only grave or serious question for litigation.

Id., 575 F.3d at 346-347. The Plaintiffs may not load up on one element of the TRO standard while ignoring another and expect to obtain injunctive relief. The current law of this circuit rejects old standards which "allow[ed] requirements to be conditionally redefined as other requirements are more fully satisfied. Id., 575 F.3d at 347.

  **B.     The Plaintiffs cannot demonstrate a likelihood of success on the merits.**

Immediate and preliminary injunctive relief is demanded in five counts of the Complaint. Counts II, III, and IV of the Complaint are civil rights claims. Count V is based on an alleged violation of the Clean Water Act. Count XI is a general demand for a TRO based on the preceding substantive allegations.

1. <u>The Plaintiffs seek injunctive relief when the proper cause of action is a writ of mandamus.</u>

The plaintiffs do not understand the *status quo* they seek to preserve.  In challenging the adequacy of the RAP, they are challenging only CBAC or Whiting-Turner's "inculpable person" status. This is, whether they are entitled to liability protection under the Voluntary Cleanup Program ("VCP"), not whether they can start or continue construction. The VCP is a voluntary program and construction could occur with no RAP.  The alleged loss of "inculpable person" status by any entity is not a ground to enjoin the construction.

The primary purpose of the VCP program is redevelopment of properties "with known or perceived contamination" that, because of that perception, have been economically useless. Md. Code Ann, Environment §7-503(b)(1).  It is designed for the benefit of those who might redevelop such properties- to encourage investigation of these properties, accelerate their cleanup, provide "predictability and finality to the clean up," and of course to protect public health where cleanup is performed. *Id.* at §7-503(b)1)-(4). The VCP is not an environmental protection program in the fashion argued by the Plaintiffs.

The Program is designed to grant "inculpable person status" to one who seeks to develop contaminated property, and once MDE grants such status, that person "is not liable for existing contamination at the eligible property."  *Id.* at §7-505(b). Stripped of the designation, the entity would continue development or construction activities without benefit of statutory immunity from liability.

Participation in the VCP is voluntary. Participation is not a condition of developing commercial property. A person or entity submits an application to MDE, on the basis of which the latter approves the applicants status as an "inculpable person." *Id.* at §7-506(e)(1).  "Inculpable

person" includes "[a] successor in interest in an eligible property acquired from an inculpable person" *Id.* at §7-501(j)(2)(i).

After MDE approves the applicant's participation in the Program, the applicant submits a "response action plan" (RAP) relevant to the property. *Id.* at §7-508. "The Department shall approve a response action plan if the Department determines that the response action plan protects public health and the environment." *Id.* at §7-510.

MDE's approval letter is a determination that, "[no] further action will be required to accomplish the objectives set forth in the approved response action plan," and that if the plan is implemented to the satisfaction of MDE, and the cleanup criteria are achieved, the participant "will receive a certificate of completion." *Id.* at §7-511(c). That certificate warrants that the participant is "released from further liability for the remediation of the eligible property[.]" *Id.* at §7-513(b)(4).

MDE does not issue a permit under the VCP, and public participation under the Program amounts only to notice and an opportunity to comment. MDE is to provide notice of an application for the Program, and an opportunity to comment, *Id.* at §7-506(d); the applicant provides notice of the proposed response action plan through a newspaper advertisement and a sign at the land in question, *Id.* at §7-509 (a)(2) &(2); and MDE receives written comments on the RAP, and hosts a "public information meeting," *Id.* at §7-509(b),(c). There is no requirement that MDE respond to or address public comments.[1]

Insulation of liability as an "inculpable person" through the VCP is not a prerequisite to beginning, continuing, or completing construction. It is merely an *incentive* to those who may be otherwise disinclined by their potential liability to begin such endeavors. Should the Plaintiffs prevail in demonstrating that the RAP is deficient, their success may merit only a stripping of some

---

[1] The Plaintiffs did not participate, anyway, as conceded at the last hearing.

entities "inculpable person" status—not a halt of construction—by MDE. Alleged deficiencies in any aspect of the VCP cannot properly ground a grant of immediate injunctive relief.

To the extent the VCP aspect of this case is briefed further by one or more of the other defendants, Whiting-Turner incorporates those arguments by reference.

2. The Plaintiffs cannot demonstrate a likelihood of success on the civil rights claims.

The Plaintiffs claim, in support of Count II (Violation of Title VI of the Civil Rights Act of 1964), that "[t]he approval of the deficient RAP has a disparate impact on the predominately African-American communities." *See*, Complaint at ¶149. In support of Count III (Violation of the Civil Rights Act §1983) the Plaintiffs allege that, "[t]his action is brought on behalf of Plaintiffs and other persons of African-American descent, in such communities." *See,* Complaint at ¶161. To substantiate Count IV (Violation of the Fourteenth Amendment), the Plaintiffs allege that "[t]his action is brought on behalf of the Plaintiffs and other persons of lower income and/or African-American descent." *See*, Complaint at ¶169.

First, it bears mentioning that "persons of lower income" is not a class protected under the Civil Rights Act, nor the Fourteenth Amendment. Second, though the Plaintiffs use jargon associated with class action lawsuits, they do not seek class certification. Therefore, the merits of their claims, and the probability of their success thereon, must be measured by the named Plaintiffs, not the potential members of an uncertified class. Lastly, the Supreme Court has held that disparate impact, alone, is not enough to invalidate governmental action under the Fourteenth Amendment. *Washington v. Davis*, 426 U.S. 229, 242 (1976)("Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of the government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another"). The burden on the Plaintiffs is greater than that. "Proof of racially discriminatory intent

or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-265 (1977).

To sustain their burden, the Plaintiffs may demonstrate such an invidious discriminatory purpose by both direct and circumstantial evidence. *Id.* at 266. The Supreme Court has provided five factors to be considered: (1) the historical background of the decision, especially if it reveals a series of actions taken for invidious purposes; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence; (4) departures from substantive considerations, especially of the factors normally considered important to the decision-maker strongly favor a decision contrary to the one reached; and (5) legislative or administrative history, especially where there are contemporaneous statements by members of the decision-making body, minutes of its meetings, or reports. *Id.* at 267-268.

The Plaintiffs support their "disparate impact" argument with three general allegations. First, the Plaintiffs allege that the State allowed the City of Baltimore and the Casino to bypass regulatory guidelines and statutory requirements. *See,* Complaint at ¶¶ 79, 85, 88, 89,. Second, they allege that a "similar" project was conducted in Fells Point, which is alleged to be a "predominately upper-middle/upper class" neighborhood populated by "Caucasian residents." *See,* Complaint at ¶83. They allege that the State required a much larger budget for environmental clean-up for the Fells Point project. Third, that the City of Baltimore "has a pattern of intentional discrimination in the siting of undesirable industry that causes toxic contamination near predominately African-American communities within the boundaries of Baltimore City, such as the Site at issue in this case." *See,* Complaint at ¶145.

These allegations are entirely unsubstantiated by reference to exhibits, citations, factual references, or any affidavit submitted in support of their Motion. In fact, the Plaintiffs' allegations

6

ignore the historical evidence that shows that Westport and Cherry Hill were working farms some 50 years prior to the founding of Baltimore City, and were built among industry:

> As early as 1675, settlers were setting up small farms in what is now Westport. In 1732, wealthy landowner Charles Carroll purchased the plots and the following year, sold several tracts along the Middle Branch of the Patapsco River to fellow British settler John Moale. The Middle Branch, rather than the Northwest Branch, might have served as the original settlement of Baltimore had Moale not believed that iron mining was more lucrative than real estate speculation. Moale founded the Baltimore Company and constructed an iron furnace at the mouth of the Gwynns Falls, which empties into the Middle Branch. The foundry continued in operation until the Civil War with scows transporting the iron ore out through the Middle Branch harbor.

http://www.westportpartnerships.org/www/docs/118/westport_waterfront_development_community_partnerships/   (last checked 8/5/2013 6:09 pm)

In sum, the Plaintiffs cannot demonstrate a likelihood of success on the merits because their allegations regarding the racially disparate impact of the project are superficial, conclusory, and contrary to historical evidence.

3. <u>The Plaintiffs cannot demonstrate a likelihood of success on the merits on their Clean Water Act claim.</u>

Count V of the Complaint alleges that the City of Baltimore, the Casino, and the Maryland Department of the Environment violated the Clean Water Act ("CWA"). Based on that allegation, the Plaintiffs further allege that the Whiting-Turner and other defendants are obligated to obtain National Pollution Discharge Elimination System ("NPDES") permits. The Plaintiff further alleges that because permits were not obtained "[t]he violation has cause [sic] Plaintiff [sic] and the public in general to suffer substantial and irreparable harm to their health and the health of the environment."

The Plaintiffs' allegations regarding the discharge of pollutants and obligation of the Defendants to have NPDES permits are entirely unsubstantiated by reference to exhibits, citations, factual references, or any affidavit submitted in support of their Motion. Further, the Plaintiffs aver

a past and continuing injury to the Plaintiffs and the "public in general." The "public in general" is not a named party, and as such should be ignored for purposes of pleading. The Plaintiffs adduce no evidence of physical or mental ailments to themselves or the environment, and no monetary loss resulting from diminished wages or property loss. The allegations and supporting affidavits speak only of a speculative, potential injury. Even taking the allegations regarding the application of the CWA and the NPDES as true, a claim cannot be sustained without damages. That the Plaintiffs cannot substantiate any injury is fatal to their claim, and they are unlikely to succeed on the merits.

### C. The Plaintiffs have not suffered, nor will they suffer, irreparable harm.

It is incumbent upon the Plaintiffs to demonstrate a real and irreparable harm in order to obtain a TRO. The Plaintiffs allege a speculative harm. For instance, at Paragraph 16 of the Affidavit of Jan Kool, the harm is so speculative, it borders on the absurd: contaminated ground water *may* come into contact with utility pipes; those utility pipes *may* become cracked; if those pipes become cracked, the contaminated water *may* leak into the pipes; if the contaminated ground water leaks into the pipes, it *may* discharge into surrounding waters; if the contaminated water discharges into surrounding waters, the Plaintiffs *may* suffer an injury. *See,* Affidavit of Jan Kool at ¶16.

This is exactly the kind of "speculative harm" the Supreme Court has held to be insufficient to sustain a TRO. *See, Winter v. Nat. Resources Defense Council, Inc.*, 555 U.S. 7, 33 (2008)(injunction of Navy training activity alleged to have been harming marine life denied, "in light of the fact that the training has been going on for 40 years with no documented episode of harm to a marine mammal"). The Plaintiffs have not adduced any evidence that contamination has spread. They cite to no test results, no environmental or physical reactions, and no monetary loss that would indicate an "irreparable injury."

Further, the Plaintiffs allege, in support of their argument, that the Holiday Inn Express, who is not a party to this action, would suffer injury.  *See*, Affidavit of Jan Kool at ¶¶9(i), 9(o), and 14.  Such an allegation does nothing to change the balance of harms.

### D. Whiting-Turner will suffer a calculable, definite, and irreparable harm if the TRO is issued.

The court is to consider, prior to granting a TRO, the affect of its issuance on the enjoined parties.  If this Court were to issue a TRO, Whiting-Turner would suffer the following direct consequences:

- Whiting-Turner would be forced to immediately lay off, reassign, or terminate at least:
    - 195 laborers
    - 27 supervisors/managers

- Whiting-Turner would be forced to terminate, amend, or breach consummated contracts in the amount of $98,000,000.00.

- Whiting-Turner would be forced to transport, dismantle, re-sell, or return a massive trailer complex on site, a concrete batch plant, 3 tower cranes, several truck and crawler cranes, earthmoving and excavating equipment, millions of dollars of formwork and reinforcing steel, utility piping and various other supplies and equipment.

*See,* Affidavit of David M. Hahner, attached hereto as Exhibit A.

The injury incumbent on Whiting-Turner, in contrast to that alleged by the Plaintiffs, is concrete, substantial, and irreparable.  This court must balance the equities, measuring the potential harm to each party in determining whether a TRO is appropriate.  Here, Whiting-Turner's potential harm amounts to *at least* ninety-eight million dollars.  The Plaintiffs, on the other hand, allege a potential, future, and immeasurable injury.  In this case, the balance tips heavily in favor of Whiting-Turner.

### E. The public interest is not served by the issuance of a TRO

The Plaintiff seeks a TRO to enjoin actions that have been proposed, reviewed and vetted by expert professionals, subjected to public comment, and approved by the State. The public has a societal interest in finality, comity, and conservation of scarce judicial resources. *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1926 (2013). This interest does not diminish because the decision is an administrative, rather than a judicial one. *Modeba v. Gonzales*, 167 Fed.Appx. 967, 2006 WL 435807 (C.A. 4)(recognizing the "strong public interest in the finality of administrative decisions").

Here, to grant the TRO sought by the Plaintiffs would be to undermine the finality of decisions made by the MDE, the City of Baltimore, and the State of Maryland. The public was afforded the right to review the RAP and attend a public hearing to comment. The Plaintiffs are not entitled to a TRO merely because they did not participate in the process. To grant them one now would be to diminish the importance of public hearing and comment, and give the public a *de facto* "veto" over administrative decisions.

### F. Assuming, *arguendo*, the Court is inclined to grant a TRO, the Plaintiffs' request to waive the bond requirement should be denied.

The Plaintiffs, on page 11 of their Motion, request this Court to waive the surety and bond requirement that is concomitant with the granting of a TRO. In light of the staggering cost to Whiting-Turner alone, who is but one Defendant among many, each of whom will incur some calculated damage by the granting of a TRO, waiving of the bond requirement is inappropriate.

### G. Conclusion

The Plaintiffs seek an extraordinary remedy that would impose a titanic cost on the Defendants. They have fallen woefully short in satisfying the burden of production and persuasion required for the grant of a TRO. As such, the Plaintiffs' request must be denied.

/s/
Thomas C. Valkenet (Bar No. 03968)
Ian T. Valkenet (Bar No. 30112)
Young & Valkenet
600 Wyndhurst Avenue, Suite 230
Baltimore, Maryland 21210
(410) 323-0900
TCV@youngandvalkenet.com

Attorneys for The Whiting-Turner Contracting Company

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 7, 2013, a copy of the foregoing Entry of Appearance was filed electronically on the Courts' PACER system, and was thus served via the Court's transmission facilities, to:

| | |
|---|---|
| Walter W. Green, Esquire<br>Law Office of Walter W. Green<br>7309 Baltimore Avenue, Suite 115<br>College Park, Maryland 20740<br>wgreen@greenslaw.com | Anuj Sud, Esquire<br>Sud Law Firm<br>7309 Baltimore Avenue, Suite 117<br>College Park, Maryland 20740<br>anuj@sudlawfirm.com |
| Attorney for the Plaintiffs | Attorney for the Plaintiffs |

Thomas Mark Lingan
Mary Rosewin Sweeney
Kenneth L. Thompson
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, Maryland 21202
tmlingan@venable.com

Attorneys for CBAC Gaming

/s/
Thomas C. Valkenet