IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JAMES R. ROBINSON, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Case No. 1:13-CV-02234-RDB |
| | * | |
| MARYLAND DEPARTMENT OF THE ENVIRONMENT, *et al.*, | * | |
| Defendants. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### AFFIDAVIT OF RICHELLE HANSON

1.  I am over the age of eighteen and competent to testify to the matters stated herein.

2.  In 1998, I received a B.S. in Geology from Vassar College and in 2000 I received a M.S. in Marine Science from University of Southern Mississippi.

3.  I have been employed by the Maryland Department of the Environment ("Department") for 12 years. Currently I am a project manager within the Department, and I have been in this position since 2004.

4.  As a project manager, I am principally responsible for reviewing the Voluntary Cleanup Program ("VCP") application forms and all relevant environmental reports, determining whether the application package is complete and the property is adequately characterized, and when necessary, attending the public informational meeting, reviewing response action plans ("RAPs") and ensuring that the implementation of the RAP has been adequate prior to issuance of a Certificate of Completion ("COC"). I have been the project manager for 101 applications for 64 properties that have applied to the VCP.

5.  As part of my duties as the project manager for the site in question, I reviewed and approved VCP applications filed by BDC for two aggregated parcels of real estate,

EXHIBIT A

commonly known as "Gateway South Phase I Properties" and "Warner Street Properties". The properties are located in an industrial area. The nearest residence is more than ¼ mile from the property.

6. The properties had been used for a number of different commercial purposes dating back well over 100 years, but had in recent times been unoccupied, except for abandoned warehouses and other structures. Site assessments submitted as part of the applications showed that the properties were contaminated with a number of substances in a fashion typical of commercial properties in Baltimore City. I have personally served as project manager of at least two other waterfront properties that were similar.

7. On April 25, 2008, BDC, on behalf of the City of Baltimore, the property owner, submitted an application to the VCP seeking a Certificate of Completion for future commercial use of the Gateway South property.

8. On June 4, 2009, BDC, on behalf of the City of Baltimore, the property owner, submitted an application to the VCP seeking a Certificate of Completion for future commercial use of the Warner Street property.

9. On the VCP application forms submitted for the properties in 2008 and 2009, BDC indicated that the future use of the property was retail space with parking garage office space and indoor sports arena.

10. Meanwhile, on November 4, 2008, by referendum, the people of Maryland voted to allow video lottery terminals (VLTs) at a limited number of gambling sites, including Baltimore City.

11. I determined that the properties were eligible for participation in the VCP, and that BDC was an eligible participant, that it was entitled to inculpable person status, and accepted the applications for commercial use in the normal course of business.

12. In February 2011, BDC verbally notified the VCP that the Gateway South and Warner Street properties were being considered for the VLT location in Baltimore City.

13. Thereafter, BDC submitted a comprehensive Response Action Plan ("RAP") covering both aggregated parcels ("Combined RAP"). A RAP is a roadmap to guide the environmental remediation of the properties. The proposed RAP dated April 29, 2011 identified the property as the future VLT site. After meeting all of the public participation steps set forth in Environment Article 7-509, including newspaper publication, a public information meeting, holding open a formal public comment period, and exchanging comments with the applicant, the Department approved the RAP on September 15, 2011. It is my understanding that BDC subsequently leased the property to CBAC Gaming for development. Such a transfer to a second party is not unusual, in my experience.

14. It frequently happens that the developer of a VCP site has a plan for the site that is different from the general proposal made by the original applicant. Normally, the developer of the property will also apply to the VCP, as happened in this case. Such details as change in location and type of structures may mean that some change in the RAP is necessary. By long-standing practice, when a later applicant proposes a RAP that is generally the same plan as was approved after going through the public notice and comment process by an earlier applicant, the Department considers the second RAP without repeating the full process, provided nothing has changed at the site in the interim. That is exactly what happened in this case.

15. More generally, for as long as I have been involved with the VCP, it has been necessary to amend RAPs. This happens even when the original applicant goes on to develop the site itself. On almost every site, some change is required as the work progresses, sometimes for unexpected site conditions, newly discovered contamination, change in building plans and so forth. It is not uncommon for more than one change to be necessary on a given site. For such changes, assuming they do not materially alter the original plan, the Department requires written

documentation and approval in the form of a "RAP Addendum" or "RAP Amendment". The Department has never required public notification and comment on such changes.

16. I personally attended the BDC public information meeting held on June 1, 2011. None of the named plaintiffs to this lawsuit attended the meeting, nor did any member of the general public. The Department received one information request but no comments on the application or the RAP during the comment periods, before, after or during the information meeting.

17. In almost all cases, public meetings on VCP sites are lightly attended. In many cases, there are no public attendees. It is frequently the case that the does not receive any comments on a proposed RAP. It does happen, from time to time, that the Department receives a comment outside the formal comment period, sometimes by telephone, letter or email. The Department accepts all comments from the public, no matter when or how received, and considers them.

18. On July 10, 2012, the Department received a second VCP application for the aggregate parcels from CBAC Gaming. The applicant posted a sign at the property that included the name and address of the applicant and the property, my name, address and telephone number, as the person at the from whom information about the application could be obtained, and the period of time during which the would receive and consider written comments from the public. They posted most, but not all, of the same information on its website. The formal dates for receipt of comments were inadvertently not added. The website did not contain my contact information specifically, though it did contain contact information for the , and any inquiry about the site would have been routed to me as the project manager. The Department posted an amended fact sheet that reflected the new application of CBAC Gaming.

19. After determining that CBAC Gaming was an eligible participant entitled to inculpable person status, I accepted the application.

20. It frequently happens that an additional application for a property is submitted by another entity after a first application is received. The first applicant received pays a $6,000 application fee and subsequent applications pay a $2,000 application fee. The lower fee is based on the premise that additional applications will use the same data as the first application and will require less administrative review time. (Environmental Article, §7-506(a)(2)(ii and iii).

21. For properties such as this one, where an active application exists and a second application is submitted, the VCP does not require additional sampling to meet the one year data limit set forth in the VCP Guidance Document. The purpose of the data is to provide the Department a basis for decision as to whether a RAP is needed. To make that decision in the first instance, the Department requires fresh data, less than one year old. Once it is known that a RAP is needed, it is not necessary to answer that question again for a subsequent applicant—the answer is already in hand. In the case of the Gateway South and Warner Street properties, the VCP used the same data submitted for the original VCP application to determine whether a cleanup plan (RAP) was necessary for the property. No additional data was necessary to determine that CBAC Gaming needed to have a RAP in place to address contamination at the property. In fact, CBAC Gaming acknowledged in their application submittal that a RAP was required by submitting a proposed Amendment with their VCP application on July 10, 2012. New data would not have changed this requirement, unless it were to show that the contamination had somehow disappeared, an event outside the range of possibility. The VCP does not require the gathering of data for no useful purpose.

22. Thus, CBAC Gaming submitted a "Response Action Plan Amendment" (2012 RAP Amendment), based on the knowledge that it would have to address contamination at the site. The 2012 RAP Amendment was the same as the RAP already considered and approved, but with some minor modifications intended to suit the specific design of the structures CBAC proposed to build. It was, in all material respects, the same plan and equally as protective of

public health and the environment. I was personally familiar with the site, and knew that no substantial activity had taken place there since the original RAP was approved. In accordance with its normal practice, the Department considered and approved the 2012 RAP Amendment on November 27, 2012, without requiring a repeat of the public meeting process.

23. Meanwhile, on November 6, 2012, by referendum, the people of Maryland voted to allow table games at a limited number of gambling sites, including the Horseshoe Casino, converting what had been a slot machine parlor into a venue now permitting a wider selection of gambling attractions.

24. Shortly after that, a group of citizens represented by the law firm of Rich & Henderson filed a lawsuit in the Circuit Court for Baltimore City, claiming that they had been deprived of their right to public notice and comment on the approval of the CBAC 2012 RAP Amendment. None of those plaintiffs had attended the public meeting or submitted comments on what was a substantially identical RAP when BDC took it through the public notice and comment process in the summer of 2011. They demanded that work at the Horseshoe site be stopped until they had been given notice, a public meeting, and a chance to comment on the CBAC 2012 RAP Amendment.

25. Thereafter, although the Department believed it had fully complied with the requirements of the statute it administers, pursuant to the direction of the Department Secretary Robert M. Summers, I personally supervised a repeat of each step directed by § 7-509, public notice and comment. (See Affidavit of Robert M. Summers, Attachment A-1).

26. In the ordinary course of business, I personally saw notices of a public information meeting and comment period for the subject site published in the Baltimore Sun on March 23 and March 30, 2013.

27. I personally saw a sign posted on the property giving notice of a public information meeting and comment period.

28. I caused the notice of the information meeting to be published on the Department's website, along with information that the formal comment period would remain open until April 23, 2013, which it did. My name and telephone number is posted as the Department contact person for the site.

29. The public information meeting took place from 6-8 pm on April 11, 2013 at Montgomery Park, on Washington Boulevard. I attended the meeting. None of the Plantiffs named in this suit attended the public meeting, called for information or submitted comments on the 2012 RAP Amendment during the public comment period or in the period since the meeting.

30. Members of the public offered oral comments and asked questions. I took notes of the comments, and in some cases responded to the questions. In other cases, different members of Department staff responded to questions. The meeting was scheduled to last for two hours, and was called to an end at 8:00 p.m. when the heating and air conditioning was scheduled to end in the meeting space. Attachment A-2 is copy of the room reservation requesting climate control.

31. The Department received voluminous written comments from plaintiffs' counsel Rich & Henderson on April 23, 2013, but received additional comments from only one other member of the public, Mr. Adam Turner. Along with other members of the Department staff, I personally reviewed and considered each of the comments received.

32. In accordance with its normal practice, the Department considers public comments whenever received, whether during a formal comment period or not. Accordingly, when an Affidavit of Dr. Bouwer was sent to the Department along with a letter from Rich & Henderson on January 7, 2013, the Department treated it as a public comment.

33. The issues raised in the affidavit were known to the Department and had been previously considered, but the Department reconsidered each of them. The Department and CBAC mutually agreed that CBAC would conduct additional arsenic soil sampling at the Site.

CBAC's consultant, Urban Green, submitted a work plan, and performed the sampling. The results of the recent sampling were inconsistent with the earlier arsenic result that was of concern to Mr. Bouwer and suggest that arsenic contamination is not an issue at the Site. The VCP nonetheless decided that, in order to address public concerns about arsenic, CBAC should either perform further investigation or remove the soils in the vicinity of the sampling location known as B-38. Thereafter CBAC removed the soils, which were tested and found to be non-hazardous, and thereafter properly disposed of offsite.

34. Many of the comments made by members of the public at the information meeting concerned dust, truck traffic, the deposition of soil into neighborhoods, truck noise and offsite soil disposal. I personally visited the site soon after the meeting and met with CBAC construction supervisors and Denise Sullivan, Urban Green, to be sure that these concerns were addressed. In all cases, proper procedures were in place, but I notified CBAC that I would require written changes to the 2012 RAP Amendment to reflect the procedures. CBAC had already increased dust monitoring at the site beyond the minimum stated in the 2012 RAP Amendment. My investigation revealed that all demolition debris and soil leaving the site was going to proper disposal sites and not, for example, to an abandoned school property in the neighborhood, as had been rumored among members of the public.

35. On May 23, 2013, the VCP approved a revised RAP Amendment ("2013 RAP Amendment") after CBAC Gaming completed two additional revisions to the document in response to VCP comments in May 2013.

36. Having now received the affidavit of Jan Kool, Ph.D. the Department, in accordance with its normal practice to consider all public comments, whenever and however presented, has treated it as offering additional public comments. The issues raised in the Kool affidavit were all known to the Department and had been previously considered, but the Department reconsidered each of them. The VCP statute does not require that Department

respond to comments. It requires that it consider them. Thus, the observations presented below, and those of Mark Mank, the Department toxicologist, presented in a separate affidavit, are, in this circumstance, intended to go beyond the Department's normal process and shed light upon its considerations.

37. The affidavit states that the VCP Guidance Document and Code of Maryland, Environment Article §7-508 includes specific requirements for a RAP (Kool Affidavit para 9.c.) Dr. Kool conflates the requirements mandated by the Environment Article versus recommendations in the Guidance Document. The Guidance Document is a document released in 2006 that set forth guidance for participating in the VCP. VCP recommendations and requirements have changed over time and the VCP Guidance Document is not regulation or law. Dr. Kool blends the statute with the guidance, and presents guidance as if set forth by statute. Specifically, the requirements for a RAP set forth in Environment Article are as follows:

    a. A plan for all work necessary to perform the proposed RAP, including the long-term monitoring and maintenance of the site, if necessary;

    b. A demonstration to the satisfaction of the Department that the RAP

        1. Will achieve the appropriate cleanup criteria; and

        2. Will protect public health and the environment.

    c. A certified written statement that the property meets all applicable county and municipal zoning requirements; and

    d. Any other information related to the proposed RAP that the Department may reasonably require to determine that the plan meets the requirements of this subtitle.

38. Dr. Kool raises issues with potential discharge and stormwater management at the property during construction activities. The VCP does not have jurisdiction over either discharge or stormwater management but the 2013 RAP Amendment in Section 8.6 discusses the options

for addressing dewatering at the property. The approved 2013 RAP Amendment states in Sections 1.1, 6.7, and 9.0, as required by the VCP, that CBAC Gaming will comply with all local state and federal laws and regulations by obtaining all necessary approvals and permits to conduct the activities pursuant to an approved RAP. Standing water management and stormwater discharge are authorized under a sediment and erosion control permit issued by the City of Baltimore, not the RAP. The RAP is not a detailed permit, nor any permit at all, it is a blueprint for remediation of the site in a way that protects human health and the environment.

39. The Kool affidavit states multiple times that the 2013 RAP Amendment should address assumed and potential off-site impacts, including conducting immediate offsite air sampling in structures not owned or controlled by the City or CBAC. The VCP is a property-driven program and the RAP by nature is limited to the property participating in the VCP. An <u>inculpable person</u> such as the City and CBAC participating in the VCP, is not responsible for historic contamination that left the site before it took possession or control. If there is such contamination, it is the responsibility of the current offsite property owner or, potentially the responsible person (RP) who owned the site at the time the contamination left the site. (For other possible RPs see the definition of Responsible Person at Environment Article § 7-201u ). An example of such a possible RP is Maryland Chemical, which for many years operated at the Site.

40. In the event that VCP staff determines that there may be historic off-site impact, the issue is generally referred to the Controlled Hazardous Substances (CHS) Enforcement Section or the Oil Control Program (OCP) to contact the RP depending on the potential nature of the off-site contaminants. The VCP does not address historic off-site impacts directly. Neither CBAC Gaming, BDC nor Baltimore City is a RP for the Gateway South and Warner Street Properties. For the Gateway South property, Maryland Chemical Corporation is the Responsible Person. In this case, the VCP did not determine it was necessary to refer the property to the CHS Section or OCP, though it evaluated the data and considered the options.

41. A RAP approved by the VCP does require that the Participant through a variety of options, eliminate pathways for that contamination to impact human health and the environment based on the environmental assessments and contamination identified during the application review process. If contamination is <u>currently</u> leaving the site in amounts or concentrations that pose a threat to human health or the environment a Participant must reduce the source on the property in the RAP. The Department's analysis of the data confirms that is not the case in this instance. For a more detailed discussion of this issue see the Affidavit of Mark Mank.

42. Mr. Kool also has issue with the extent of sampling at the properties, stating that it is inadequate to properly characterize the contamination. The VCP review of the applications considered all historical data from 1998 through 2007, including the 2000 Datanet report in reviewing and approving the work plans for environmental assessments at the properties. The VCP required KCI to collect additional samples two times in 2009 to meet the VCP requirements for sampling for the 2007 application submitted for the Gateway South property. The VCP required KCI to collect additional samples at the Warner Street properties after the initial data was submitted in June 2009 for the 2009 application. Prior to acceptance of the 2007 and 2009 BDC applications for the properties and during the assessment process of the VCP, a total of 95 soil samples, 22 groundwater samples and 13 soil gas samples were collected. The VCP determined these samples were sufficient to characterize the property. This data was used by the VCP in toxicological evaluations to determine that a RAP was required to address impacts at the site. (See Affidavit of Mark Mank). The results of these same samples and evaluations were used to accept the CBAC Gaming application for participation in the VCP.

43. The affidavit includes multiple discussions of correction of the data tables and removal of a vapor intrusion table in the 2013 RAP Amendment. All tables and figures were corrected in the revision process. Urban Green had created the removed table to summarize their own calculations of risk from the vapor intrusion pathway. Because the VCP used their own

calculations in evaluating the vapor intrusion risks rather than those of Urban Green, CBAC was directed to remove the unnecessary vapor intrusion table to avoid confusion to the public. Both sets of calculations used the same underlying soil gas data but used different assumptions.

44. The affidavit also suggests that the Health and Safety Plan (HASP) was not sufficient to protect worker safety during construction. As part of the toxicological evaluations completed by the VCP during the application review of the properties, the construction worker population was identified as exceeding the recommended risk levels for commercial populations (See Mark Mank affidavit). Therefore, the VCP required that the RAP for the properties include a remedy to protect the construction worker population. The 2013 RAP Amendment discusses the construction worker exposure pathways in Section 4.2 and identifies the HASP and dust monitoring to control potential worker exposure in Section 4.4. While the VCP does not review or approve HASPs, it does require the HASP be attached as an appendix to the RAP to document that the remedy is in place. It is the responsibility of the Participant to ensure that a proper HASP for conditions at the site is drafted and implemented. In the 2013 RAP Amendment, the HASP is Appendix E. Furthermore, during my site visit to the property on April 19, 2013, Whiting-Turner described the training and documentation activities related to the HASP for all construction personnel on the property (See Site Visit memo, Attachment A-3).

45. Dr. Kool states there is no actual cleanup of contamination at the property, which is incorrect. The 2013 RAP Amendment specifies the following activities will be completed:

    a. Active vapor extraction points will be installed beneath the buildings on the property. Active vapor extraction is a source reduction technique for VOCs in soil. In addition to protecting building occupants from the accumulation of vapors in an enclosed space, as the vapors are pulled from beneath the surface, the source area shrinks over time. Furthermore, the RAP includes confirmation

sampling of soil gas and indoor air and soil gas in Sections 6.1, 6.1.1 and 6.1.2 to evaluate the efficacy of the proposed vapor intrusion remedy.

b. Removal of potentially arsenic impacted soil was required by the VCP and the removal requirements, including collection of confirmation samples and soil disposal requirements are set forth in Section 6.4 of the 2013 RAP Amendment.

c. Removal of all underground storage tanks, some of which contained diesel fuel, heating oil or solvents, from the property,. Currently 13 tanks have been removed under the oversight of the OCP. Some of these tanks had leaked, and all petroleum impacted soil has been or will be removed during proper tank closure, meeting the requirements of the Oil Control law and regulations and under the supervision of the Department's OCP. This is required by 2013 RAP Amendment Section 8.8 and further by the statement in Sections 1.1, 6.7, and 9, as required by the VCP, that CBAC Gaming will comply with **all** local state and federal laws and regulations by obtaining all necessary approvals and permits to conduct the activities pursuant to an approved RAP. According to the RAP status report received by the VCP on August 7, 2013, 1100 tons of petroleum impacted soil was removed for off-Site disposal to Soil Safe, Inc. in Brandywine, Maryland and approximately 40 tons of petroleum and chlorinated solvent impacted soil was removed for off-site disposal by Cycle Chem, Inc. as part of tank removals through May 31, 2013.

d. The cap is intended to protect commercial populations from soil remaining on the property  The 2013 RAP Amendment includes specific details and requirements for the cap to ensure the protection of public health after construction. Two capping scenarios are discussed, paved and concrete covered areas are detailed in Section 6.2 and landscaped areas are discussed in Section 6.3.

e. All soil removed from the property must be properly disposed of and manifests provided to the VCP per Section 8.5 of the 2013 RAP Amendment and further by the statement in Sections 1.1, 6.7, and 9, as required by the VCP, that CBAC Gaming will comply with all local state and federal laws and regulations by obtaining all necessary approvals and permits to conduct the activities pursuant to an approved RAP.

46. The Kool affidavit takes issue with the fact that the cap and remedies are not certified by a professional engineer. The VCP does not have engineers on staff and therefore requires the Participant have a qualified entity design the remedy to ensure they are sufficient. In addition, the VCP does require confirmation sampling to demonstrate the efficacy of a remedy and periodic inspections to ensure remedies remain protective of public health and the environment after completion of the RAP.

47. The affidavit has issues with the monitoring for vapor intrusion set forth in the 2013 RAP Amendment and specifically mentions page 19 of the 2013 RAP Amendment. Page 19 of the 2013 RAP Amendment is Section 5.0, Cleanup Criteria, which specifies the point at which the COC can be issued, not the long term monitoring and maintenance as suggested by the affidavit. The long term monitoring requirements for the property are set forth in Section 6.1, 6.1.1 and 6.1.2. In fact, per Environment Article §7-513 (d), a requirement for long-term monitoring and maintenance may not delay issuance of the COC.

48. Upon proper completion of a RAP, the VCP issues a Certificate of Completion (COC) for a property. The COC includes property use restrictions and institutional controls necessary or the protection of public health and the environment. The COC is recorded in the land records on the deed for the property. The 2013 RAP Amendment details in Section 6.8 that institutional controls will include requirements for characterizing, containerizing and properly disposing of any groundwater encountered during excavations, notification of the Department

prior to any excavation of soil at the property, requirement for a HASP for any excavations at the property; complete characterization and proper disposal of any material excavated beneath the cap, maintenance and inspection of the containment remedy, and continued operation of the active vapor mitigation system in perpetuity unless there post-treatment monitoring sampling events confirm that soil gas remediation levels have been met.

49.     The approved 2013 RAP Amendment has been deemed by the VCP to meet all the requirements set forth in Code of Maryland, Environment Article §7-508 and be protective of public health and the environment

**I SOLEMNLY AFFIRM** under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

_8/8/2013_
Date

_Richelle Hanson_
Richelle Hanson
Geologist, Lead/Advanced

IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

| | |
|---|---|
| RUTH SHERRILL, *et al.*, | * |
| Plaintiffs, | * |
| v. | * No. 24-C-13-001000 |
| MARYLAND DEPARTMENT OF THE ENVIRONMENT, *et al.*, | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

### AFFIDAVIT OF ROBERT M. SUMMERS

1. I am over the age of eighteen and competent to testify to the matters stated herein.

2. I am the Secretary of the Maryland Department of the Environment, with full statutory authority to direct the activities of the Department.

3. The Department believes it has fully discharged its duty in the actions taken to approve the RAP at the subject site. Nevertheless, in light of public interest recently expressed by plaintiffs, and in the interest of transparent and open process, I have directed the staff of the Voluntary Cleanup Program to take all steps necessary to comply with the directives of Environment Article § 7-509, Public Participation, with reference to a Response Action Plan submitted by participant CBAC Gaming, whether these steps have already been taken or not.

4. These steps are to be taken without delay, unless this Court orders a delay or, for reasons not advanced by MDE, holds that they are not necessary.

I SOLEMNLY AFFIRM under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

3/12/2013
Date

Robert M. Summers
Secretary
Maryland Department of the Environment


EXHIBIT A-1

8/6/13 Maryland.gov Mail - Re: Aqua, Terra and Aeris Rooms for 4/11/2013, 5:30-8:00 p.m.

Case 1:13-cv-02234-RDB   Document 25-1   Filed 08/08/13   Page 17 of 19



# Re: Aqua, Terra and Aeris Rooms for 4/11/2013, 5:30-8:00 p.m.

**Justin Creswell** <JCreswell@mde.state.md.us>　　　　　　　　　　Mon, Mar 25, 2013 at 3:31 PM
To: "Hanson, Richelle" <RHanson@mde.state.md.us>

Richelle,

I have requested the HVAC for that time frame.

Justin Creswell
Facilities Manager
MD Department of the Environment
1800 Washington Blvd., Suite 505
Baltimore MD  21230
410-375-7072 (Cell)
410-537-4427 (Office)
410-537-4443 (fax)

*Please consider the environment before printing this email or its attachments.*

Visit us on Facebook: www.facebook.com/MDEnvironment
and Twitter:
www.twitter.com/MDEnvironment

>>> Richelle Hanson 3/25/2013 12:01 PM >>>
Justin,

We're holding a public meeting in the Aqua, Terra and Aeris Rooms on 4/11/13 from 5:30-8:00 p.m.   Could you have them leave the heat and air conditioning on so the temperature is about 68 degrees for that time period?

Thanks,
Richelle


Richelle Hanson, Project Manager
Statewide VCP/Brownfields
Maryland Department of the Environment
Land Management Administration
1800 Washington Blvd., Suite 625
Baltimore, Maryland 21230-1719
Tel: 410-537-3493
Fax: 410-537-3472



EXHIBIT A-2



# MDE

## MARYLAND DEPARTMENT OF THE ENVIRONMENT
LAND MANAGEMENT ADMINISTRATION
LAND RESTORATION PROGRAM
1800 Washington Blvd. Suite 625
Baltimore, MD 21224

**MEMORANDUM**

TO: Gateway South and Warner Street Properties File

FROM: Richelle Hanson  RAH

SUBJECT: On-Site Meeting, April 18, 2013

DATE: April 19, 2013

---

On April 18, 2013 at from 1:00 p.m. to 2:00 p.m., I met with the construction supervisors at the Gateway South and Warner Street properties to follow up on the citizen concerns from the public meeting held on April 11, 2013. While MDE has received emails from two residents following the meeting, no one has followed up regarding the construction concerns. The meeting was held at the construction trailers for the site, which are located at 1411 Warner Street. Present were:

Buzzy Driscoll, Whiting-Turner
Valerie Eickleberger, Whiting-Turner
Pless Jones, Sr., P&J Contracting (Demolition Contractor)
Sean Brown, Commercial Construction
Glen Nigrin, Potts & Callahan, Inc.
Perry Nugent, Potts & Callahan, Inc.
Bill Harmon, Urban Green Environmental
Denise Sullivan, Urban Green Environmental
Richelle Hanson, MDE/VCP

I began by indicating that I requested the meeting to follow up on the concerns presented at the public meeting, specifically, the concerns regarding disposal of soil, construction debris, trucks and soil in the street. A summary of the discussion is below.

**Temporary Stockpiling Off-site**: On April 12, 2013, I followed up with Julie Day of the Baltimore City Housing and Community Development (BCHCD) regarding the reports of Mt. Winans Elementary School as a possible location for disposal of material or temporary stockpiling. She indicated that there had been a call to her office about the potential location from one of the contractors (Pless Jones) at the site but given the community concern at a public meeting where she discussed it, the BCHCD indicated that was not a suitable location. According to follow up discussions with Denise Sullivan of Urban Green the same day, there had been inquiries regarding whether they could use temporary off-site stockpile and Ms. Sullivan had indicated to all parties that all materials must remain on-site until properly disposed of.



EXHIBIT A-3

During this meeting, I reiterated that no soil material was to be removed off-site (or brought on-site) without approval by the VCP.

**C&D Disposal**: All material removed to date has been from above slab and has been sent to two locations for recycling. These locations are: BRC Processing Facility and Transfer Station operated by Baltimore Recycling Center, LLC and located at 1030 Edison Highway, Baltimore MD 21213 and L&J Processing Facility operated by L&J Waste Recycling, LLC and located at 222 North Calverton Street, Baltimore MD 21213. In addition, Whiting-Turner has tickets for all materials removed as part of their requirements to meet LEED Silver certification for the building. According to Urban Green, the Solid Waste Program at MDE has approved the building slabs for re-use on the property. Following the meeting I confirmed with Martha Hynson that it was approved. She indicated it was approved based on sampling that showed the material met the residential cleanup standards.

**Future soil disposal**: Currently collecting disposal samples to determine proper disposal. Anticipate disposing of soil at Soil Safe where necessary and considering whether it makes sense to try to meet requirements for commercial clean fill for landfill daily cover for other soil.

**Tracking trucks**: Urban Green (environmental consultant) is on-site 40 hours per week and has a log of every truck leaving the site. In addition, Whiting-Turner has a log of trucks leaving site and has tickets for each truck.

**On-Street soil**: There is a tire wash station on site. For trucks that choose not to wash before leaving site, Whiting-Turner monitors conditions and has a sub-contractor on call with a 20 minute response time to address any soil in the street. During rain events, a street sweeper has been hired to address the soil on Warner Street. This was observed cleaning just prior to the meeting, which occurred shortly after rain had stopped.

**Construction workers HASP**: Every worker has a tagged helmet that can be tracked back to records to show that HASP has been signed and worker trained.

**General tracking of conditions**: Whiting-Turner keeps a log of all unusual conditions adjacent to the site. For example, utility workers for adjacent properties discharging water on to the adjacent streets.