IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| **JAMES R. ROBINSON, et al.** | * |
| **Plaintiffs,** | * Case No. **1:13-cv-02234-RDB** |
| v. | * |
| **STATE OF MARYLAND DEPARTMENT OF THE ENVIRONMENT and ROBERT SUMMERS, in his official capacity as Secretary of the Maryland Department of Environment, et al.** | * * * |
| **Defendants.** | * |

\* \* \* \* \* \* \* \* \* \* \* \*

### SUPPLEMENTAL AFFIDAVIT OF JAN KOOL, Ph.D.

I, Jan Kool, do hereby swear and affirm, based on personal knowledge and under penalties of perjury, as follows:

1. That I am over the age of eighteen (18) years and have personal knowledge of the facts set forth herein and am competent to testify to such facts.

2. That on August 2, 2013, I submitted an affidavit in the above referenced case. I hereby submit a supplemental affidavit and incorporate the contents of my August 2, 2013 Affidavit herein.

3. I have reviewed the revised RAP for the Site, dated May 2013. As far as I know this is the final version of the RAP and the construction activities at the Site are being conducted in accordance with this version of the RAP. Because construction

activities have already been under way before the May 2013 RAP was provided, I assume that Site activities were conducted in accordance with the November 2012 version of the RAP.

4. My original affidavit was based on the November 2012 RAP. The distinction is important. The May 2013 version of the RAP addresses a number of deficiencies that were noted in my original affidavit, but the revisions in the RAP also means that initial construction activities were conducted with less protections to workers, nearby public, and the environment than what CBAC, the City and MDE now acknowledge as being necessary.

5. I have also reviewed the affidavit of Ms. Sullivan. This affidavit, among other things, confirms that dust monitoring has increased since the initial Site activities. (P.9) and that wheel washing and street sweeping is now being conducted.

6. In my opinion, the revised RAP still contains a number of significant deficiencies. Neither the revised RAP, nor the information in Ms. Sullivan's affidavit, nor any other document that I have reviewed change my conclusions included in my original affidavit.

7. Paragraph 36 of Ms. Sullivan's affidavit states that following completion of construction, the Site will be nearly 100% impervious and that no precipitation will infiltrate the Site. Ms. Sullivan's statement ignores the fact that during the construction period, soils are uncovered, as a result, of the re-grading, excavation and other construction activities, meaning soil is exposed and the incidence of rain water

percolating through the soil and carrying contamination downward to the groundwater is accordingly increased as a direct result of construction.

8. Paragraph 36 in Ms.. Sullivan's affidavit also addressed discharge permits, including a permit for discharging to the City's sewer system, which apparently has been obtained since the revised RAP, and a general storm water NPDES permit. While Ms. Sullivan's affidavit mentions discharge effluent monitoring, the RAP contains no such provisions for containing or otherwise storing water on site until laboratory testing results are received to ensure that the water being discharged meets standards. The general storm water NPDES permit does not contain any provisions relating to chemical contamination in the discharge effluent.

9. Paragraph 36 in Ms. Sullivan's affidavit asserts that my affidavit does not accurately quote § 7-500 of the Environmental Article with regard to the requirement that the RAP must delineate applicability and effectiveness of the selected techniques to significantly reduce the toxicity mobility and volume of contamination at the Site. The specific language of § 7-500 states that the response action plan must include demonstration to the satisfaction of MDE. That the purpose of the response action plan is to protect the public's health and the environment. The MDE's guidelines state that the RAP must include the elements that I cited in my original affidavit. Based on discussions with Neil Peters of the ARM Group, who has extensive experience with the VCP including work at 10 sites across Maryland, the MDE normally requires substantially more backup (in the form of engineering calculations, testing, data, etc.) in a proposed response action plan than a mere claim of professional judgment.

3

10. The revised May 2013 RAP does include removal of contaminated soil in the area of "soil boring B-38" and active vapor extraction at two locations, that were not part of the previous RAP. I agree that these are positive measures, but as a whole the RAP revisions is significantly deficient with regard to investigating, handling, and disposal of contaminated materials at the site during construction in comparison with the RAP for the Site that was developed in 2011 by KCI Technologies. Based in the known condition of the Site (from the Environmental Site Assessments), the 2011 RAP:

    a. Identified need for soil testing along proposed construction, excavations utility trenches, building foundations, and storm water management facility in order to appropriately handle soil that should be handled as RCRA hazardous waste based on contamination level.

    b. Identified the presence of asbestos construction materials (ACM), lead-based paint (LBP), PCB, and mercury-carbonate equipment.

    c. Included an 11-page material management plan describing potential location of contaminated materials and providing procedures for handling and disposing of the material during construction.

11. The 2013 RAP provides only for TCP testing only for soil removal at the former "soil boring B-38" location, and for soil that will be disposed of off site. In accordance with § 8.5 of the RAP, soil that is excavated on-site, other than from B-38, will be managed on-site, and can be used as back fill without any testing. This means that utility trenches can be back filled with soil that contains hazardous levels of contaminants, thereby creating a health risk for future workers performing utility repairs.

The 2011 RAP stipulated that utility trenches should be filled with clean fill, this requirement was dropped in both the 2012 RAP and the 2013 RAP.

12. Section 8.8 of the 2013 RAP address removal of underground storage tanks and abandoned drums from the Site, but does not mention the demolition and removal of existing building foundation. The 2011 RAP included provisions for testing of concrete containing visual staining to engage proper handling and disposal of contaminated materials. These and other material testing provisions have been removed from the 2013 RAP. Page 36 of the 2013 RAP states that rubble and debris excavated from the Site will be disposed of in accordance with the appropriate laws and regulations. In my opinion, this is a meaningless statement if there materials are not tested for contamination prior to disposal.

13. Page 12 of Ms. Sullivan's affidavit indicates that 13 underground storage tanks have been removed from the Site as part of the Site clearing and construction activities. Along with this, a substantial quantity of contaminated soil has been removed. Ms. Sullivan's affidavit states the amount of soil removed is over 13,000 tons. The amount of soil removed from the Site seems very high, and is much higher than is stated in § 8.8 of the 2013 RAP. I agree that removal of the USTs and contaminated soil is a positive measure, but it also is indicative of the extent of subsurface contamination at the Site, and the UST excavation removes contamination only in specific locations where USTs were found.

14. Sections 5 and 6.1 of the 2013 RAP and paragraph 42 Ms. Sullivan's affidavit discusses air quality monitoring requirements. The indoor are quality

monitoring procedures are no different that those in the 2012 RAP except that they now include that the sampling locations will be established before the actual monitoring begins. As stated in my original affidavit, the proposed monitoring period for 60 days. Based on discussions with Mr. Neil Peters of the ARM Group, I understand that at other VCP sties with vapor intrusion issues, the MDE had required up to 2 years of indoor air monitoring. In my opinion, the much shorter 60 day period for this Site is not adequate to protect future Site workers and visitors. Any building experience some degree of settling following construction which can cause cracks in the foundation, ruptured seals around utility etc. which creates pathways for soil vapor in the structure. The indoor air monitoring period must be of significant duration to measure such changes. Moreover, the monitoring plan still does not contain any provisions for changing the vapor system when the indoor air quality criteria are not met, except continued monitoring . Last but not least, the indoor air quality criteria are only fro the VOC's, TCE, cis-trans-1-2-DCE and vinyl chlnide. The monitoring requirements leave out many of the VOCs that have been detected at the site in soil vapor intrusion screening values. S listed in § 2.5.3 of the RAP, when other VOC's include benzene, hexane, peutane, 1.1.1-TCA, PCE, and chloroform. The omission of PCE in the list required by MDE is especially puzzling given the very high concentration of PCE that have been detected in the soil and groundwater underneath the Site.

    15.    The RAP now includes active vapor extraction at two locations. Although I did not find the location stated in the RAP, according to Paragraph 39 in Ms.. Sullivan's affidavit, they are at the former soil boring B-28 and B-35 location. I agree that the

addition of active vapor extraction is a positive measure. However, the state soil gas cleaning criteria in the RAP are in error by a factor of 1000. The criteria stipulated by MDE in the letter to CBAC dated May, 6 2013 are in $ug/m^3$. The criteria stated in section 5 of the RAP are in $mg/m^3$ which is 1000 times higher.

16. In my original affidavit, I discussed the very high level of chlorinated solvents, primarily PCE and TCE, that were detected underneath 1551 Russell Street in 2000 by DataNet Engineering. This data was included in an appendix to the 2009 Phase II ESA report, and were pointed out in a letter to MDE from the ARM Group, dates April, 23, 2013. Paragraph 44 in Ms.. Sullivan's affidavit asserts that my opinion about the high levels of chlorinated solvent contamination in well MW-6 is incorrect and the highest concentrations of chlorinated solvents ere in soil boring B-2 and well MW-2. The important fact is that DataNet Engineering investigation found very high levels oh chlorinated solvents at multiple locations in this area of the site. I disagree with her statement, in reviewing the DataNet Engineering report, it shows the following levels of chlorinated solvents (TCE, PCE, DCE etc.)

MW-2-----6080 mg/l

B-2--------25,200 mg/l

MW-6----58,090 mg/l

Ms. Sullivan's affidavit asserts that more recent sampling has been done in this area in the 2007 through 2013 investigation. She, however, does not address the very puzzling fact that the two wells that had the highest concentrations in 2000, namely MW-2 and MW-6 have never been resampled in these subsequent investigations. Well MW-5

7

which is located near MW-6 was resampled in 2009, which showed that the PCE and TCE concentrations at this well, although still lower than at MW-6, had nearly doubled between 2000 and 2009. The very high PCE and TCE concentrations indicate the possible presence on DNAPL which, being more dense than water, has a tendency to sink to the base on the aquifer. My opinion remains that neither the horizontal nor the vertical extent of VOC concentration in the northwestern portion of the Site have been adequately delineated. I disagree with Ms. Sullivan's statement that the DataNet data shows that groundwater flow is to the east of the Holiday Inn Hotel is therefore located cross-gradiant or up-gradiant of the Site. The measurement locations upon which Ms. Sullivan bases her conclusions about direction of groundwater flow, were all located along the same line. In is not possible to reliably infer groundwater flow direction from data points along one line. While I agree that the dominant groundwater flow direction is toward the Middle Branch of the Patapsco River, the data does not preclude other and/or locally variable groundwater flow directions. More importantly, the direction of groundwater flow in the vicinity of the Holiday Inn property is not the controlling factor in determining possible impacts from the Site. As stated in my original affidavit, my main concern about impacts at the Holiday Inn property is the vapor intrusion pathway which does not have to be aligned with the direction of the groundwater flow, but can easily go in cross-gradiant or up-gradiant directions, depending on the path of least resistance to the vapor migration.

17. In summary, while the May 2013 RAP addresses number of weaknesses in the November 2012 version that I previously reviewed, as a whole, the document still

contain significant deficiencies with regard to safeguarding public health and the environment. My opinion remains that contaminates have migrated across the property bounty and are impacting human health and the environment.

**I hereby certify under the penalties of perjury this 9th day of August, 2013, that the contents of the foregoing are true and correct.**

_____
Jan Kool, Ph.D.