**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| **JAMES R. ROBINSON, et al.** | * | |
| **Plaintiffs,** | * | **Case No. 1:13-cv-02234-RDB** |
| **v.** | * | |
| **STATE OF MARYLAND DEPARTMENT** | * | |
| **OF THE ENVIRONMENT and** | | |
| **ROBERT SUMMERS, in his official** | * | |
| **capacity as Secretary of the Maryland** | | |
| **Department of Environment, et al.** | * | |
| **Defendants.** | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTIVE RELIEF**

**TABLE OF CONTENTS**

STATEMENT OF FACTS……………………………………………………. 1

    The Cooperative Memorandum Agreement between MDE and EPA 2

    The Deficits of the CBAC Gaming RAP…………………………… 8

ARGUMENT…………………………………………………………….. 14

Plaintiffs have met the requirements for the Issuance of Temporary and
Preliminary Injunctive Relief……………………………………………….. 14

Standard for Grant of TRO and Preliminary Injunction……………………… 14

  A) Plaintiffs have a Likelihood of Success on the Merits……………………… 15

    Plaintiffs' Title VI, Equal Protection and §1983 Claims………………… 16

    The Discriminatory Effect…………………………………………….. 19

The Historical Background of the Decision…………………………  22

The Specific Sequence of Events and Departure from Normal      24
Sequence……………………………………………………………….

Plaintiffs' Public Nuisance Claim………………………………………..  32

B) Plaintiffs are Likely to Suffer Irreparable Harm…………………………….  33

C) The Balance of Hardships Tips in Plaintiffs' Favor………………………...  34

D) The Injunction is in the Public Interest…………………………………..  35

CONCLUSION……………………………………………………………………...  35

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | |
|---|---|
| **JAMES R. ROBINSON, et al.** | * |
| **Plaintiffs,** | *  **Case No. 1:13-cv-02234-RDB** |
| **v.** | * |
| **STATE OF MARYLAND DEPARTMENT** | * |
| **OF THE ENVIRONMENT and** | |
| **ROBERT SUMMERS, in his official** | * |
| **capacity as Secretary of the Maryland** | |
| **Department of Environment, et al.** | * |
| **Defendants.** | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**TEMPORARY RESTRAINING ORDER**
**AND PRELIMINARY INJUNCTIVE RELIEF**

COME NOW, Plaintiffs (hereinafter "Plaintiffs"), by and through their undersigned counsel, and file this Memorandum of Law in Support of their Motion for Temporary Restraining Order and Preliminary Injunctive Relief.

**STATEMENT OF FACTS**

The facts are set forth in Plaintiffs' Complaint and supported by the exhibits attached to Plaintiffs' Complaint.[1]  Defendant City is the fee simple owner of certain parcels of property in the Camden-Carroll Industrial Area of Baltimore City, located at 1501, 1525, and 1551 Russell Street (commonly referred to as the "Gateway South Phase I Properties") and 1501, 1601, 1629, 1633, and 1645 Warner Street, 2119 Haines Street,

---

[1] Unless otherwise stated, all references to exhibits are to the exhibits attached to Plaintiffs' Complaint.

2104 Worcester Street and 2102 Oler Street, (commonly referred to as the "Warner Street Properties") (collectively the "Site" or the "Properties").  *See* Exhibit A(1)-(12).   The Properties are located in close proximity to the communities of Westport and Cherry Hill in Baltimore City.  The Westport Community demographics consist of eighty six percent (86%) African-American with an average annual household income of Twenty Seven Thousand Four Hundred Fourteen Dollars ($27,414), and there are an estimated twenty percent (20%) of the homes in the Westport neighborhood that are vacant.  U.S. Census Bureau, 2010 Census Summary.  The Cherry Hill Community is 96% African American with a median household income of $19,183   U.S. Census Bureau, 2010 Census Summary.

The open space area abutting the Warner Street Properties (commonly called the "Waterfront Parcels") contains a portion of the Gwynns Falls Greenway, which is a recreational trail used by members of the public for biking and walking.  Protecting the Middle Branch portion of the Patapsco River has been identified by Baltimore City's Comprehensive Master Plan as critical to achieving the overall Water Quality and Habitat required to restore the Baltimore Harbor to fishing and swimming standards established by the Clean Water Act.  *See* Exhibit B, p 59.

The Middle Branch, as a portion of the Baltimore Harbor, and its adjacent tributaries are listed as degraded water bodies under federal and state law.  The Patapsco River is a tributary to the Chesapeake Bay and is identified as one (1) of three (3) priority restoration rivers in the 2000 Chesapeake Bay Agreement.  *See* Exhibit C, p 3.

On April 25, 2008 and June 4, 2009, Defendant City, through its agent Defendant Baltimore Development Corporation, submitted two Voluntary Cleanup Program (hereinafter "VCP") applications to Defendant MDE proposing to remediate the area of the Site, and requesting liability protection as an Inculpable Person upon completion (the "City VCP Applications").  *See* Exhibit D.  Defendant City's VCP Applications relied upon eight (8) different Phase I or II Environmental Site Assessments (hereinafter "ESA"), which were completed between May 2007 and May 2009. These ESAs also referred to and/or attached a number of earlier ESAs conducted at and around the Properties from 2000 to 2009.  *See* Exhibit E.  Defendant City contracted with KCI Technology to perform the testing and assessment of the site, and create the Phase I and Phase II Environmental Site Assessment required by the VCP.  *See* Exhibit G.  Defendant City's VCP Applications and ESAs reveal a long history of industrial uses at the Properties which have released a complex mix of organic and inorganic contaminants in, on, and under the soil and groundwater which, as a consequence, creates the contaminant vapors at and from the Properties at levels exceeding state and federal cleanup standards. *See* Exhibit E and Exhibit H, p. 60-64.

The contaminants identified at the Properties include arsenic, lead, chlorinated solvents (including trichloroethylene and vinyl chloride) and poly-aromatic hydrocarbons.  Many of these contaminants are known and/or suspected human carcinogens.  *See* Exhibit E.  The said ESAs confirmed that contaminants at the Site are widespread and highly concentrated in soils at various depths and various locations throughout the Site (also known as "hot spots").  *See* Exhibit E  The ESAs stated that

KCI Technology was unable to access the Site to compete the testing that was proposed in the VCP Application and the Phase I assessment of the Site.  *See* Exhibit F, ¶ 5.  The ESAs also confirm that the groundwater underneath the Site, which is relatively shallow (in spots no more than five (5) feet below the surface), contains a number of the above-referenced contaminants and comes into contact with the contaminated soil on the Site. *See* Exhibit E.  The ESAs confirm that the groundwater was tested in nine (9) locations and revealed trichloroethene (TCE), tetrachloroethene (PCE) and dichloroethene (DCE) concentration levels exceeding the MDE's cleanup standards. *See* Exhibit F.  The ESA conducted at the adjacent Waterfront Parcels to the south and east of the Site confirm that the contaminated groundwater from the upgradient Properties flows through, and contaminates, the Waterfront Parcels and then discharges into the Middle Branch of the Patapsco River. *See* Exhibit E.

Defendant MDE approved the City VCP Applications for the Gateway South Phase I Properties and Warner Street Properties on December 22, 2009 and March 18, 2010, respectively, confirmed the Defendant City's Inculpable Person Status under the VCP and directed Defendant City to develop a proposed Response Action Plan (hereinafter "RAP") for remediating the properties associated with each VCP application for MDE's review and approval.  *See* Exhibit I (RAP).  On May 2, 2011, Defendant City submitted a "combined RAP" which proposed to address all the Properties associated with both VCP applications in one cleanup plan. *See* Exhibit H (Combined RAP).

Defendant City's "combined RAP" contained a cursory and incomplete analysis of the contamination at the Properties, prematurely selected "cleanup" methods which

would be the least expensive and thus the most attractive to a future developer and failed to include an implementation schedule as mandated by § 7-508 of the Environment Article.  Defendant City justified these deficiencies by stating in the RAP's "Overview" that "the RAP is intended to be general enough so that a future developer can alter that approach and maintain appropriate environmental responses."  Despite the deficiencies in the aforementioned RAP, Defendant MDE issued a final RAP Approval Letter to Defendant City on September 15, 2011 which approved the "combined RAP" submitted pursuant to Defendant City's VCP applications.  Inconsistent with the requirements of the Environment Article §7-511(c), Defendant MDE's September 15, 2011 RAP Approval Letter erroneously stated that, among other things, "no further action will be required to accomplish the objectives set forth in the approved revised RAP other than those actions described therein."

On or about July 31, 2012, the Maryland Video Lottery Terminal Facility Location Commission awarded Defendant CBAC Gaming a video lottery operation license, subject to several contingencies, for the purpose of developing and operating a Casino and ancillary facilities at the Properties.  Pursuant to the contingencies associated with Defendant CBAC Gaming's license award, Defendant CBAC Gaming and Defendant City entered into a Ground Lease Agreement ("GLA") and Land Disposition Agreement ("LDA") for the Gateway South Phase I Properties and the Warner Street Properties, respectively. *See* GLA as Exhibit I; *See* LDA as Exhibit H.  The GLA and LDA were approved by the Baltimore City Board of Estimates and executed by Defendant CBAC Gaming and Defendant City on or about October 31, 2012.  Pursuant to

5

the terms of the GLA and LDA, Developer CBAC Gaming agreed to buy or lease the Properties "as is," agreed to participate in the VCP, and acknowledged receipt of Defendant City's approved RAP which is represented as "providing a blueprint for conducting the required environmental remediation of the Property." The GLA and LDA authorize Defendant CBAC Gaming to modify the terms of Defendant City's approved RAP subject to the condition that "any modifications to the RAP must be negotiated between Developer and MDE." The GLA and LDA authorize Defendant CBAC Gaming to cap its costs for remediating the Properties to Two Million Dollars ($2,000,000.00). If Defendant CBAC Gaming's remediation costs exceed $2,000,000.00, Defendant City agreed to reduce Defendant CBAC Gaming's rental payments by one-half (i.e., up to $1,000,000.00). The GLA and LDA also authorize Defendant CBAC Gaming to terminate the Agreements if CBAC Gaming projected its remediation costs to exceed Four Million Dollars ($4,000,000.00).

Defendant City, through the GLA and LDA, entered into an agreement with Defendant CBAC Gaming where the City had substantial financial motivation to ensure the remediation costs for the Site were minimalized. Defendant MDE permitted Defendants City and CBAC Gaming to bypass regulatory guidelines and statutory requirements to begin construction prior to any public inspection or comments to the plans for the Site and prior to the implementation of a final RAP.

### The Cooperative Memorandum Agreement between MDE and EPA

Defendant MDE entered into a Cooperative Memorandum of Agreement ("MOA") with Defendant EPA that defined the responsibilities with respect to activities

regarding the redevelopment of contaminated properties known as "brownfields".  The Site is considered a "brownfield."  The MOA was entered into for the purpose of protecting the public health and environment from under-utilized sites where hazardous materials have been released.  The MOA gives MDE authority to use their resources to assure an appropriate response action plan is established and implemented to protect the public health and environment.  The EPA and MDE have concurrent power to regulate the redevelopment of "brownfields," and the MOA was signed to assure a cooperative plan to protect the public health and environment that are mutually complementary and are not duplicative.  The MOA states that MDE would have authority over the redevelopment of "brownfields" if the site has not been listed on the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA" or "Superfund") or listed on the National Priorities List ("NPL").   The MOA states that the EPA would have authority over the redevelopment of "brownfields" that the EPA determines the site possess an imminent and substantial danger to an emergency situation, the site scores a 28.5 or higher using a CERCLA Hazard Ranking System, or is subject to corrective action under the Resources Conservation and Recovery Act ("RCRA").  Defendant MDE failed to conduct any meaningful public discussion regarding the Gateway Redevelopment Project thereby violating the MOA with Defendant EPA and when it did conduct public hearings Defendant MDE did not allow for full public comment by ceasing the public hearing within two hours of its commencement.   Defendant EPA failed to enforce the terms of the MOA by requiring that Defendant MDE to properly inform the public and open up communication channels prior to making any substantial

decisions regarding the redevelopment of the Site.  Defendants EPA and MDE have excluded a predominately poor, African-American community from any meaningful public participation in a brownfield redevelopment project that has the high potential to cause serious and irreparable harm to their health and environment.

### The Deficits of the CBAC Gaming RAP

On July 7, 2012, Defendant CBAC Gaming submitted a VCP application to Defendant MDE which proposed to remediate the Site and requested liability protection as an Inculpable Person upon completion.  Defendant MDE failed to notify the public of Defendant CBAC Gaming's July 2012 VCP Application on its website as required by § 7-506 of the Environment Article.  Defendant CBAC submitted Phase I and II ESAs along with the VCP application that were identical to the defective ESAs submitted by Defendant City three (3) years prior in 2008 and 2009.  Despite no final RAP approval, Defendant CBAC gaming began construction and soil disturbance at the Site in March 2013.

Despite the MDE's Guidance Document requirement for all VCP applicants to update ESAs that are "more than one year old," the only environmental assessments contained in Defendant CBAC Gaming's VCP application were copies of the ESAs prepared and submitted with Defendant City's VCP applications more than three (3) years prior in 2008 and 2009.  Despite the MDE's Guidance Document's requirement for all VCP applicants to update all sampling data that is "more than one year old," Defendant CBAC Gaming's VCP application did not update the sampling data referenced in the ESAs.

As part of its July 2012 submission, Defendant CBAC Gaming also submitted a proposed RAP for the Site entitled "Response Plan Amendment".   Defendant CBAC Gaming's VCP application and proposed RAP stated that it intended to "use" and "build upon" the Defendant City's approved RAP as part of its VCP application and RAP submissions.   Defendant CBAC Gaming submitted a different proposed RAP prepared by its own environmental consultants, Defendant Urban Green Environmental, for MDE's review and approval by MDE.   Defendant CBAC Gaming's proposed RAP contained extensive modifications to the cleanup criteria, cleanup approaches, and implementation and completion measures which were contained in the City's approved RAP and which provide the Plaintiffs, the public health and the environment with even less protections. The majority of the modifications contained in the Defendant CBAC Gaming's RAP reduced its cleanup obligations which results in a minimization of its remediation costs. Defendant CBAC Gaming's RAP does not properly address the potential for dangerous toxins to migrate from the contaminated sites into neighboring properties, groundwater and/or the Middle Branch of the Patapsco River.   Defendant CBAC Gaming's RAP also fails to adequately address the need for excavation and proper management of contaminated soil, avoids groundwater remediation, minimizes the standards required for covering the contamination at the Site and limits the construction of a necessary vapor barrier system to a nominal portion of the Site.   Defendant CBAC Gaming's RAP does not account for adverse impacts associated with groundwater flow, velocity or contaminants transported off-site through leaching, migration, or construction created pathways.   Defendant CBAC Gaming's RAP contains no remedy to prevent the

9

contaminated groundwater at the Site from discharging into and contaminating the surrounding properties, waterways and environment.  Defendant CBAC Gaming's RAP fails to consider high levels of hazardous substances identified in the soils and fails to adequately investigate and analyze the appropriate level of cleanup that is necessary to protect human health and the environment.   Although Defendant CBAC Gaming's development-related construction activities include installing certain below-grade utilities (e.g., water, storm water and sewer) at the Site, the RAP contains no measures to avoid disturbance of contaminated soil and infiltration of groundwater to prevent the adverse impacts associated with such installations at the Site and/or surrounding environment.

The incomplete and inadequate environmental investigations and remediation techniques proposed by Defendant CBAC Gaming, and authorized by MDE, fail to address and remedy the exposure of persons and ecosystems, including, but not limited to, wildlife, fish and other aquatic life in the surrounding area to contaminated soil, groundwater and vapor, and/or releases of hazardous substances into the surrounding environment, including the publically-used Waterfront Parcels and the degraded Middle Branch of the Patapsco River.

In or around August 2012, Defendant MDE provided Defendant CBAC Gaming with written comments on its proposed RAP which included 14 enumerated modifications necessary to receive RAP approval. Defendant MDE stated in its written comments that, "[t]he VCP understands that this [RAP] amendment is intended to supersede the previously approved RAP [submitted by Baltimore City] entirely" and directed Defendant CBAC Gaming to "revise the Section 1.1 Purpose and Scope to state

clearly that this will supersede the previously approved RAP...." *See* Exhibit M.  After reviewing revised RAPs prepared and submitted by Defendant CBAC Gaming, Defendant MDE approved CBAC Gaming's proposed RAP dated November 2012, for the Properties and issued CBAC Gaming a final RAP Approval Letter dated November 27, 2012. *See* Exhibit O.  Defendant CBAC Gaming did not publish notice of its proposed RAP as required by § 7-509(a) of the Environment Article and did not otherwise provide the public with notice of the Proposed RAP.  Defendant MDE did not issue a public notice and comment period or solicit written comments on Defendant CBAC Gaming's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(b) of the Environment Article.  Defendant MDE did not hold a public information meeting on Defendant CBAC's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(c) of the Environment Article did not follow the procedure set forth in § 7-509 of the Environment Article to notify the public and open communication channels to consider public comments, and improperly permitted Defendant CBAC Gaming to begin construction at the Site on March 6, 2013. *See* Exhibit K.

Defendant MDE, as a result of allowing Defendant CBAC Gaming to commence construction prematurely, received numerous public complaints from environmentalists, lawyers, and concerned citizens, thereby resulting in the MDE reconsidering its position and conducting a public hearing.  Although Defendant MDE conducted several rounds of review and issued numerous comments on CBAC Gaming's proposed RAP which enumerated necessary Plan modifications, MDE did not issue a public notice and

comment period or hold a public information hearing as required by § 7-509 of the Environment Article until it was sued in the Circuit Court for Baltimore City in *Sherrill v. City of Baltimore* in February 2013.  In an apparent direct response to the Baltimore City lawsuit, MDE held a public hearing on Defendant CBAC Gaming's RAP on April 11, 2013, which its officials cut short after only two hours with the stated reason being that the HVAC system was on a timer and had shut off requiring the public hearing to cease. Defendant MDE failed to permit the public to fully express concern at the public hearing by cutting the meeting short before many citizens were permitted to talk, claiming that the air conditioner in the room cuts off automatically two (2) hours after the start of the meeting.  See Exhibit N.  Numerous persons present at the hearing, including some of the Plaintiffs in the instant suit were not provided the opportunity to express their comments publicly.

Defendant MDE permitted Defendant CBAC Gaming to continue construction at all times before, during and after the public meeting, thereby making any public concern and/or comment a sham.  Such action by MDE permitted Defendant CBAC to release contaminants into the environment.  Rather than requiring Defendant CBAC Gaming to take new soil and groundwater samples to complete its VCP application, as required by MDE's Guidance Document, MDE only required CBAC Gaming to prepare and submit sampling data for two limited purposes: evaluating groundwater contamination for light non-aqueous phase liquids and conducting supplemental vapor emission testing and analysis for heptachlor.

Defendant CBAC Gaming submitted through its agent Defendant Urban Green, a Revised RAP that is deficient and deviated substantially from professional standards. Defendant MDE approved the aforementioned RAP while overlooking the numerous deficiencies in violation of the VCP.  Defendant CBAC Gaming's RAP fails to provide for sufficient testing contamination controls and protections to the environment.  *See* Affidavit of Dr. Kool.  Defendant CBAC Gaming's RAP suppresses crucial data that is important to the extent of remediation needed at the Site by omitting factors from the body of the text of the RAP and using an incomprehensible appendix which generally requires professional training to sufficiently understand.  *See* Affidavit of Dr. Kool. Defendant CBAC Gaming's RAP makes conclusions based on incomplete or partial data that require factual inferences that are inconsistent with accepted standards.  *See* Affidavit of Dr. Kool.  Defendant CBAC Gaming's RAP fails to account for the transmission or potential transmission of contaminated compounds into the environment and ecosystem, and focuses solely on the potential impact of future workers and patrons of the Site.  *See* Affidavit of Dr. Kool.  Defendant MDE has approved a RAP that fails to require any remediation of an admittedly highly toxic Site.  *See* Affidavit of Dr. Kool.

Defendant Whiting-Turner ("WT") is the general construction manager and is responsible for oversight and implementation of the approved RAP to ensure compliance. Defendant WT's construction plans call for the removal of any standing water that occurs in any excavation area to be dewatered into portable tanks and discharged into sewer drains or directly into tidal waters.  *See* Exhibit N.

Defendant WT, through their actions and the actions of their agents, have contributed to the accelerated migration and flow of dangerous toxins and contaminants to neighboring properties and the environment. *See* affidavit of Dr. Kool. Defendant WT's construction plans call for the implementation of water, sewer and electrical infrastructure to be built below grade where the contaminated soil is present, and thereby creating a conduit to which contaminated materials may flow through the groundwater to neighboring properties and/or the Patapsco River. *See* Exhibit N.

## ARGUMENT

## PLAINTIFFS HAVE MET THE REQUIREMENTS FOR THE ISSUANCE OF TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

### Standard for Grant of TRO and Preliminary Injunction

"A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief pendente lite of the type available after the trial." *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, *Citizens United v. FEC*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), *aff'd, The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam) (citing *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524-26 (4th Cir. 2003); *see also De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220-21, 65 S. Ct. 1130, 89 L. Ed. 1566 (1945)).

The Supreme Court established the standard for imposing a preliminary injunction in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). That case requires parties seeking preliminary injunctions to demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest. *Id.* at 20. Before the Supreme Court

14

issued its ruling in *Winter*, this Court used a "balance-of-hardship test" that allowed it to disregard some of the preliminary injunction factors if it found that the facts satisfied other factors. *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977). However, in light of *Winter*, this Court recalibrated that test, requiring that each preliminary injunction factor be "satisfied as articulated." *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds, Citizens United v. FEC*, 558 U.S. 310, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010), *aff'd, The Real Truth About Obama, Inc. v. FEC*, 607 F.3d 355 (4th Cir. 2010) (per curiam). Accordingly courts considering whether to impose preliminary injunctions must separately consider each *Winter* factor.

*Pashby v. Delia*, 709 F.3d 307, 320-321 (4th Cir. 2013).

As the Plaintiffs' can establish these four factors, preliminary injunctive relief should be granted.

## A) PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS

In order to prevail on their request for preliminary injunctive relief, Plaintiffs must demonstrate a likelihood of success on the merits.  "Although this inquiry requires plaintiffs seeking injunctions to make a 'clear showing' that they are likely to succeed at trial, *Real Truth*, 575 F.3d at 345, plaintiffs need not show a certainty of success, see 11A Charles Alan Wright et al., Federal Practice & Procedure § 2948.3 (2d ed. 1995)." *Pashby*, 709 F.3d at 320-321 (4th Cir. 2013).

Plaintiffs have filed an eleven count complaint in this action.[2]  Plaintiffs need not make a "clear showing" of success on the merits of each count, only that Plaintiffs are likely to succeed on at least one count in their complaint related to the injunctive relief requested.  *See Pashby, supra.* (Fourth Circuit affirmed grant of preliminary injunction

---

[2] Plaintiffs intend to dismiss their Clean Water Act Count.

where it concluded that plaintiff had a likelihood of success on the merits of some, but not all, of the counts in the complaint).

### Plaintiffs' Title VI, Equal Protection and § 1983 Claims

Plaintiffs' Complaint alleges that Defendants Baltimore City, CBAC Gaming and MDE violated Title VI of the Civil Rights Acts of 1964, the Equal Protection Clause of the 14th Amendment to the United States Constitution and 42 U.S.C. § 1983. Plaintiffs have a strong likelihood to succeed on their claim that their civil rights have been violated by the Defendant City and MDE.

The Fourteenth Amendment's Equal Protection Clause states, in relevant part, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "limits all state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal,* 135 F.3d 275, 289 (4th Cir. 1998) (internal quotation marks & emphasis omitted). *See also Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985) (Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."). While the 14th Amendment applies to government action, the United States Supreme Court has held that the acts of a private party are fairly attributable to the State on certain occasions where the private party acted in concert with state action. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

There are several ways for a plaintiff to make out a valid claim of unconstitutional discrimination. In particular and applicable in the instant case, a plaintiff can identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. *Williams v. Hansen,* 326 F.3d 569, 584 (4th Cir. 2003) (citing Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 30 L. Ed. 220, 6 S. Ct. 1064 (1886)). Plaintiffs may also allege that a facially neutral statute or policy that is neutrally applied nonetheless has an adverse effect on a protected group, and that the adoption of the statute or policy was motivated by discriminatory animus. See *Hansen,* 326 F.3d at 584 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 at 264-65 (1977)).   The Equal Protection Clause "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Id. (*citing *Arlington Heights*, 429 U.S. at 265). "Rather, a plaintiff need only establish that racial animus was one of several factors that, taken together, moved the decisionmaker to act as he did. See *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 539 (6th Cir. 2002) (holding that state trooper's possession of some race-neutral basis for initiating investigation was insufficient, standing alone, to entitle trooper to qualified immunity from liability on plaintiff's equal protection claims if plaintiff could demonstrate that trooper was partly motivated by discriminatory purpose)." *Id.*

The Court's determination whether official action was motivated by intentional discrimination remains "a sensitive inquiry." *Id.* (quoting *Arlington Heights*, 429 U.S. at 266). In delving in the minds of the officials at MDE and Baltimore City, the Court may look to "such circumstantial and direct evidence of intent as may be available." *Id.*

(quoting *Arlington Heights*, 429 U.S. at 266). "An invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another." *Id.* (quoting Washington, 426 U.S. at 242).   Discriminatory purpose "implies that the decision maker 'selected or reaffirmed' a particular action in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Personal Adm'r of Mass v. Feeney*, 442 U.S. 256, 279 (1979).

The United States Supreme Court has since provided further guidance regarding this "totality of the relevant facts" inquiry.

> First, and importantly, the Court has recognized that the direct impact of the challenged official action is frequently probative of why the action was taken, since people "usually intend the natural consequences of their actions." *Id.* (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487, 137 L. Ed. 2d 730, 117 S. Ct. 1491 (1997) (citing Arlington Heights, 429 U.S. at 266)).  Other relevant considerations include: (1) the historical background of the decision, which may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents; (2) the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures; and (3) contemporary statements by the decisionmaker. *Id.* (citing *Arlington Heights*, 429 U.S. at 266-68; see also *Sylvia Dev. Corp.*, 48 F.3d at 819 (applying *Arlington Heights* to analyze intent in equal protection context); *Talbert v. City of Richmond*, 648 F.2d 925, 929 (4th Cir. 1981) (same).

*Id.*

To demonstrate a likelihood of success on the merits of their equal protection claim, Plaintiffs need only show that Defendants Baltimore City, MDE, CBAC and WT's deficiencies in the RAP and/or failure to properly remediate and/or contain the known contaminants was motivated in part by discriminatory intent. *Hansen*, 326 F.3d 569, 584-585 (4th Cir. 2003).  In order to demonstrate that Plaintiffs are likely to succeed on the

merits of their Equal Protection claim, Plaintiffs need only establish that racial animus was one of several factors that, taken together, moved the City and MDE to act as they did. *Hansen,* 326 F.3d at 584-85.

The *Arlington Heights* factors cited by the Fourth Circuit used to determine whether invidious discriminatory purpose was a motivating factor for the official decision, are "(1) the discriminatory effect of the official action, (2) the historical background of the decision, (3) the specific sequence of events leading up to the challenged decision, (4) departures from the normal procedural sequence, (5) departures from the normal substantive [standards], and (6) the legislative or administrative history of the decision." *Arlington Heights*, 429 U.S. at 266-68). "The inquiry is a practical one which is designed to determine whether the decisonmaker's actions … could not be 'reasonably explained without reference to racial concerns.'" *Clients' Council v. Pierce*, 711 F.2d 1406 (8th Cir. 1983)(quoting *Columbus Bd. of Educ. v. Penick,* 443 U.S. 449, 461 (1979)). The United States Supreme Court has stated that "determining the existence of a discriminatory purpose 'demands a sensitive inquiry into such circumstantial and direct evidence as may be available.'" *Rogers v. Lodge*, 458 U.S. 613, 73 L. Ed. 2d 1012, 1018, 102 S. Ct. 3272 (1982) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra*, 429 U.S. at 266).

**The Discriminatory Effect**

The first *Arlington Heights* factor addresses the discriminatory effect of the official action. The location of the known contaminated Site in close proximity to the Westport and Cherry Hill Neighborhoods which are comprised of predominantly African

American persons, the history of the known contamination, and the lack of full testing of the Site demonstrate a disparate impact from the leaching of contaminants into the groundwater and the Middle Branch of the Patapsco River on minority neighborhoods in close proximity to the Site.  In particular, the Cherry Hill Community borders the Middle Branch of the Patapsco River and the contaminants that escape from the Site into the Middle Branch of the Patapsco River will inevitably travel downstream to the Cherry Hill Community.   The leaching of contaminants into the environment has caused an immediate and irreparable harm to the public health.  Chemicals, such as those known at the Site, leaching into the Middle Branch from the Site, that cause even a marginal increase in cancer risk is a serious and often irreversible harm.  The only moment to eliminate this harm is before development as once the buildings are constructed the opportunity to remediate is lost.

The Harbor Point Development was completed on previously under-utilized parcels of land that had been contaminated by decades of industrial use.  The site situated between the Inner Harbor and Fells Point had previously been used by Allied Shield, a chemical company that used the property to manufacture and store bulk chemicals. Defendant MDE required the developers of Harbor Point to fully remediate the contaminated area at a cost of approximately One Hundred Million Dollars ($100,000,000.00).  The remediation included a complete removal of all contaminated soil and groundwater as well as an underground concrete barrier to prevent any contaminants from seeping to the surface or into the Baltimore Harbor.  Harbor Point is demographically opposite to Westport and Cherry Hill as Harbor Point is composed of

predominantly upper/upper-middle income class Caucasian residents. Westport and Cherry Hill are predominantly low/low-middle class African-American residents.

As demonstrated by the redevelopment of Harbor Point in close proximity to the Fells Point neighborhood, a predominantly affluent Caucasian neighborhood, the City and MDE required substantially more testing, cleanup, remediation and containment of a known contaminated site when it approved and monitored the redevelopment of the Harbor Point project.  The similarities of the Horseshoe Casino and Harbor Point projects are that each involved properties that border portions of the Patapsco River, each involved known contaminated properties in the VCP, each required an approved RAP for redevelopment, each required approval from the City and MDE, and each is envisioned to provide substantial income to the City and the State of Maryland.  The major difference in the two projects is that the Horseshoe Casino Site is in close proximity to the Westport and Cherry Hill Communities, which are predominately lower income African American communities. The other major difference is that the Horseshoe Casino Site has not been fully tested for continued contamination, and the approved RAP for the Horseshoe Casino site is inadequate given the level of known contamination.  In other words, the Westport and Cherry Hill Communities have been treated differently in the redevelopment process for a known contaminated site, which disparate treatment is as a result of race.  The laws governing the redevelopment of known contaminated properties have been applied unequally and in violation of Plaintiffs' equal protection rights under the 14th Amendment of the United States Constitution resulting in a disparate impact to the predominantly minority neighborhoods of Westport and Cherry Hill.

21

**The Historical Background of the Decision**

The City of Baltimore historically segregated white and black neighborhoods, going so far as to enact a penal ordinance that prohibited black citizens from the "use of" City blocks for "residences." *See State v. Gurry*, 121 Md. 534, 88 A. 546 (1913)(quoting *Baltimore City Ordinance* No. 692, enacted May 15, 1911 known as the "Segregation Ordinance"). The Segregation Ordinance enacted by Baltimore City made it unlawful for black citizens (referred to in the Segregation Ordinance as "colored persons") from moving into white sections of the City, called "blocks" (as identified in the Segregation Ordinance). *See Gurry*, 121 Md. at 537-38. The Court of Appeals ultimately upheld the constitutionality of the Segregation Ordinance under the police power of Baltimore City, a holding that has since been outlawed by the Civil Rights Act of 1964. Notably, in reaching such a conclusion the Court of Appeals stated that "Every well organized government has the inherent right to protect the health and provide for the safety and welfare of its people. It has not only the right, but it is a duty and obligation which the sovereign power owes to the public." *Id.* at 542. What is important in the instant case is that the Mayor and City of Baltimore have a long history of discriminatory practices against black citizens in connection with the zoning within the City of Baltimore and that Defendants MDE and the City have not complied with their "duty and obligation" to "protect the health for the safety and welfare" of Plaintiffs.

The Cherry Hill Community was designated as a black neighborhood by the City of Baltimore. *See The 1968 Riots and the History of Public Housing Segregation in*

*Baltimore*, Baltimore Riots and Rebirth – April 4, 2008, Barbara Samuels, ACLU of Maryland, http://www.prrac.org/pdf/riots_and_rebirth.pdf at page 8 where it is noted that in the 1940s "After white opposition to every proposed site, the isolated Cherry Hill peninsula was deemed the only site outside the ghetto that was 'politically acceptable' for the introduction of permanent Negro war housing." *See* 1960 Public Housing and Areas of Minority Concentration, 1960 at p. 26 demonstrating that Cherry Hill and Westport were 90-100% minority in 1964. *See also* Public Housing and Areas of Minority Concentration, 1970 at 45, and 1980 at 46, 1990 at 47, 2000 at 48 demonstrating that Cherry Hill and Westport Communities are 90-100% minority residents. There is demonstrable history of race-based policy making by Baltimore City.

Considering the proof of historical race based policy making by the City of Baltimore, the evidence of the disparate discriminatory effects of the City's actions in connection with the Site and the RAP takes on greater weight in the discriminatory intent inquiry. If the City historically considered the racial makeup of neighborhoods when formulating policy, if it initially located the minority neighborhoods in "isolated" areas close to industrial sites that are creating contamination to the environment, and if it continues to deny the protections against the contamination to the predominantly minority neighborhoods of Westport and Cherry Hill, the circumstantial evidence demonstrates that such conduct is racially motivated. *See also* Exhibit H to the Complaint at 60-64 for a history of the use of the Site. By redeveloping the Site with a proper and through remediation plan, the Defendants City, MDE, CBAC have reaffirmed a policy of placing an undue burden on a historically discriminated group. Accordingly,

23

Plaintiffs have provided a clear showing of racial motivation and demonstrated a substantial likelihood of success on the merits.

### The Specific Sequence of Events and Departure from Normal Sequence

The third *Arlington Heights* factor examines the specific sequence of events leading up to the challenged action.  As set forth above in the Facts Section, Defendant MDE entered into a MOA with Defendant EPA that defined the responsibilities with respect to activities regarding the redevelopment of "brownfield" sites such as the one at issue in this case.   The EPA and MDE have concurrent power to regulate the redevelopment of "brownfields," and the MOA was signed to assure a cooperative plan to protect the public health and environment that are mutually complementary and are not duplicative.   Defendant MDE did not conduct any meaningful public discussion regarding the Gateway Redevelopment Project thereby violating the MOA with Defendant EPA and resulting in the exclusion a predominately poor, African-American community from any meaningful public participation in the redevelopment of this brownfield Site.

In 2008, Defendant City acquired title to the Site properties.  On April 25, 2008 and June 4, 2009, Defendant City, through its agent Defendant Baltimore Development Corporation, submitted two VCP applications to Defendant MDE proposing to remediate the Site and requesting liability protection as an Inculpable Person upon completion. *See* Exhibit D.  Defendant City's VCP Applications relied upon eight (8) different Phase I or II Environmental Site Assessments (hereinafter "ESA"), which were completed between May 2007 and May 2009. These ESAs also referred to and/or attached a number of

24

earlier ESAs conducted at and around the Properties from 2000 to 2009.  *See* Exhibit E.
The said ESAs confirmed that contaminants at the Site are widespread and highly
concentrated in soils at various depths and various locations throughout the Site (also
known as "hot spots").  *See* Exhibit E.  The ESAs confirmed that the groundwater
underneath the Site contains a number of the above-referenced contaminants and comes
into contact with the contaminated soil on the Site.  *See* Exhibit E.  The ESA conducted
at the adjacent Waterfront Parcels to the south and east of the Site confirm that the
contaminated groundwater from the upgradient Properties flows through, and
contaminates, the Waterfront Parcels and then discharges into the Middle Branch of the
Patapsco River. *See* Exhibit E.

On May 2, 2011, Defendant City submitted a "combined RAP" which proposed to
address all the Properties associated with both VCP applications in one cleanup plan. *See*
Exhibit H (Combined RAP).  Defendant City's "combined RAP" contained a cursory and
incomplete analysis of the contamination at the Properties, prematurely selected
"cleanup" methods which would be the least expensive and thus the most attractive to a
future developer and failed to include an implementation schedule as mandated by § 7-
508 of the Environment Article.  Defendant City justified these deficiencies by stating in
the RAP's "Overview" that "the RAP is intended to be general enough so that a future
developer can alter that approach and maintain appropriate environmental responses."
Despite the deficiencies in the aforementioned RAP, Defendant MDE issued a final RAP
Approval Letter to Defendant City on September 15, 2011 which approved the
"combined RAP" submitted pursuant to Defendant City's VCP applications.  Inconsistent

with the requirements of the Environment Article §7-511(c), Defendant MDE's September 15, 2011 RAP Approval Letter erroneously stated that, among other things, "no further action will be required to accomplish the objectives set forth in the approved revised RAP other than those actions described therein."

Pursuant to the terms of the GLA and LDA entered into with Defendant City, Developer CBAC Gaming agreed to buy or lease the Properties "as is," agreed to participate in the VCP, and acknowledged receipt of Defendant City's approved RAP which is represented as "providing a blueprint for conducting the required environmental remediation of the Property." The GLA and LDA authorize Defendant CBAC Gaming to cap its costs for remediating the Properties to Two Million Dollars ($2,000,000.00). If Defendant CBAC Gaming's remediation costs exceed $2,000,000.00, Defendant City agreed to reduce Defendant CBAC Gaming's rental payments by one-half (i.e., up to $1,000,000.00). The GLA and LDA also authorize Defendant CBAC Gaming to terminate the Agreements if CBAC Gaming projected its remediation costs to exceed Four Million Dollars ($4,000,000.00). Defendant City, through the GLA and LDA, entered into an agreement with Defendant CBAC Gaming where the City had substantial financial motivation to ensure the remediation costs for the Site were minimalized. Defendant MDE permitted Defendants City and CBAC Gaming to bypass regulatory guidelines and statutory requirements to begin construction prior to any public inspection or comments to the plans for the Site and prior to the implementation of a final RAP. The actions of Defendants City, MDE and CBAC Gaming are a deviation of established

requirements as compared to other similarly situated VCP sites, such as the recent Harbor Point Development.

On July 7, 2012, Defendant CBAC Gaming submitted a VCP application to Defendant MDE which proposed to develop the Site and requested liability protection as an Inculpable Person upon completion.  Defendant MDE failed to notify the public of Defendant CBAC Gaming's July 2012 VCP Application on its website as required by § 7-506 of the Environment Article.  Defendant CBAC submitted Phase I and II ESAs along with the VCP application that were identical to the defective ESAs submitted by Defendant City three (3) years prior in 2008 and 2009.  The only environmental assessments contained in Defendant CBAC Gaming's VCP application were copies of the ESAs prepared and submitted with Defendant City's VCP applications more than three (3) years prior in 2008 and 2009, which is a departure from the MDE's Guidance Document requirement for all VCP applicants to update ESAs that are "more than one year old."  Defendant CBAC Gaming's VCP application did not update the sampling data referenced in the ESAs which is a deviation from normal substantive standard.  Despite no final RAP approval, Defendant CBAC gaming began construction and soil disturbance at the Site in March 2013.

Defendant CBAC Gaming submitted a different proposed RAP than that of the City prepared by its own environmental consultants, Defendant Urban Green Environmental, for MDE's review and approval by MDE.  Defendant CBAC Gaming's proposed RAP contained extensive modifications to the cleanup criteria, cleanup approaches, and implementation and completion measures which were contained in the

27

City's approved RAP and which provide the Plaintiffs, the public health and the environment with even less protections.  The majority of the modifications contained in the Defendants CBAC Gaming RAP reduced its cleanup obligations in order to minimize its remediation costs.

Defendant CBAC Gaming's RAP does not account for adverse impacts associated with groundwater flow, velocity or contaminants transported off-site through leaching, migration, or construction created pathways.  Although Defendant CBAC Gaming's development-related construction activities include installing certain below-grade utilities (e.g., water, storm water and sewer) at the Site, the RAP contains no measures to avoid disturbance of contaminated soil and infiltration of groundwater to prevent the adverse impacts associated with such installations at the Site and/or surrounding environment.

The incomplete and inadequate environmental investigations and remediation techniques proposed by Defendant CBAC Gaming, and authorized by MDE, fail to address and remedy the exposure of persons and ecosystems, including, but not limited to, wildlife, fish and other aquatic life in the surrounding area to contaminated soil, groundwater and vapor, and/or releases of hazardous substances into the surrounding environment, including the publically-used Waterfront Parcels and the degraded Middle Branch of the Patapsco River.

By letter dated August 10, 2012, Defendant MDE approved Defendant CBAC Gaming's VCP application for the Properties and affirmed Defendant CBAC Gaming's Inculpable Person Status.  Rather than requiring Defendant CBAC Gaming to take new soil and groundwater samples to complete its VCP application, as required by MDE's

Guidance Document, MDE only required CBAC Gaming to prepare and submit sampling data for two limited purposes: evaluating groundwater contamination for light non-aqueous phase liquids and conducting supplemental vapor emission testing and analysis for heptachlor.

After reviewing revised RAPs prepared and submitted by Defendant CBAC Gaming, Defendant MDE approved CBAC Gaming's proposed RAP dated November 2012, for the Properties and issued CBAC Gaming a final RAP Approval Letter dated November 27, 2012. *See* Exhibit O.  Defendant CBAC Gaming did not publish notice of its proposed RAP as required by § 7-509(a) of the Environment Article and did not otherwise provide the public with notice of the Proposed RAP.  Defendant MDE did not issue a public notice and comment period or solicit written comments on Defendant CBAC Gaming's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(b) of the Environment Article.  Defendant MDE did not hold a public information meeting on Defendant CBAC's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(c) of the Environment Article.

Defendant MDE failed to follow the procedure set forth in § 7-509 of the Environment Article to notify the public and open communication channels to consider public comments, and improperly permitted Defendant CBAC Gaming to begin construction at the Site on March 6, 2013.  *See* Exhibit K.  Defendant MDE, as a result of allowing Defendant CBAC Gaming to commence construction prematurely, received numerous public complaints from environmentalists, lawyers, and concerned citizens, thereby resulting in the MDE reconsidering its position and conducting a public hearing.

29

Defendant MDE conducted a public hearing regarding Defendant CBAC Gaming's RAP on April 11, 2013 after it was sued in the Circuit Court for Baltimore City related to the procedural deficiencies set forth herein.   Defendant MDE permitted Defendant CBAC Gaming to continue construction at all times before, during and after the public meeting, thereby making any public concern and/or comment a sham.   Such action by MDE permitted Defendant CBAC to release contaminants into the environment.

A copy of the City of Baltimore Zoning Districts and Sub-Districts, Ordinance 06-296, July 28, 2006, is attached hereto as Exhibit 1.   As is shown on the 2006 Zoning Map, the Westport Community is completely surrounded by the M-1, M-2 and M-3 Industrial Districts and the Cherry Hill Community is surrounded on three sides by such Industrial Districts and is bordered by the Middle Branch of the Patapsco River on the fourth side.

Plaintiffs live in close proximity to the contaminated Casino Site, fish in the Patapsco River and eat the fish caught as part of their regular diet.   Plaintiffs are regular users of the trails and pathways adjacent to the Site and are at a high risk of exposure to the contaminants at the Site as those contaminants invade the groundwater.   Unless adequate testing of the entire Site is performed, Plaintiffs' health is at a significantly higher risk to be adversely affected by the known contamination and the movement of the known contamination and Plaintiffs will be irreparably harmed when such contamination enters the groundwater and moves from the Site.   The City and MDE has seen fit to protect those Caucasian residents located in close proximity to the contaminated Harbor

30

East Site, but have not provided the same protections to the predominately African American residents in close proximity to the Casino Site.

Plaintiffs have identified numerous deficiencies, errors and omissions in the RAP, the inadequate testing of the Site and the significantly high potential for a failure of containment of the known contaminants at the Site.   *See Affidavit of Dr. Kool.* Construction should be immediately halted and the proper testing of the Site should be completed and the results fully analyzed by all parties to this action.

As outlined herein, the actions of MDE and CBAC Gaming were a departure from the normal sequence of events and requirements of a RAP for a Site such as this and a deviation from the MDE's Guidance Document that provides its normal substantive standards for a RAP and construction in accordance therewith.   Consequently, the third, fourth and fifth *Arlington Heights* factors clearly show a racially discriminatory intent in connection with the RAP for the Site.

The totality of the circumstances of the approval of the RAP, the deficiencies in the RAP, the failure of the required public notice, the deviation from normal substantive standards, the historical race related policy making of Baltimore City, and the disparate treatment of this Site as compared to Harbor Point, all lead to the conclusion that there exists an invidious discriminatory purpose that was the motivating factor in the decision to allow Defendant CBAC Gaming to begin and continue construction at the Site without proper testing of the groundwater and soil.   Accordingly, Plaintiffs have satisfied the first factor for the issuance of a TRO and Preliminary Injunction by demonstrating a likelihood of success on the merits of their Title VI, 14th Amendment and § 1983 claims.

### Plaintiffs' Pubic Nuisance Claim

The Court of Appeals of Maryland set forth the elements of a public nuisance in *Tadjer v. Montgomery County*, 300 Md. 539, 551-53, 479 A.2d 1321 (1984). "To be considered public, the nuisance must affect an interest common to the general public, rather than peculiar to one individual, or several." *Tadjer*, 300 Md. at 552, 479 A.2d 1321 (*quoting* W. Prosser, *Torts* § 89, at 585 (4th ed. 1971)). The Court of Appeals of Maryland held that "A public nuisance is an unreasonable interference with a right in common to the general public." *Tadjer*, 300 Md. at 552, 479 A.2d 1321 (quoting Restatement of Torts (Second) § 821B(1) (1979)).

As noted by this Court and as agreed to by all parties, there is no dispute that the Site is contaminated. The Affidavit of Dr. Kool demonstrates that the failure to provide sufficient protections during construction presents a threat to the public waterway of the Patapsco River, as well as a threat to the environment as a whole and a threat to the Plaintiffs. The State of Maryland has specifically recognized that the general public has a right to a clean and healthy environment. *Maryland Annotated Code*, Natural Resources Art. § 1-302 (Repl. Vol. 2012); *Maryland Annotated Code*, Natural Resources Art. § 1-502 (Repl. Vol. 2012); *Maryland Annotated Code*, Environment Art. § 4-402.

The actions of the Defendants City, MDE, CBAC and WT in continuing construction at the contaminated Site without adequate testing of the groundwater and soil creates a public nuisance as the leaching of contamination is an unreasonable interference with the right of the general public and Plaintiffs to the use and enjoyment of the Middle Branch of the Patapsco River and the paths adjacent to the Site free from

exposure to contamination from the Site.  Moreover, as the requirements of the VCP were not met, Defendants City, CBAC and WT should lose their "inculpable person" status, exposing them to significant liability for the leaching of contamination, which further supports Plaintiffs likelihood of success on the merits.   As Plaintiffs have provided a clear showing of a public nuisance at the contaminated Site, Plaintiffs have satisfied the first element for the issuance of a TRO and Preliminary Injunction.

**B)      PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM**

The Plaintiffs must make a showing of at least a likelihood of irreparable harm for the grant of preliminary injunctive relief and a mere possibility is insufficient.  *Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008). Plaintiffs fish in the Patapsco River and eat the fish caught as part of their regular diet.  Plaintiffs are regular users of the trails and pathways adjacent to the Site and are at a high risk of exposure to the contaminants at the Site as those contaminants invade the groundwater.  Unless adequate testing of the entire Site is performed, it is actual and imminent that Plaintiffs' health is at a significantly higher risk to be adversely affected by the known contamination and the movement of the known contamination and Plaintiffs will be irreparably harmed when such contamination enters the groundwater and moves from the Site.  Moreover, the injury to the environment from the leaching of contamination at the Site is irreparable harm to Plaintiffs.  *See Maryland Annotated Code*, Natural Resources Art. §§ 1-302 & 1-502 (Repl. Vol. 2012)(stating that "The protection, preservation, and enhancement of the State's diverse environment is necessary for the maintenance of the public health and welfare and the continued viability of the economy of the State and is a matter of the

highest public priority"; "All State agencies must conduct their affairs with an awareness that they are stewards of the air, land, water, living and historic resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations"; that "each person has a fundamental and inalienable right to a healthful environment, and each person has a responsibility to contribute to the protection, preservation, and enhancement of the environment"; "that the natural resources and scenic beauty of the State of Maryland are in danger of irreparable harm occasioned by the use and exploitation of the physical environment." *See also Maryland Annotated Code*, Environment Art. § 4-402 (The General Assembly of Maryland further stated "that the improper use and exploitation constitute an invasion of the right of every resident of Maryland to an environment free from pollution to the extent possible.")

**C)       THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFFS' FAVOR**

The only hardship identified by Defendants is economic in nature.  In the same manner that a purely economic injury is not sufficient to grant a TRO, a purely economic hardship should not be sufficient for the denial of a TRO.  The Plaintiffs have demonstrated that the contamination leaching into the groundwater and Middle Branch of the Patapsco River is a danger to their life and health. The balance of hardships between human life and health against economic hardship should weigh heavily in favor of the protection of human life and health.  Accordingly, this factor weighs in favor of injunctive relief for Plaintiffs.

**D)      THE INJUNCTION IS IN THE PUBLIC INTEREST.**

The State of Maryland has specifically stated that it is the public policy of the State to have a healthy and clean environment.  *See Maryland Annotated Code*, Natural Resources Art. §§ 1-302 & 1-502 (Repl. Vol. 2012).  The granting of Plaintiffs' Motion to For TRO is in the public interest because it enforces the express public policy of the State of Maryland and provides for the protection of the Plaintiffs and the environment by sufficient testing of the Site to contain the known contamination at the Site.

## CONCLUSION

For the reasons set forth herein, in Plaintiffs' Complaint and Plaintiffs' Motion for Temporary Restraining Order, as well as on the record during hearing on this matter, Plaintiffs request the issuance of preliminary injunctive relief.

Respectfully submitted,


_____/s/_____
Anuj Sud  Fed. Bar No. 17126
Sud Law Firm
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
(301) 277-0304
Fax: (301) 277-0305
anuj@sudlawfirm.com



_____/s/_____
Walter W. Green  Fed. Bar No. 15007
Law Office of Walter W. Green
7309 Baltimore Avenue
Suite 115
College Park, MD 20740
(301) 927-3100
Fax: (301) 927-3542
wgreen@GreensLaw.com

Attorneys for Plaintiffs

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 8, 2013 a copy of the forgoing

Memorandum of Law was served via the Court's ECF system on:

Thomas Mark Lingan, Esq.
Mary Rosewin Sweeney, Esq.
Kenneth L. Thompson, Esq.
Venable, LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202

Thomas C. Valkenet, Esq.
Ian T. Valkenet, Esq.
Young & Valkenet
600 Wyndhurst Avenue
Baltimore, MD 21210

Elizabeth B. Dawson, Esq.
U.S. Dept. of Justice
601 D. St. NW
Washington, DC 20004

Matthew Zimmerman, Esq.
Assistant Attorney General
Maryland Dept. of the Environment
Office of the Attorney General
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230

And I further Certify that a copy of the foregoing Memorandum of Law will be served on the remaining Defendants in this case who at this time have not been served with the Original Complaint via private process service.

_____/s/_____
Walter W. Green