**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| **JAMES R. ROBINSON, individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 1938 Light Street | | |
| Baltimore, Maryland 21230 | * | Case No.13-02234-RDB |
| | | |
| **DUWAIN HEIM individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 2423 Annapolis Road | | |
| Baltimore, Maryland 21230 | * | |
| | | |
| **RICK GARDNER individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 3501 Elmore Avenue | | |
| Baltimore, Maryland 21213 | * | |
| | | |
| **VANESSA MACK individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 3000 Hanlon Avenue | | |
| Baltimore, Maryland 21216 | * | |
| | | |
| **CALVIN WILSON individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 4811 Norwood Road | | |
| Baltimore, Maryland 21212 | * | |
| | | |
| **MARYETTA BAQUOL individually,** | * | |
| **and on behalf of all others** | | |
| **similarly situated,** | * | |
| 2819 Pennsylvania Avenue | | |
| Baltimore, Maryland 21227 | * | |

**AMI LAWSON individually,**      *
**and on behalf of all others**
**similarly situated,**      *
4306 Ethland Avenue
Baltimore, Maryland 21207      *

**KENNETH MCKENZIE individually,**      *
**and on behalf of all others**
**similarly situated,**      *
3509 Rogers Avenue
Baltimore, Maryland 21215      *

**JOSEPH JORDAN, III, individually,**      *
**and on behalf of all others**
**similarly situated,**      *
1120 Cherry Hill Road, Apt. K
Baltimore, Maryland 21225      *

**QUENTIN SAWYER, individually,**      *
**and on behalf of all others**
**similarly situated,**      *
3904 8th Street
Baltimore, Maryland 21225      *

**MIA QUATTLEBAUM, individually**      *
**and on behalf of all others**
**similarly situated,**      *
2380 Seamon Avenue, Apt. T
Baltimore, Maryland 21225      *

**JOHN QUATTLEBAUM, individually**      *
**and on behalf of all others**
**similarly situated,**      *
2819 Ridgewood Avenue
Baltimore, Maryland 21215      *

**JEFF LINK, individually**      *
**and on behalf of all others**
**similarly situated,**      *

2421 Annapolis Road
Baltimore, Maryland 21230       *

**MICHAEL HEWLETT, individually**       *
**and on behalf of all others**
**similarly situated,**       *
3702 Songbird Circle
Baltimore, Maryland 21227       *

**JAMES JOHNSON, individually**       *
**and on behalf of all others**
**similarly situated,**       *
2300 Terra Firma Road, Apt T-2
Baltimore, Maryland 21225       *

**LARRY FORD, individually**       *
**and on behalf of all others**
**similarly situated,**       *
655 West Lafayette Avenue
Baltimore, Maryland 21217       *

**BRIDDGETTE HOPKINS, individually**       *
**and on behalf of all others**
**similarly situated,**       *
1022 Bristol Place
Baltimore, Maryland 21225       *

**TED SHIN, individually**       *
**and on behalf of all others**
**similarly situated,**       *
1020 West Patapsco Avenue
Baltimore, Maryland 21230       *

**TYRA PATTERSON**, **individually**       *
**and on behalf of all others**
**similarly situated,**       *
2420 Marbourne Avenue
Baltimore, Maryland 21230       *

**TONY MCLAMY**, **individually**               *
**and on behalf of all others**
**similarly situated,**                          *
2420 Marbourne Avenue
Baltimore, Maryland 21230                        *

**JAN JOHNS**, **individually**                  *
**and on behalf of all others**
**similarly situated,**                          *
6950 Baltimore Annapolis Boulevard
Baltimore, Maryland 21225                        *

**HELEN PARTLOW, individually**                  *
**and on behalf of all others**
**similarly situated,**                          *
658 Hamburg Street
Baltimore, Maryland 21230                        *

**WARREN BULLOCK, individually**                 *
**and on behalf of all others**
**similarly situated,**                          *
827 North Woodington Road
Baltimore, Maryland 21229                         *

**AUDRIANNE HOPKINS, individually**              *
**and on behalf of all others**
**similarly situated,**                          *
1051 Leadenhall Street
Baltimore, Maryland 21230                         *

**ARTHUR WASHINGTON, individually**              *
**and on behalf of all others**
**similarly situated,**                          *
2731 Giles Road
Baltimore, Maryland 21225                         *

**FRED DAVIS, individually**                    *
**and on behalf of all others**
**similarly situated,**                          *
650 East Biddle Street
Baltimore, Maryland 21202                        *


**JOANN OWENS, individually**                    *
**and on behalf of all others**
**similarly situated,**                          *
2428 Haywood Street
Baltimore, Maryland 21224                        *


**LAMONTE THOMAS, individually**                 *
**and on behalf of all others**
**similarly situated,**                          *
6010 Charles Street
Baltimore, Maryland 21207                        *


**JIMMIE FLYTHE, individually**                  *
**and on behalf of all others**
**similarly situated,**                          *
831 Seagull Avenue, Apt. A-3
Baltimore, Maryland 21225                        *


**LAURA FLYTHE, individually**                   *
**and on behalf of all others**
**similarly situated,**                          *
831 Seagull Avenue, Apt. A-3
Baltimore, Maryland 21225                        *


**BILL JONES, individually**                     *
**and on behalf of all others**
**similarly situated,**                          *
1506 Pontiac Street
Baltimore, Maryland 21225                        *

**ELMER BARNHEART, individually**          *
**and on behalf of all others**
**similarly situated,**                    *
2423 Annapolis Road
Baltimore, Maryland 21230                  *

**PAUL JOHNSON, individually**             *
**and on behalf of all others**
**similarly situated,**                    *
212 4th Avenue
Baltimore, Maryland 21225                  *

**LISA REEDER, individually**              *
**and on behalf of all others**
**similarly situated,**                    *
2423 Annapolis Road
Baltimore, Maryland 21230                  *

**JONTAE COTTON, individually**            *
**and on behalf of all others**
**similarly situated,**                    *
5604 Force Road
Baltimore, Maryland 21206                  *

**LINWOOD GREY, individually**             *
**and on behalf of all others**
**similarly situated,**                    *
1022 Vine Street
Baltimore, Maryland 21223                  *

**EVERETT MONTGOMERY, individually**       *
**and on behalf of all others**
**similarly situated,**                    *
2222 Round Road
Baltimore, Maryland 21225                  *

**MEL HILL, individually**                    *
**and on behalf of all others**
**similarly situated,**                        *
1005 Bristol Place
Baltimore, Maryland 21225                      *


**TYRONE WHEELER, individually**              *
**and on behalf of all others**
**similarly situated,**                        *
5011 Corley Road, Apt G2
Baltimore, Maryland 21207                      *


**RODERICK ROBINSON, individually**          *
**and on behalf of all others**
**similarly situated,**                        *
5620 Milwood Avenue, 1st Floor
Baltimore, Maryland 21244                      *


**MARC FOX, individually**                    *
**and on behalf of all others**
**similarly situated,**                        *
9405 White Cedar Drive
Baltimore, Maryland 21117                      *


**DAKWON GILLIAN, individually**             *
**and on behalf of all others**
**similarly situated,**                        *
4602 Chatford Avenue
Baltimore, Maryland 21206                      *


**ANTONIO WASHINGTON, individually**         *
**and on behalf of all others**
**similarly situated,**                        *
2015 North Longwood Street
Baltimore, Maryland 21216                      *

**DEBORAH GATERS, individually**                    *
**and on behalf of all others**
**similarly situated,**                             *
307 North Payson Street
Baltimore, Maryland 21223                           *

**BRIAN JACOBS, individually**                      *
**and on behalf of all others**
**similarly situated,**                             *
1573 Ridgely Street
Baltimore, Maryland 21230                           *

**KELSEY SCOTT, individually**                      *
**and on behalf of all others**
**similarly situated,**                             *
2831 Elgin Avenue
Baltimore, Maryland 21216                           *

**DONALD MONROE, individually**                     *
**and on behalf of all others**
**similarly situated,**                             *
5105 Leeds Avenue
Baltimore, Maryland 21227                           *

**MERAB RICE, individually**                        *
**and on behalf of all others**
**similarly situated,**                             *
2309 Annapolis Road
Baltimore, Maryland 21230                           *

**RUTH SHERRILL, individually**                     *
**and on behalf of all others**
**similarly situated,**                             *
2631 Waterview Avenue
Baltimore, Maryland 21230                           *

**JAMES LEONARD, individually**	*
**and on behalf of all others**
**similarly situated,**	*
2232 Cedley Street
Baltimore, Maryland 21230	*

**TIM BULL, individually**	*
**and on behalf of all others**
**similarly situated,**	*
2039 Annapolis Road
Baltimore, Maryland 21230	*

**RICHARD HARRIS, individually**	*
**and on behalf of all others**
**similarly situated,**	*
2635 Maisel Street
Baltimore, Maryland 21230	*

**AJ ROBINSON EL, individually**	*
**and on behalf of all others**
**similarly situated,**	*
2307 Cedley Street
Baltimore, Maryland 21230	*

**MICHAEL GALLAGHER, individually**	*
**and on behalf of all others**
**similarly situated,**	*
2304 Sidney Avenue
Baltimore, Maryland 21230	*

     **Plaintiffs,**	*

**v.**	*

**STATE OF MARYLAND DEPARTMENT**	*
**OF THE ENVIRONMENT**
1800 Washington Boulevard	*
Baltimore, Maryland 21230
	*

Serve:                          *
                    Attorney General
                    Douglas F. Gansler             *
                    200 Saint Paul Place
                    Baltimore, Maryland 21202      *

**ROBERT SUMMERS, in his official**      *
**capacity as Secretary of the Maryland**
**Department of Environment**            *
1800 Washington Boulevard
Baltimore, Maryland 21230                *

                    Serve:                          *
                    Attorney General
                    Douglas F. Gansler             *
                    200 Saint Paul Place
                    Baltimore, Maryland 21202      *

**MAYOR AND CITY COUNCIL OF**            *
**BALTIMORE**
100 N. Holliday Street, Room 250         *
Baltimore, Maryland 21202
                                         *
                    Serve:
                    George Nilson, Esq.            *
                    Baltimore City Law Dept.
                    100 N. Holliday Street, Suite 101  *
                    Baltimore, Maryland 21202
                                         *

**STEPHANIE RAWLINGS-BLAKE,**
**in her official capacity as Mayor of**   *
**Baltimore City**
100 N. Holliday Street, Room 250         *
Baltimore, Maryland 21202
                                         *
                    Serve:
                    George Nilson, Esq.            *
                    Baltimore City Law Dept.
                    100 N. Holliday Street, Suite 101  *
                    Baltimore, Maryland 21202

**CBAC GAMING, LLC.**
One Caesars Palace Drive                     *
Las Vegas, Nevada 89109
                                              *

     Serve:                       *
     CSC-Lawyers Incorporating
     Service Company              *
     7 St Paul Street, Suite 1660
     Baltimore, Maryland 21202    *

                                              *
**BALTIMORE DEVELOPMENT**                      *
**CORPORATION**
2537 St. Paul Street                           *
Baltimore, Maryland 21218
                                              *
     Serve:
     Mr. Clayton J. Powell, Jr.   *
     2537 St. Paul Street
     Baltimore, Maryland 21218    *

     **Defendants.**              *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## PLAINTIFFS' FIRST AMENDED COMPLAINT
## AND DEMAND FOR JURY TRIAL

COME NOW, the Plaintiffs, by and through their undersigned counsel, file this Amended Complaint against the Defendants, and state the following in support thereof:

**Parties**

1.      At all times relevant to this dispute Plaintiff, James R. Robinson, resided at 1938 Light Street, Baltimore, Maryland, 21230, approximately 4600 feet from the center of the future site of the Horseshoe Casino.  James R. Robinson is a member of the Westport-Cherry Hill Class defined in this Complaint.

2.      At all times relevant to this dispute Plaintiff, Duwain Heim, resided at 2423 Annapolis Road, Baltimore, Maryland, 21230, approximately 5000 feet from the center of the future site of the Horseshoe Casino.  Duwain Heim is a member of the Westport-Cherry Hill Class defined in this Complaint.

3.      At all times relevant to this dispute Plaintiff, Rick Gardner, resided at 3501 Elmore Avenue, Baltimore, Maryland, 21213, approximately 4600 feet from the center of the future site of the Horseshoe Casino.  Rick Gardner is a member of the Westport-Cherry Hill Class defined in this Complaint.

4.      At all times relevant to this dispute Plaintiff, Vanessa Mack, resided at 3000 Hanlon Avenue, Baltimore, Maryland, 21216.  Vanessa Mack is a member of the Westport-Cherry Hill Class defined in this Complaint.

5.      At all times relevant to this dispute Plaintiff, Calvin Wilson, resided at Norwood Road, Baltimore, Maryland, 21212, approximately 5.2 miles from the center of the future site of the Horseshoe Casino.

6. At all times relevant to this dispute Plaintiff, Maryetta Baquol, resided at 2819 Pennsylvania Avenue, Baltimore, Maryland, 21227, approximately 2.9 miles from the center of the future site of the Horseshoe Casino. Maryetta Baquol is a member of the Westport-Cherry Hill Class defined in this Complaint.

7. At all times relevant to this dispute Plaintiff, Ami Lawson, resided at 4306 Ethland Avenue, Baltimore, Maryland, 21207, approximately 5.02 miles from the center of the future site of the Horseshoe Casino.

8. At all times relevant to this dispute Plaintiff, Kenneth McKenzie, resided at 3509 Rogers Avenue, Baltimore, Maryland, 21230, approximately 6.2 miles from the center of the future site of the Horseshoe Casino.

9. At all times relevant to this dispute Plaintiff, Joseph Jordan, III, resided at 1120 Cherry Hill Road, Baltimore, Maryland, 21225, approximately 1.5 miles from the center of the future site of the Horseshoe Casino. Joseph Jordan, III is a member of the Westport-Cherry Hill Class defined in this Complaint.

10. At all times relevant to this dispute Plaintiff, Quentin Sawyer, resided at 3904 8th Street, Baltimore, Maryland, 21225, approximately 3.1 miles from the center of the future site of the Horseshoe Casino. Quentin Sawyer is a member of the Westport-Cherry Hill Class defined in this Complaint.

11. At all times relevant to this dispute Plaintiff, Mia Quattlebaum, resided at 2380 Seamon Avenue, Apartment T, Baltimore, Maryland, 21225,

approximately 1.3 miles from the center of the future site of the Horseshoe Casino. Mia Quattlebaum is a member of the Westport-Cherry Hill Class defined in this Complaint.

12. At all times relevant to this dispute Plaintiff, John Quattlebaum, resided at 2819 Ridgewood Avenue, Baltimore, Maryland, 21215, approximately 5.08 miles from the center of the future site of the Horseshoe Casino. John Quattlebaum is a member of the Westport-Cherry Hill Class defined in this Complaint.

13. At all times relevant to this dispute Plaintiff, Jeff Link, resided at 2421 Annapolis Road, Baltimore, Maryland, 21230, approximately 5000 feet from the center of the future site of the Horseshoe Casino. Jeff Link is a member of the Westport-Cherry Hill Class defined in this Complaint.

14. At all times relevant to this dispute Plaintiff, Michael Hewlett, resided at 3702 Songbird Court, Baltimore, Maryland, 21229, approximately 2.3 miles from the center of the future site of the Horseshoe Casino. Michael Hewlett is a member of the Westport-Cherry Hill Class defined in this Complaint.

15. At all times relevant to this dispute Plaintiff, James Johnson, resided at 2300 Terra Firma Road, Baltimore, Maryland, 21225, approximately 1.47 miles from the center of the future site of the Horseshoe Casino. James Johnson is a member of the Westport-Cherry Hill Class defined in this Complaint.

16.     At all times relevant to this dispute Plaintiff, Larry Ford, resided at 655 West Lafayette Avenue, Baltimore, Maryland, 21217, approximately 2.2 miles from the center of the future site of the Horseshoe Casino.  Larry Ford is a member of the Westport-Cherry Hill Class defined in this Complaint.

17.     At all times relevant to this dispute Plaintiff, Bridgette Hopkins, resided at 1022 Bristol Place, Baltimore, Maryland, 21225, approximately 3.35 miles from the center of the future site of the Horseshoe Casino.  Bridgette Hopkins is a member of the Westport-Cherry Hill Class defined in this Complaint.

18.     At all times relevant to this dispute Plaintiff, Ted Shin, resided at 1020 West Patapsco Avenue, Baltimore, Maryland, 21230, approximately 1.88 miles from the center of the future site of the Horseshoe Casino.  Ted Shin is a member of the Westport-Cherry Hill Class defined in this Complaint.

19.     At all times relevant to this dispute Plaintiff, Tyra Patterson, resided at 2420 Marbourne Avenue, Baltimore, Maryland, 21230, approximately 1.8 miles from the center of the future site of the Horseshoe Casino.  Tyra Patterson is a member of the Westport-Cherry Hill Class defined in this Complaint.

20.     At all times relevant to this dispute Plaintiff, Tony McLamy, resided at 2420 Marbourne Avenue, Baltimore, Maryland, 21230, approximately 1.8 miles from the center of the future site of the Horseshoe Casino.  Tony McLamy is a member of the Westport-Cherry Hill Class defined in this Complaint.

21.     At all times relevant to this dispute Plaintiff, Jan Johns, resided at 6950 Baltimore-Annapolis Blvd., Baltimore, Maryland, 21225.

22.     At all times relevant to this dispute Plaintiff, Helen Partlow, resided at 658 Hamburg Street, Baltimore, Maryland, 21230.

23.     At all times relevant to this dispute Plaintiff, Warren Bullock, resided at 827 North Woodington Road, Baltimore, Maryland, 21229.

24.     At all times relevant to this dispute Plaintiff, Audrianne Hopkins, resided at 1051 Leadenhall Street, Baltimore, Maryland, 21230.

25.     At all times relevant to this dispute Plaintiff, Arthur Washington, resided at 2731 Giles Road, Baltimore, Maryland, 21225, approximately 1.6 miles from the center of the future site of the Horseshoe Casino.  Arthur Washington is a member of the Westport-Cherry Hill Class defined in this Complaint.

26.     At all times relevant to this dispute Plaintiff, Fred Davis, resided at 650 East Biddle Street, Baltimore, Maryland, 21229, approximately 2.3 miles from the center of the future site of the Horseshoe Casino.  Fred Davis is a member of the Westport-Cherry Hill Class defined in this Complaint.

27.     At all times relevant to this dispute Plaintiff, Joann Owens, resided at 2428 Haywood Street, Baltimore, Maryland, 21224.

28.     At all times relevant to this dispute Plaintiff, Lamonte Thomas, resided at 6010 Charles Street, Baltimore, Maryland, 21207.

29.     At all times relevant to this dispute Plaintiffs, Jimmie and Laura Flythe, resided at 831 Seagull Avenue, Apt. A-3, Baltimore, Maryland, 21225. Jimmie and Laura Flythe are members of the Westport-Cherry Hill Class defined in this Complaint.

30.     At all times relevant to this dispute Plaintiff, Bill Jones, resided at 1506 Pontiac Street, Baltimore, Maryland, 21225, approximately 4.3 miles from the center of the future site of the Horseshoe Casino.  Bill Jones is a member of the Westport-Cherry Hill Class defined in this Complaint.

31.     At all times relevant to this dispute Plaintiff, Elmer Barnheart, resided at 2423 Annapolis Road, Baltimore, Maryland, 21230, approximately 5000 feet from the center of the future site of the Horseshoe Casino.  Elmer Barnheart is a member of the Westport-Cherry Hill Class defined in this Complaint.

32.     At all times relevant to this dispute Plaintiff, Paul Johnson, resided at 212 4th Avenue, Baltimore, Maryland, 21225, approximately 3.0 miles from the center of the future site of the Horseshoe Casino.  Paul Johnson is a member of the Westport-Cherry Hill Class defined in this Complaint.

33.     At all times relevant to this dispute Plaintiff, Lisa Reeder, resided at 2423 Annapolis Road, Baltimore, Maryland, 21230, approximately 5000 feet from

the center of the future site of the Horseshoe Casino. Lisa Reeder is a member of the Westport-Cherry Hill Class defined in this Complaint.

34. At all times relevant to this dispute Plaintiff, Jontae Cotton, resided at 5604 Force Road, Baltimore, Maryland, 21206, approximately 5.9 miles from the center of the future site of the Horseshoe Casino.

35. At all times relevant to this dispute Plaintiff, Linwood J. Gray, resided at 1022 Vine Street, Baltimore, Maryland, 21223, approximately 1.2 miles from the center of the future site of the Horseshoe Casino. Linwood J. Gray is a member of the Westport-Cherry Hill Class defined in this Complaint.

36. At all times relevant to this dispute Plaintiff, Everett Montgomery resided at 2222 Round Road, Baltimore, Maryland, 21225, approximately 1.4 miles from the center of the future site of the Horseshoe Casino. Everett Montgomery is a member of the Westport-Cherry Hill Class defined in this Complaint.

37. At all times relevant to this dispute Plaintiff, Mel Hill, resided at 1005 Bristol Place, Baltimore, Maryland, 21225, approximately 3.3 miles from the center of the future site of the Horseshoe Casino. Mel Hill is a member of the Westport-Cherry Hill Class defined in this Complaint.

38. At all times relevant to this dispute Plaintiff, Tyrone Wheeler resided at 5011 Corely Road, Apartment G2, Baltimore, Maryland, 21207, approximately

4.8 miles from the center of the future site of the Horseshoe Casino. Tyrone Wheeler is a member of the Westport-Cherry Hill Class defined in this Complaint.

39.     At all times relevant to this dispute Plaintiff, Roderick Robinson, resided at 5620 Midwood Avenue, Baltimore, Maryland, 21244, approximately 6.0 miles from the center of the future site of the Horseshoe Casino.

40.     At all times relevant to this dispute Plaintiff, Marc Fox, resided at 9405 White Cedar Drive, Baltimore, Maryland, 21117.

41.     At all times relevant to this dispute Plaintiff, Dakwon Gilliam, resided at 4602 Chatford Avenue, Baltimore, Maryland, 21225, approximately 5.1 miles from the center of the future site of the Horseshoe Casino. Dakwon Gilliam is a member of the Westport-Cherry Hill Class defined in this Complaint.

42.     At all times relevant to this dispute Plaintiff, Antonio Washington, resided at 2015 North Longwood Street, Baltimore, Maryland, 21216, approximately 3.3 miles from the center of the future site of the Horseshoe Casino. Antonio Washington is a member of the Westport-Cherry Hill Class defined in this Complaint.

43.     At all times relevant to this dispute Plaintiff, Deborah Gaters, resided at 307 North Payson Street, Baltimore, Maryland, 21223, approximately 1.7 miles from the center of the future site of the Horseshoe Casino.  Deborah Gaters is a member of the Westport-Cherry Hill Class defined in this Complaint.

44.     At all times relevant to this dispute Plaintiff, Brian Jacobs, resided at 1573 Ridgely Street, Baltimore, Maryland, 21230, less than .25 miles from the center of the future site of the Horseshoe Casino.  Brian Jacobs is a member of the Westport-Cherry Hill Class defined in this Complaint.

45.     At all times relevant to this dispute Plaintiff, Kelsey Scott, resided at 2831 Elgin Avenue, Baltimore, Maryland, 21216.

46.     At all times relevant to this dispute Plaintiff, Donald Monroe, resided at 5105 Leeds Avenue, Baltimore, Maryland, 21227.

47.     At all times relevant to this dispute Plaintiff, Merab Rice, resided at 2309 Annapolis Road, Baltimore, Maryland 21230.

48.     At all times relevant to this dispute Plaintiff, Ruth Sherrill, resided at 2631 Waterview Avenue, Baltimore, Maryland 21230.

49.     At all times relevant to this dispute Plaintiff, James Leonard, resided at 2232 Cedley Street, Baltimore, Maryland 21230.

50.     At all times relevant to this dispute Plaintiff, Tim Bull, resided at 2039 Annapolis Road, Baltimore, Maryland 21230.

51.     At all times relevant to this dispute Plaintiff, Richard Harris, 2635 Maisel Street, Baltimore, Maryland 21230.

52.     At all times relevant to this dispute Plaintiff, AJ Robinson El, 2307 Cedley Street, Baltimore, Maryland 21230.

53.     At all times relevant to this dispute Plaintiff, Michael Gallagher, 2304 Sidney Avenue, Baltimore, Maryland 21230.

54.     Defendant Stephanie Rawlings-Blake in her official capacity as Mayor of Baltimore City (hereinafter "Mayor") is the elected official charged with the responsibility for overseeing the operations of the government of the City of Baltimore, Maryland.  The City of Baltimore is a municipal corporation of the State of Maryland that is run by the City Council.  Defendants Mayor and City Council are collectively referred to as the "City" herein.

55.     Defendant CBAC Gaming, LLC, (hereinafter "CBAC Gaming") is a limited liability company organized under the laws of a state other than Maryland and maintains its principle place of business in Nevada.

56.     Defendant Baltimore Development Corporation (hereinafter "BDC") is a Maryland corporation with its principal place of business at 2537 Saint Paul Street, Baltimore, Maryland 21218. BDC is a quasi-governmental entity.

57.     Defendant State of Maryland, Department of Environment is an agency of the State of Maryland that is headed by Defendant Robert Summers in his official capacity as Secretary of the Maryland Department of the Environment (hereinafter "Secretary Summers") who is the appointed head of the Maryland agency that administers the Voluntary Cleanup Program.  Defendant Secretary

Summers and Maryland Department of the Environment are collectively referred to as "MDE" in herein.

## Jurisdiction and Venue

58.     This Court has jurisdiction over this action in accordance with 28 U.S.C. §§ 1331 and 1343, in that this action, in part, arises under the Constitution of the United States and the Laws of the United States, and asserts a violation of civil rights secured by the Constitution of the United States and by Laws of the United States.

59.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391(b) because the Plaintiffs' causes of action arose within the State of Maryland.

## THE CLASS MEMBERS
## WESTPORT AND CHERRY HILL COMMUNITIES

60.     In addition to the named Plaintiffs, there are approximately three thousand similarly situated individuals residing in close proximity to the Site in the Westport and Cherry Hill Communities in Baltimore City.

61.     The Plaintiffs bring this action on behalf of themselves and all others similarly situated, as representative members of the following proposed class: All residents that live in close proximity to the Site in the Westport and Cherry Hill Communities in Baltimore City where contaminants have been determined to exist.

62.     The members of the class are so numerous that joining the individual members would be impracticable.  Based upon publicly available information, it is believed that the class includes thousands of members.  Class members may be readily identified from information and records in possession and control of the Defendants.

63.     There are questions of law and fact common to the class, which predominate over questions affecting individual members of the class.     The remedy sought is ascertained by resolving the common legal issues to all class members. Common issues include, but are not limited to, the following:

a.     Whether the Defendants violated the class members' civil rights by permitting the redevelopment of a known contaminated area adjacent to a predominantly low-income, African-American community, without performing the necessary and/or proper remediation?

b.     Whether the Defendants violated the Voluntary Cleanup Program and other laws as alleged herein?

c.     Whether the Defendants have created a public nuisance for the Westport and Cherry Hill communities and other adjacent communities?

d. Whether the Defendants violated the Plaintiffs' and class members' Fourteenth Amendment Rights of Due Process and Equal Protection under the law?

e. Whether there has been a violation of Article XIX of the Maryland Constitution?

f. Whether the Defendants have damaged Plaintiffs and the members of the class as alleged herein?

64. The representative Plaintiffs' claims are typical of those of the members of the class and are based on the same legal theories. Plaintiffs and all members of the class have sustained and/or will continue to sustain damages arising out of the conduct of the Defendants.

65. The representative Plaintiffs have demonstrated that they can fairly and adequately assert and protect the interests of the members of the class. The Plaintiffs' interests are not antagonistic to those of the other members of the class. Neither the representative Plaintiffs nor their counsel have any interest which might prevent them from actively and vigorously pursuing this action.

66. A class action is superior to other available means for the fair and efficient prosecution of this action. The prosecution of separate actions by individual members of the class and adjudication for individual members of the class would be dispositive of the interest of the other members of the class, or

would substantially impair the ability of other members of the class to protect their interests.

67.     A class action will result in an orderly and expeditious administration of the class members' claims, and economies of time, effort and expense, and uniformity of decisions will be assured.

**Statement of Facts**

68.     Defendant City is the fee simple owner of certain parcels of property in the Camden-Carroll Industrial Area of Baltimore City, located at 1501, 1525, and 1551 Russell Street (commonly referred to as the "Gateway South Phase I Properties") and 1501, 1601, 1629, 1633, and 1645 Warner Street, 2119 Haines Street, 2104 Worcester Street and 2102 Oler Street, (commonly referred to as the "Warner Street Properties") (collectively the "Site" or the "Properties").  *See* Exhibit A(1)-(12) attached to the Original Complaint.  *All exhibits referenced in this Amended Complaint, unless otherwise explicitly stated, were attached to the Original Complaint and are part of the record and incorporated herein as if attached hereto*.

69.     The Properties are located near the communities of Westport and Cherry Hill in Baltimore City, surrounded by numerous commercial properties, and within 500 feet from a string of three (3) residential properties located on the 1500 block of Ridgely Street.

70.    The Westport Community demographics consist of eighty six percent (86%) African-American with an average annual household income of Twenty Seven Thousand Four Hundred Fourteen Dollars ($27,414), and there are an estimated twenty percent (20%) of the homes in the Westport neighborhood that are vacant. *See Exhibit B*.

71.    Baltimore City has a troubled history of racial and socio-economic segregation and racially motivated laws and ordinances. Particularly, the Segregation Ordinance enacted in Baltimore City made it unlawful for African American citizens (referred to as "colored persons" within the language of the Ordinance) to own or reside in "white" blocks of the city. The Ordinance created designated "black" neighborhoods, including the area known now as the Cherry Hill community.

72.    In the late 19th and early 20th century, Baltimore City had a surge of industrial growth. This growth transformed the landscape of the City turning large portions of the City into industrial and/or manufacturing facilities, particularly areas adjacent to the Patapsco River and/or railroad terminals. As a result, the land adjacent to the Patapsco River became heavily concentrated with industrial use facilities.

73.    The Segregation Ordinance, with the strong support of white citizens, determined that the Cherry Hill/Westport peninsula was the only site

outside the ghetto that it was "politically acceptable" to introduce a permanent minority housing.

74.     The Cherry Hill/Westport community was located adjacent to the Patapsco River and near the Camden Railroad Terminal, and in close proximity to numerous industrial facilities.

75.     Baltimore City formulated its housing policy based on race and situated a historically discriminated class of citizens in an area that was densely populated by industrial facilities that were, at the time, causing harm to the environment by disposing of toxic chemical in a dangerous manner.

76.     There are residential homes on Ridgley Street in close proximately to the Site that are located at 1573, 1575, and 1577 Ridgely Street, within one-tenth of a mile of the Site.

77.     The City acquired title to the Gateway South Phase I Properties on September 28, 2005 for the purchase price of $3,476,000.00.

78.     The City acquired title to the Warner Street Properties on May 5, 2008 pursuant to its condemnation powers for the purchase price of $7,800,000.00.

79.     The Warner Street Properties abut the Middle Branch of the Patapsco River and protected open spaces along the shoreline.  The Properties also contain wetlands which provide water quality benefits to the adjacent Middle

Branch tributary and designated wildlife habitat areas for wintering waterfowl, which are protected under the Maryland Critical Area Act, Title 8, Subtitle 18 of the Natural Resources Article of the Maryland Annotated Code, and the Baltimore City Critical Area Management Program, Baltimore, Maryland, Ordinance 02-350 (2002).

80.     The open space area abutting the Warner Street Properties (commonly called the "Waterfront Parcels") contains a portion of the Gwynns Falls Greenway, which is a recreational trail used by members of the public, including several Plaintiffs herein, for biking and walking.

81.     Protecting the Middle Branch portion of the Patapsco River has been identified by Baltimore City's Comprehensive Master Plan as critical to achieving the overall Water Quality and Habitat required to restore the Baltimore Harbor to fishing and swimming standards established by the Clean Water Act.  *See Exhibit C.*

82.     The Middle Branch, as a portion of the Baltimore Harbor, and its adjacent tributaries are listed as degraded water bodies under federal and state law.

83.     The Properties were historically used as urban industrial areas, that for approximately one century, were subject to large chemical and toxic environmental damage.  Areas, such as the Properties, have been classified by the EPA and MDE as "brownfields".

84.     On April 25, 2008 and June 4, 2009, the City, through BDC, submitted two Voluntary Cleanup Program (hereinafter "VCP") applications to MDE proposing to remediate the Gateway South Phase I Properties and Warner Street Properties, respectively, and requesting liability protection as an Inculpable Person upon completion (the "City VCP Applications").

85.     The City's VCP Applications relied upon eight (8) different Phase I or II Environmental Site Assessments (hereinafter "ESA"), which were completed between May 2007 and May 2009. These ESAs also referred to and/or attached a number of earlier ESAs conducted at and around the Properties from 2000 to 2009. *See Exhibit E.*

86.     The City contracted with KCI Technology to perform the testing and assessment of the site, and create the Phase I and Phase II Environmental Site Assessments required by the VCP. *See Gateway South Redevelopment ESA, Phase II, at Exhibit G.*

87.     The City's VCP Applications and ESAs reveal a long history of industrial uses at the Properties which have released a complex mix of organic and inorganic contaminants in, on, and under the soil and groundwater which, as a consequence, creates the contaminant vapors at and from the Properties at levels exceeding state and federal cleanup standards. *See Exhibit E.*

88.     1501 Warner Street was initially developed in the 1890s and used as a warehouse.  Gordon Cartons, Inc. occupied the property from the 1940s until 1989 and used the facility to store material and products.  Most recently, the buildings were used by Second Chance, Inc. to store antiques and architectural structures.  *See Gateway South, combined Redevelopment ESA and Final Response Action Plan, p. 60, ¶ 5-8, at Exhibit H,.*

89.     1601 Warner Street was initially developed in the 1890s by Baltimore Cedar Company and used as a machinery for woodworking, by 1901 a Varnish and Color Company occupied the property and used it to store chemicals and petroleum products.  Most recently, Baltimore Cycle Salvage occupied the property from 1989 until 2005 and used the facility to store motorcycle parts.  The property has been vacant and unoccupied since 2005. *See Exhibit H*, p 61, ¶ 1-3.

90.     1629 Warner Street was developed in the early 1900s and used to store chemicals and petroleum products for a Varnish and Color Company.  Sometime in the mid-20th Century Gordon Carton, Inc. occupied the property and used the property to produce paper products.  Most recently, Baltimore Cycle Salvage occupied the property from 1989 until 2005 and used the facility to store motorcycle parts.  The property has been vacant and unoccupied since 2005. *See Exhibit H*, p 61, ¶ 3-4.

91.     1633 Warner Street was developed in the early 1900s and occupied by Prudent Company, a manufacturer of fire proof doors and windows.  In 1952 Gordon Carton, Inc. occupied the property and used the property to store chemicals and solvents.  From 1988-1995 Baltimore Paving occupied the property and used it to store materials, including petroleum products.  Most recently, Baltimore Cycle Salvage occupied the property from 1995 until 2005 and used the facility to store motorcycle parts.  The property has been vacant and unoccupied since 2005. *See Exhibit H*, p 61, ¶ 5.

92.     1645 Warner Street was developed in the early 1900s and occupied by Prudent Company, a manufacturer of fire proof doors and windows.  In 1952 the property was used by a Brass Foundry and Machinery company.  From 1972 to 2006 the property was occupied by a number of different companies including a Wharf Company, Ice Company, and Sun Oil Company. *See Exhibit H*, p 62, ¶ 1.

93.     1501 Russell Street was developed in the early 1900s and occupied by American Cyanamid Company that produced and stored, organochlorine pesticides.  Most recently, beginning from 1973 the property was occupied by Maryland Chemical Company for bulk chemical storage.  Historically, this property has been in continuous use as a chemical manufacture and storage facility. *See Exhibit H*, p 62, ¶ 5-6.

94.     1525 Russell Street was developed in the mid-20th century and has been continually occupied by the Maryland Chemical Company and used to manufacture and store various chemicals. *See Exhibit H*, p 63, ¶ 2.

95.     In the early 1900s 1551 Russell Street was and used as a factory and warehouse for Maryland Container Company.  In the 1940s the property was occupied American Cyanamid Company to manufacture and store various chemicals.  Most recently, Pheasant Warner Company, LLC, owned the property before selling it to Baltimore City. *See Exhibit H*, p 63, ¶ 4.

96.     2119 Haines Street was undeveloped and used for storing irregular lumber, and most recently occupied by Second Chances, Inc. to store antiques. *See Exhibit H*, p 63, ¶ 7.

97.     2110 Haines Street was an undeveloped parcel with a storage shed used to house logs and lumber, and most recently the parcel was used by Greyhound Bus Terminal. *See Exhibit H*, p 64, ¶ 2.

98.     2104 Worchester Street was developed in the mid-1900s by J.B. MacNeal Paints, Oils, and Varnish Company and used for "stripping" varnish and/or paint from furniture.  In 1972 Gordon Carton, Inc. occupied the parcel and used it as a warehouse and storage facility until it deteriorated beyond any usable condition. *See Exhibit H*, p 64, ¶ 3.

99.     2102 Oler Street was undeveloped until the 1950s at which time the parcel was used to store lumber. In 1973 Gordon Carton, Inc. occupied the property and installed Underground Storage Tanks ("UST") near the Northwest border of the parcel. Most recently, the parcel was used by Baltimore Restoration, Inc. for an undisclosed purpose. *See Exhibit H*, p 64, ¶ 6.

100.    The contaminants identified at the Properties include arsenic, lead, chlorinated solvents (including trichloroethylene and vinyl chloride) and poly-aromatic hydrocarbons. Many of these contaminants are known and/or suspected human carcinogens. *See Exhibit E.*

101.    The ESAs confirmed that contaminants at the Site are widespread and highly concentrated in soils at various depths and various locations throughout the Site (also known as "hot spots"). *See Exhibit E. See also Affidavit of Jan Kool, Ph.D. attached to the Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order and incorporated herein by reference as if attached hereto.*

102.    The ESAs stated that KCI Technology was unable to access the entire Site to complete the testing that was proposed in the VCP Application and the Phase I assessment of the Site. *See Exhibit F*, ¶ 5.

103.    The ESAs also confirm that the groundwater underneath the Site, which is relatively shallow (in spots no more than five (5) feet below the surface),

contains a number of the above-referenced contaminants and comes into contact with the contaminated soil on the Site. *See Exhibit E.*

104. The ESAs confirm that the groundwater was tested in nine (9) locations and revealed trichloroethene (TCE), tetrachloroethene (PCE) and dichloroethene (DCE) concentration levels exceeding the MDE's cleanup standards. *See Exhibit F.*

105. The ESA conducted at the adjacent Waterfront Parcels to the south and east of the Site confirm that the contaminated groundwater from the upgradient Properties flows through, and contaminates, the Waterfront Parcels and then discharges into the Middle Branch of the Patapsco River. *See Exhibit E.*

106. As mandated by § 7-506(d) of the Environment Article, of the *Annotated Code of Maryland*, MDE published notice of each of the VCP Applications relating to the Site on its website, shortly thereafter naming the BDC, on behalf of Baltimore City, as the "applicant" and issued a 30-day public comment period.

107. MDE approved the City's VCP Applications for the Gateway South Phase I Properties and Warner Street Properties on December 22, 2009 and March 18, 2010, respectively, confirmed the City's "Inculpable Person Status" under the VCP and directed the City to develop a proposed Response Action Plan (hereinafter "RAP") for remediating the properties associated with each VCP

application for MDE's review and approval. *See Gateway South Redevelopment ESA, Phase I Updated, at Exhibit I.*

108.    On May 2, 2011, the City submitted a "combined RAP" which proposed to address all the Properties associated with both VCP applications in one cleanup plan. *See Exhibit H.*

109.    In an effort to satisfy the public notice and comment mandate in § 7-509 of the Environment Article, the City published notice of the proposed RAP for both VCP applications in the Baltimore Sun on May 14, 2011 and May 21, 2011.

110.    In an effort to satisfy the public participation mandate in § 7-509(c) of the Environment Article, MDE held a public information meeting on the Defendant City's combined RAP at the Harbor Hospital in Baltimore Maryland on June 1, 2011.

111.    The City's "combined RAP" contained an incomplete analysis of the contamination at the Properties, prematurely selected "cleanup" methods which would be the least expensive and thus the most attractive to a future developer and failed to include an implementation schedule as mandated by § 7-508 of the Environment Article. The City justified these deficiencies by stating in the RAP's "Overview" that "the RAP is intended to be general enough so that a future developer can alter that approach and maintain appropriate environmental responses."

112.    Despite the deficiencies in the aforementioned RAP, MDE issued a final RAP Approval Letter to Defendant City on September 15, 2011 which approved the "combined RAP" submitted pursuant to the City's VCP applications.

113.    Inconsistent with the requirements of the Environment Article §7-511(c), MDE's September 15, 2011 RAP Approval Letter erroneously stated that, among other things, "no further action will be required to accomplish the objectives set forth in the approved revised RAP other than those actions described therein."

114.    On or about July 31, 2012, CBAC Gaming was awarded a video lottery operation license, subject to several contingencies, for the purpose of developing and operating the proposed Horseshoe Casino facility at the Properties.

115.    Pursuant to the contingencies associated with CBAC Gaming's license award, CBAC Gaming and the City entered into a Ground Lease Agreement ("GLA") and Land Disposition Agreement ("LDA") for the Gateway South Phase I Properties and the Warner Street Properties, respectively.

116.    Pursuant to the terms of the GLA and LDA, CBAC Gaming agreed to buy or lease the Properties "as is," agreed to participate in the VCP, and acknowledged receipt of Defendant City's approved RAP which is represented as "providing a blueprint for conducting the required environmental remediation of the Property."

117. The GLA and LDA authorize CBAC Gaming to modify the terms of Defendant City's approved RAP subject to the condition that "any modifications to the RAP must be negotiated between Developer and MDE."

118. The GLA and LDA authorize CBAC Gaming to cap its costs for remediating the Properties to Two Million Dollars ($2,000,000.00). If CBAC Gaming's remediation costs exceed $2,000,000.00, Defendant City agreed to reduce Defendant CBAC Gaming's rental payments by one-half (i.e., up to $1,000,000.00).

119. The GLA and LDA also authorize CBAC Gaming to terminate the Agreements if CBAC Gaming projected its remediation costs to exceed Four Million Dollars ($4,000,000.00).

120. The City, through the GLA and LDA, entered into an agreement with CBAC Gaming where the City had substantial financial motivation to ensure the remediation costs for the Site were minimalized.

121. MDE permitted Defendants City and CBAC Gaming to bypass regulatory guidelines and statutory requirements to begin construction prior to any public inspection or comments to the plans for the Site and prior to the implementation of a final RAP.

122.   The actions of MDE and CBAC Gaming are a severe and abrupt deviation of established requirements as compared to other similarly situated VCP sites.

123.   On July 7, 2012, CBAC Gaming submitted a VCP application to MDE which proposed to remediate the Gateway South Phase I Properties and Warner Street Properties and requested liability protection as an Inculpable Person upon completion.

124.   MDE failed to notify the public of CBAC Gaming's July 2012 VCP Application on its website as required by § 7-506 of the Environment Article.

125.   CBAC submitted Phase I and II ESAs along with the VCP application that were identical to the defective ESAs submitted by City three (3) years prior in 2008 and 2009.

126.   Despite no final RAP approval, CBAC gaming began construction and soil disturbance at the Site in March 2013.

127.   Despite the MDE's Guidance Document requirement for all VCP applicants to update ESAs that are "more than one year old," the only environmental assessments contained in CBAC Gaming's VCP application were copies of the ESAs prepared and submitted with City's VCP applications more than three (3) years prior in 2008 and 2009.

128.    Despite the MDE's Guidance Document's requirement for all VCP applicants to update all sampling data that is "more than one year old," CBAC Gaming's VCP application did not update the sampling data referenced in the ESAs.

129.    As part of its July 2012 submission, CBAC Gaming also submitted a proposed RAP for the Site entitled "Response Plan Amendment". CBAC Gaming's VCP application and proposed RAP stated that it intended to "use" and "build upon" the City's approved RAP as part of its VCP application and RAP submissions.

130.    CBAC Gaming did not request MDE approval to transfer the City's RAP Approval Letter and did not propose to implement the City's RAP approved by MDE.  Rather, CBAC Gaming submitted a different proposed RAP prepared by its own environmental consultants for MDE's review and approval by MDE.

131.    CBAC Gaming's proposed RAP was even less protective to the Plaintiffs' health and the surrounding environment.

132.    The majority of the modifications contained in the CBAC Gaming RAP reduced its cleanup obligations in order to minimize its remediation costs.

133.    CBAC Gaming's RAP ignores the potential for dangerous toxins to migrate from the contaminated sites into neighboring properties, groundwater and/or the Middle Branch of the Patapsco River.

134.    CBAC Gaming's RAP merely provides for capping of the toxic soil with a layer of concrete, asphalt, or top soil as the sole remediation requirement.

135.    CBAC Gaming's RAP ignores the need for excavation and proper management of contaminated soil, avoids groundwater remediation, minimizes the standards required for covering the contamination at the Site and limits the construction of a necessary vapor barrier system to a nominal portion of the Site.

136.    CBAC Gaming's RAP does not account for adverse impacts associated with groundwater flow, velocity or contaminants transported off-site through leaching, migration, or construction created pathways.

137.    CBAC Gaming's RAP contains no remedy to prevent the contaminated groundwater at the Site from discharging into and contaminating the surrounding ecosystem, including but not limited to, the adjacent Waterfront Parcels, which contain sensitive habitat protection areas and wetlands, and the Middle Branch of the Patapsco River.

138.    CBAC Gaming's RAP ignores high levels of hazardous substances identified in the soils and fails to adequately investigate and analyze the appropriate level of cleanup that is necessary to protect human health and the environment.

139.    Soil samples taken at the Site establish the presence of "hot spots" which, if excavated, will be classified as "hazardous waste" under applicable

federal and state laws; however, CBAC Gaming's RAP only proposes to cover (or "cap") hot spots with standard construction materials (i.e., concrete, asphalt or landscaping). The RAP does not require the removal of the hazardous soil and/or the use of low permeability construction materials or construction techniques to prevent the movement of storm water into the hot spots and into the groundwater.

140. Although CBAC Gaming's development-related construction activities include installing certain below-grade utilities (e.g., water, storm water and sewer) at the Site, the RAP contains no measures to avoid disturbance of contaminated soil and infiltration of groundwater to prevent the adverse impacts associated with such installations at the Site and/or surrounding environment.

141. The incomplete and inadequate environmental investigations and remediation techniques proposed by CBAC Gaming, and authorized by MDE, fail to address and remedy the exposure of persons and ecosystems, including, but not limited to, wildlife, fish and other aquatic life in the surrounding area to contaminated soil, groundwater and vapor, and/or releases of hazardous substances into the surrounding environment, including the publically-used Waterfront Parcels and the degraded Middle Branch of the Patapsco River.

142. By letter dated August 10, 2012, MDE approved CBAC Gaming's VCP application for the Properties and affirmed CBAC Gaming's Inculpable Person Status.

143. MDE's August 10, 2012 application approval letter also acknowledged receipt of CBAC Gaming's proposed RAP and stated that it would review the proposed RAP.

144. Rather than requiring CBAC Gaming to take new soil and groundwater samples to complete its VCP application, as required by MDE's Guidance Document, MDE only required CBAC Gaming to prepare and submit sampling data for two limited purposes: evaluating groundwater contamination for light non-aqueous phase liquids and conducting supplemental vapor emission testing and analysis for heptachlor.

145. Although MDE conducted several rounds of review and issued numerous comments on CBAC Gaming's proposed RAP which enumerated necessary plan modifications, MDE did not issue a public notice and comment period or hold a public information hearing as required by § 7-509 of the Environment Article.

146. In or around August 2012, MDE provided Defendant CBAC Gaming with written comments on its proposed RAP which included 14 enumerated modifications necessary to receive RAP approval. MDE stated in its written comments that "[t]he VCP understands that this [RAP] amendment is intended to supersede the previously approved RAP [submitted by Baltimore City] entirely" and directed CBAC Gaming to "revise the Section 1.1 Purpose and

Scope to state clearly that this will supersede the previously approved RAP...." *See MDE letter accepting amendments of the RAP from CBAC Gaming, LLC, at Exhibit M.*

147.   After reviewing revised RAPs prepared and submitted by CBAC Gaming, MDE approved CBAC Gaming's proposed RAP dated November 2012, for the Properties and issued CBAC Gaming a final RAP Approval Letter dated November 27, 2012. *See MDE approval of the Amended RAP, at Exhibit O.*

148.   CBAC Gaming did not publish notice of its proposed RAP as required by § 7-509(a) of the Environment Article and did not otherwise provide the public with notice of the Proposed RAP.

149.   MDE did not issue a public notice and comment period or solicit written comments on CBAC Gaming's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(b) of the Environment Article.

150.   MDE did not hold a public information meeting on CBAC Gaming's RAP prior to issuing its November 27, 2012 RAP Approval Letter as mandated by § 7-509(c) of the Environment Article.

151.   As a result of the above procedural deficiencies, Defendant MDE did not consider written comments submitted by the public regarding the contents of CBAC Gaming's RAP prior to issuing its November 27,2012 RAP Approval Letter as mandated by § 7-511(a) of the Environment Article.

152. MDE failed to follow the procedure set forth in § 7-509 of the Environment Article to notify the public and open communication channels to consider public comments, and improperly permitted CBAC Gaming to begin construction at the Site on March 6, 2013.

153. MDE, as a result of allowing CBAC Gaming to commence construction prematurely, received numerous public complaints from environmentalists, lawyers, and concerned citizens, thereby resulting in the MDE reconsidering its position and conducting a public hearing.

154. MDE conducted a sham public hearing regarding CBAC Gaming's RAP on April 11, 2013, which several Plaintiffs attended.

155. MDE permitted CBAC Gaming to continue construction at all times before, during and after the public meeting, thereby making any public concern and/or comment a sham.

156. MDE failed to permit the public, including the Plaintiffs in attendance, to fully express concern at the public hearing by cutting the meeting short before many citizens were permitted to talk, claiming that the air conditioner in the room cuts off automatically two (2) hours after the start of the meeting. *See Exhibit N*.

157. MDE made a request to CBAC Gaming to make 15 amendments to the approved RAP, but MDE claimed that the amendments were not substantial

and, therefore, not subject to the public notification required by § 7-509 of the Environment Article, denying Plaintiffs their statutory right of notice and meaningful opportunity to participate in CBAC Gaming's VCP application. *See Exhibit L.*

158.    MDE's attempt to satisfy their statutory requirement by conducting a hearing after, and while, construction was ongoing fails to cure their previous violation of § 7-509 of the Environment Article.

159.    CBAC Gaming submitted through its agent Urban Green, a Revised RAP that is deficient and deviated substantially from professional standards, MDE approved the aforementioned RAP while overlooking the numerous deficiencies in violation of the VCP.

160.    CBAC Gaming's RAP fails to provide for sufficient testing, contamination controls and protections to the environment.

161.    CBAC Gaming's RAP attempts to suppress crucial data that is important to the extent of remediation needed at the Site by omitting factors from the body of the text of the RAP and using an incomprehensible appendix which generally requires professional training to sufficiently understand.

162.    CBAC Gaming's RAP makes conclusions based on incomplete or partial data that require factual inferences that are inconsistent with accepted standards.

163.    CBAC Gaming's RAP fails to account for the transmission or potential transmission of contaminated compounds into the environment and ecosystem, and focuses primarily on the potential impact of future workers and patrons of the Site.

164.    CBAC Gaming, BDC, City, and MDE have failed to provide any meaningful plan to reverse or stop the environmental damage caused by the contaminated Site, thereby violating various State and Federal laws.

165.    CBAC Gaming has established and proceeded with construction plans that are in violation of the MDE approved RAP, as well as State and Federal Law.

166.    The construction plans call for the removal of any standing water that occurs in any excavation area to be dewatered into portable tanks and discharged into sewer drains or directly into tidal waters.

167.    CBAC Gaming, through their actions and the actions of their agents, have contributed to the accelerated migration and flow of dangerous toxins and contaminants to neighboring properties and the environment.

168.    The construction plans call for the implementation of water, sewer and electrical infrastructure to be built below grade where the contaminated soil is present, and thereby creating a conduit to which contaminated materials may flow

through the groundwater to neighboring properties and/or the Middle Branch of the Patapsco River. *See Exhibit N.*

169.    Defendant MDE entered into a Cooperative Memorandum of Agreement ("MOA") with the EPA that defined the responsibilities with respect to activities regarding the redevelopment of "brownfields" such as the Site.

170.    The MOA was entered into for the purpose of protecting the public health and environment from under-utilized sites where hazardous materials have been released.

171.    The MOA gives MDE authority to use their resources to assure an appropriate response action plan is established and implemented to protect the public health and environment.

172.    Defendant MDE failed to conduct any meaningful public discussion regarding the Gateway Redevelopment Project thereby violating the MOA. Additionally, MDE violated the MOA by its actions and omissions as set forth above.

173.    MDE has excluded a predominately low-income, African-American community from any meaningful public participation in a brownfield redevelopment project that has the potential to cause serious and irreparable harm to their health and environment.

174.     On November 4, 2008, the qualified voters of Maryland ratified Article XIX of the Maryland Constitution (hereinafter "Article XIX") allowing the operation of video lottery facilities within the State.

175.     Article XIX mandates the qualifications for the location of a Video Lottery Facility ("VLF") in Baltimore City.

176.     Section (c)(3)(v) of Article XIX states that a VLF in Baltimore City may only be located in a nonresidential area, within one-half mile of both Interstate 95 and Maryland Route 295, on property owned by Baltimore City on the date the application for video lottery operation license is submitted.  The VLF may not be adjacent to or within one-quarter mile of a property that was zoned residential and used as a residential dwelling on the date the application for the video lottery operation license is submitted.

177.     CBAC Gaming submitted its video lottery operation license application on September 23, 2011 to operate a VLF in Baltimore City at the Properties.

178.     On September 23, 2011, there were at least three (3) properties within one-quarter mile from the site that were used as residential dwellings. Those addresses include 1573 Ridgely Street, 1575 Ridgely Street, and 1577 Ridgley Street, Baltimore, Maryland 21230 (hereinafter collectively referred to as the "Residences") as well as an existing hotel.

179. The Residences are located exactly one city block from the Site and are approximately four hundred thirty three (433) feet from the Site, or converted to miles, the Residences are approximately eight tenths (0.08) of a mile from the Site.

180. Furthermore, portions of the VLF, which are included in BDC's ground lease with CBAC Gaming for the VLF, are within one-quarter mile of zoned residential neighborhoods that had residential dwellings in use at the time the video lottery operation license was issued.

181. CBAC Gaming, the City and BCD have violated Article XIX by constructing a VLF and obtaining a video lottery operation license for said VLF in a location not permitted under Article XIX.

### COUNT I
#### (Declaratory Judgment)

182. Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 181 as if fully set forth herein.

183. This is an action for declaratory judgment for the purpose of determining a question of actual controversy between the parties and terminating uncertainty and controversy giving rise to this proceeding.

184. Plaintiffs are residents of Baltimore City who live in close proximity to the Site and/or are persons who use the trails and waterways, including the Middle Branch of the Patapsco River, adjacent to the Site.

185.     The Maryland General Assembly has specifically declared that it is the public policy of the State of Maryland that "The protection, preservation, and enhancement of the State's diverse environment is necessary for the maintenance of the public health and welfare and the continued viability of the economy of the State and is a matter of the highest public priority." *Maryland Annotated Code*, Natural Resources Art. § 1-302 (Repl. Vol. 2012). The public policy of the State of Maryland further expressly mandates that "All State agencies must conduct their affairs with an awareness that they are stewards of the air, land, water, living and historic resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations." The General Assembly has expressly recognized that "each person has a fundamental and inalienable right to a healthful environment, and each person has a responsibility to contribute to the protection, preservation, and enhancement of the environment." *Maryland Annotated Code*, Natural Resources Art. § 1-302 (Repl. Vol. 2012).

186.     The General Assembly of the State of Maryland has expressly stated the public policy of the State of Maryland and declared "that the natural resources and scenic beauty of the State of Maryland are in danger of irreparable harm occasioned by the use and exploitation of the physical environment. It further finds that the improper use and exploitation constitute an invasion of the right of

every resident of Maryland to an environment free from pollution to the extent possible." *Maryland Annotated Code*, Natural Resources Art. § 1-502 (Repl. Vol. 2012).

187.    The Maryland General Assembly has declared that "Because the quality of the waters of this State is vital to the public and private interests of its citizens and because pollution constitutes a menace to public health and welfare, creates public nuisances, is harmful to wildlife, fish and aquatic life, and impairs domestic, agricultural, industrial, recreational, and other legitimate beneficial uses of water, and the problem of water pollution in this State is closely related to the problem of water pollution in adjoining states, it is State public policy to improve, conserve, and manage the quality of the waters of the State and protect, maintain, and improve the quality of water for public supplies, propagation of wildlife, fish and aquatic life, and domestic, agricultural, industrial, recreational, and other legitimate beneficial uses. Also, it is State public policy to provide that no waste is discharged into any waters of this State without first receiving necessary treatment or other corrective action to protect the legitimate beneficial uses of this State's waters, …." *Maryland Annotated Code*, Environment Art. § 4-402.

188.    The RAP submitted by CBAC Gaming and approved by MDE demonstrates extensive contamination of the Site including the presence of arsenic and other metals and chlorinated solvents. The RAP is insufficient to determine

the full extent of the contamination of the Site and the full extent of the movement of the contamination through the soil, groundwater and vapors.

189. The construction activities at the Site, which are now underway, include soil disturbance and subsurface activities that are disturbing the known contaminants at the Site. The RAP contains several errors and omissions about the level of arsenic and other contaminants when compared with prior Site assessments performed in or around 2000. The RAP improperly fails to consider the site assessments performed in 2000 and results in a faulty conclusion concerning the extent of the contamination of the Site. The RAP relies upon partial data from investigations performed in 2007 and 2009 at different locations at the Site than the investigations in 2000 that revealed severely elevated levels of arsenic and other contaminants moving off Site.

190. The result of the inadequate investigation relied upon in the RAP is a misleading conclusion that the Site has less contamination and thus misstates the amount and type of remediation necessary to contain the known contamination at the Site.

191. MDE failed to adhere to its own applicable mandates that require a RAP to include data and investigation that is no more than one (1) year old.

192. The RAP approved by MDE does not adequately protect the environment, ecosystem, wildlife, plant life, and people using the Middle Branch of the Patapsco River and the park and trails adjacent to the Site.

193. The construction plans for the Site call for disturbance of the contaminated soil five feet from the surface which will impact the existing groundwater at the Site and any contamination has a strong likelihood of entering the groundwater and traveling to adjacent properties and into the Middle Branch of the Patapsco River.

194. In their own construction plans, CBAC Gaming has instructed its workers to remove potentially contaminated water and to dump the same into the sewers and/or tidal waters. *See* Exhibit Q.

195. The failure to properly contain the known contamination will impact the Middle Branch of the Patapsco River by increasing the level of contamination in the River. The failure to property contain the known contamination at the Site will impact the Plaintiffs' health in raising the contamination in the fish in the Patapsco River that are eaten by the Plaintiffs. The paths and wetlands adjacent to the Site will be exposed to higher contamination as the contamination enters the groundwater and rises to the surface and the Plaintiffs using the paths will be exposed to contamination.

196.     In order to prevent the known contaminants from traveling from the Site into the groundwater and into the Middle Branch of the Patapsco River, more extensive testing should be performed at the Site and increased remediation implemented.

197.     Defendants contend that the RAP is sufficient and provides for sufficient actions to contain the known contamination at the Site.  As set forth above, Plaintiffs contend that the RAP is misleading, and together with the construction and actions of the Defendants fails to adequately evaluate the risk of spreading the known contamination during the course of construction and remediate the known contamination.

198.     Plaintiffs are entitled to a declaration from this Court as to the validity and sufficiency of the RAP and the rights and obligations of the Defendants in performing proper remediation and containing the known contamination during construction, and post construction, and having additional investigations performed to evaluate the locations set forth in the 2000 investigations that were ignored by the RAP.  Plaintiffs are entitled to a declaration of the rights of the Plaintiffs in connection with the risk of contamination spreading to the Middle Branch of the Patapsco River and other areas adjacent to the Site that are used by the Plaintiffs.

199. The Plaintiffs contend that the Site is not in compliance with Article XIX of the Maryland Constitution. Defendants contend that the Site is in compliance with Article XIX of the Maryland Constitution.

200. There exists an actual controversy of a justiciable issue between Plaintiffs and Defendants within the jurisdiction of this Court, involving the rights and liabilities of the parties. This action challenges Defendants' approval, funding, construction and remediation at the Site. This action further challenges the Site pursuant to Article XIX.

201. Antagonistic claims are present between the parties. These claims indicate imminent and inevitable litigation.

202. A declaratory judgment by this Court will terminate this controversy.

WHEREFORE, Plaintiffs' move this Honorable Court:

A. To determine and adjudicate the rights and liabilities of the parties with respect to the RAP, VCP and the Site and the containment and remediation of the known contaminants at the Site;

B. To declare that the RAP is insufficient and that the Site requires further investigation and testing to determine the proper method of containment and remediation of the known contamination at the Site;

C.      To declare that BDC is not an "Inculpable Person" pursuant to the VCP relating to the Site;

D.      To declare that CBAC Gaming is not an "Inculpable Person" pursuant to the VCP relating to the Site;

E.      To determine and adjudicate the rights and liabilities of the parties under Article XIX of the Maryland Constitution;

F.      To declare that the Site does not conform to Article XIX of the Maryland Constitution; and

G.      That this Honorable Court award to Plaintiffs such other and further relief as their cause may require.

## COUNT II
(Violation of Title VI of the Civil Rights Act of 1964)

203.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 202 as if fully set forth herein.

204.    Title VI of the Civil Rights Act of 1964 is codified at 42 U.S.C. § 2000d and provides in pertinent part that "no person in the United States shall, on the ground of race … be subjected to discrimination under any program or activity receiving Federal financial assistance."

205.    The VCP program utilized by Baltimore City involving the Site receives federal financial assistance.

206. Baltimore City has a pattern of intentional discrimination in the siting of undesirable industry that causes toxic contamination near predominantly African-American communities within the boundaries of Baltimore City, such as the Site.

207. MDE, by approving and permitting RAPs for the VCP of such contaminated sites within the boundaries of Baltimore City near predominately African-American communities without requiring proper investigation of the contaminated sites and remediation of the contaminated sites is engaging in a pattern of intentional discrimination against those predominantly African-American communities.

208. Plaintiffs are primarily African-American and reside in the predominantly African-American communities of Westport and Cherry Hill in Baltimore City. The claims in this count are on behalf of those Plaintiffs who are African-American.

209. MDE and Baltimore City pursued a plan to prevent public comment and participation of Plaintiffs in discussions concerning the RAP for the Site at a meaningful point in the process.

210. The approval of the deficient RAP has a disparate impact on the predominantly African-American communities of Westport and Cherry Hill and

upon Plaintiffs and other similarly situated members of the predominantly African-American communities of Westport and Cherry Hill.

211. The submission of the deficient RAP by CBAC Gaming, approval of the RAP by MDE and Baltimore City, and construction without sufficient investigation at the Site constitute an ongoing intentional violation of Title VI of the Civil Rights Act of 1964. MDE, the City and CBAC Gaming, by their regulations, custom and actions have failed and refused to terminate and abolish such discriminatory practices. The injury to Plaintiffs is continuous, great and irreparable; is calculated to affect and does affect, their health, rights and privileges as citizens of the United States.

212. By this suit and proceeding, Plaintiffs seek to redress the deprivation by Secretary Summers in his official capacity as director of MDE, and as an officer of the State of Maryland, Rawlings-Blake in her official capacity as Mayor, City and CBAC Gaming, under color of state law and of regulation, custom, or usage of Plaintiffs' civil rights, privileges, and immunities secured to them by the laws of the United States.

213. MDE, the City, BDC and CBAC Gaming's aforementioned conduct is illegal, and is in violation of the Plaintiffs' rights and privileges as guaranteed by the Constitution of the United States and the Civil Rights Act, and in pursuance of their unlawful conduct to injure and oppress Plaintiffs herein in the free

exercise and enjoyment of their rights and privileges as secured and guaranteed to them as citizens of the United States by the Constitution of the United States, as particularly provided under the Fourteenth Amendment, and under the said Civil Rights Act. Plaintiffs are entitled to such equal protections, advantages and privileges, and to equal treatment and rights with other persons of the United States, in the use and enjoyment of lands and waterways adjacent to the Site and near their community free from contamination and to the equal protection of the laws in their use and enjoyment of said privileges as provided and afforded to other persons.

214. This action is brought on behalf of Plaintiffs and other persons of African-American descent, all citizens of the United States of America, residing in close proximity to the Site in the communities of Westport and Cherry Hill. The questions involved in this proceeding are those of a common and general interest, the parties numerous, and it is impractical to bring all of them before the court. Therefore, the Plaintiffs sue for the benefit of all.

215. This action is brought under the provisions of the Judicial Code of the United States, 28 U.S.C. § 1343, to prevent the Defendants from unlawfully interfering with the Plaintiffs' rights to the equal protection of the laws and to due process of law, and under the provisions of the Civil Rights Act.

216. Plaintiffs have no plain, speedy or adequate remedy at law. Plaintiffs are suffering great and irreparable damages, for the reasons herein alleged.

WHEREFORE, Plaintiffs move this Honorable Court:

(a) Grant Judgment in favor of Plaintiffs against all Defendants, jointly and severally, in the amount of $100,000,000.00, plus interest and costs, and

(b) Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT III
### (Violation of the Civil Rights Act § 1983)

217. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 216 as if fully set forth herein.

218. 42 U.S.C. § 1983 provides in pertinent part "Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…."

219. The Defendants MDE, the City and CBAC Gaming, by their regulations, custom and actions have failed and refused to terminate and abolish such discriminatory practices. The injury to Plaintiffs is continuous, great and irreparable; is calculated to affect and does affect, their health, rights and privileges as citizens of the United States.

220. By this suit and proceeding, Plaintiffs seek to redress the deprivation by Defendant Secretary Summers in his official capacity as director of MDE, and as an officer of the State of Maryland, Defendant Rawlings-Blake in her official capacity as Mayor, the City and CBAC Gaming, under color of state law and of regulation, custom, or usage of Plaintiffs' civil rights, privileges, and immunities secured to them by the laws of the United States.

221. Defendants' aforementioned conduct is illegal and is in violation of Plaintiffs' rights and privileges as guaranteed by the Constitution of the United States and the Civil Rights Act, and in pursuance of their unlawful conduct to injure and oppress Plaintiffs herein in the free exercise and enjoyment of their rights and privileges as secured and guaranteed to them as citizens of the United States by the Constitution of the United States, as particularly provided under the Fourteenth Amendment, and under the said Civil Rights Act. Plaintiffs are entitled to such equal protections, advantages and privileges, and to equal treatment and rights with other persons of the United States, in the use and

enjoyment of lands and waterways adjacent to the Site and near their community free from contamination and to the equal protection of the laws in their use and enjoyment of said privileges as provided and afforded to other persons.

222.    This action is brought on behalf of Plaintiffs and other persons of African-American descent, in such communities, all citizens of the United States of America, residing in close proximity to the Site in the community of Westport and Cherry Hill.  The questions involved in this proceeding are those of a common and general interest, the parties numerous, and it is impractical to bring all of them before the court.  Therefore, the Plaintiffs sue for the benefit of all.

223.    This action is brought under the provisions of the Judicial Code of the United States, 28 U.S.C. § 1343, to prevent the Defendants from unlawfully interfering with the Plaintiffs' rights to the equal protection of the laws and to due process of law, and under the provisions of the Civil Rights Act.

224.    Plaintiffs have no plain, speedy or adequate remedy at law. Plaintiffs are suffering great and irreparable damages, for the reasons herein alleged.

WHEREFORE, Plaintiffs move this Honorable Court:

(a)    Grant Judgment in favor of Plaintiffs against all Defendants, jointly and severally, in the amount of $100,000,000.00, plus interest and costs; and

(b)     Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT IV
(Violation of the Fourteenth Amendment)

225.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 224 as if fully set forth herein.

226.    The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

227.    The Defendants MDE and the City by their regulations, custom and actions have failed and refused to terminate and abolish such discriminatory practices.   The injury to Plaintiffs is continuous, great and irreparable; is calculated to affect and does affect, their health, rights and privileges as citizens of the United States.

228.    By this suit and proceeding, Plaintiffs seek to redress the deprivation by Defendant Secretary Summers in his official capacity as director of MDE, and as an officer of the State of Maryland, Defendant Rawlings-Blake in her official capacity as Mayor, and the City, under color of state law and of regulation,

custom, or usage of Plaintiffs' civil rights, privileges, and immunities secured to them by the laws of the United States.

229. Defendants' aforementioned conduct is illegal and is in violation of Plaintiffs' rights and privileges, as guaranteed by the Constitution of the United States and the Civil Rights Act, and in pursuance of their unlawful conduct to injure and oppress Plaintiffs herein in the free exercise and enjoyment of their rights and privileges as secured and guaranteed to them as citizens of the United States by the Constitution of the United States, as particularly provided under the Fourteenth Amendment, and under the said Civil Rights Act. Plaintiffs are entitled to such equal protections, advantages and privileges, and to equal treatment and rights with other persons of the United States, in the use and enjoyment of lands and waterways adjacent to the Site and near their community free from contamination and to the equal protection of the laws in their use and enjoyment of said privileges as provided and afforded to other persons.

230. This action is brought on behalf of the Plaintiffs and other persons of lower income and/or African-American descent, all citizens of the United States of America, residing in close proximity to the Site in the community of Westport and Cherry Hill. The questions involved in this proceeding are those of a common and general interest, the parties numerous, and it is impractical to bring all of them before the court. Therefore, the Plaintiffs sue for the benefit of all.

231. This action is brought under the provisions of the Judicial Code of the United States, 28 U.S.C. § 1343, to prevent the Defendants from unlawfully interfering with the Plaintiffs' rights to the equal protection of the laws and to due process of law, and under the provisions of the Civil Rights Act.

232. Plaintiffs have no plain, speedy or adequate remedy at law. Plaintiffs are suffering great and irreparable damages, for the reasons herein alleged.

WHEREFORE, Plaintiffs moves this Honorable Court:

(a)     Grant Judgment in favor of Plaintiffs against Defendants Secretary Summers in his official capacity as director of MDE, and as an officer of the State of Maryland, Defendant Rawlings-Blake in her official capacity as Mayor, and Baltimore City, jointly and severally, in the amount of $100,000,000.00, plus interest and costs; and

(b)     Grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT V
(Public Nuisance)

233. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 232 as if fully set forth herein.

234. The Properties owned, operated, maintained and/or regulated by Defendants have caused dangerous chemical compounds to be released into the Middle Branch of the Patapsco River, portions of the Gwynns Falls Greenway, and neighboring communities exposing the Plaintiffs, and the public in general, to harmful and toxic quantities of arsenic, lead, chlorides, hydrocarbons and other carcinogens.

235. The City, CBAC Gaming, BDC and MDE had actual knowledge that the toxins were present prior to choosing the Site, and had actual knowledge that disturbing the soil through demolition, grading, and excavation posed a serious and substantial threat to public health and the environment.

236. The City, CBAC Gaming, BDC and MDE failed to take reasonable measures to reduce and/or eliminate the exposure to the environment, Plaintiffs, and the public in general as to the toxins, by failing to remediate the Site of contaminated soil and groundwater, failing to properly treat the contaminated soil and groundwater, and by failing to accurately notify the public as required by statute.

237. The actions and/or inactions of the City, CBAC Gaming, BDC and MDE constituted an unreasonable interference with a right common to the general public.

238. The Public in general has a right to a healthy and safe environment.

239.     The Plaintiffs are among the class of people that were foreseeably harmed as a direct and proximate cause of the Defendants' unreasonable acts and/or omissions constituting a public nuisance.  The Plaintiffs are entitled to damages as a result of this nuisance.

WHEREFORE, the Plaintiffs demand judgment in the amount of One Hundred Million Dollars ($100,000,000.00) against all Defendants, jointly and severally, and request this Honorable Court grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

## COUNT VI
(Breach of Contract)

240.     Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 through 239 as if fully set forth herein.

241.     Defendant MDE and the United States Environmental Protection Agency, Region III ("EPA") entered into a Memorandum of Agreement ("MOA") to allocate regulatory authority over the redevelopment of "brownfields" within the State of Maryland.

242.     Defendant MDE breached the MOA by failing to properly apply the VCP program in connection with the Site, by failing to require responsible parties to investigate and cleanup the Site where the release of hazardous substances has

occurred and may occur in the future, by failing to promote appropriate investigations and cleanups of the Site, and by failing to provide necessary information to public and private developers, citizens, municipalities and elected officials relating to the Site, among other breaches.

243.    Plaintiffs are third party beneficiaries and/or expected third party beneficiaries of the MOA between the MDE and EPA.

244.    MDE's breaches of the MOA are the direct and proximate cause of dangerous toxins entering the environment causing severe and extensive risk and damage to the Plaintiffs' health and the environment.

WHEREFORE, Plaintiffs respectfully request this Honorable Court order Secretary Summers and MDE to specifically perform the MOA, and grant judgment against Defendant Secretary Summers in his official capacity as Director of MDE in the amount of One Hundred Million Dollars ($100,000,000.00), and grant Plaintiffs their costs and expenses, including reasonable attorney's fees, and such other and further relief as the nature of their cause may require.

_____ /s/

Anuj Sud  Fed. Bar No. 17126
Sud Law Firm
7309 Baltimore Avenue, Suite 117
College Park, MD 20740
(301) 277-0304
Fax: (301) 277-0305
anuj@sudlawfirm.com


_____ /s/

Walter W. Green  Fed. Bar No. 15007
Law Office of Walter W. Green
7309 Baltimore Avenue, Suite 115
College Park, MD 20740
(301) 927-3100
Fax: (301) 927-3542
wgreen@GreensLaw.com

Attorneys for Plaintiffs

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury on all Counts of their Amended Complaint.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 14, 2013 a copy of the forgoing

Amended Complaint was served on all counsel of record via the Court's ECF

system.

_____/s/_____
Walter W. Green