IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>JAMES R. ROBINSON, <em>et al.</em>,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Plaintiffs,</td><td></td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td></td><td>Civil Action No. RDB-13-2234</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>MARYLAND DEPARTMENT OF<br>THE ENVIRONMENT, <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>Defendants.</td><td>*</td><td></td></tr>
</table>

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

This case is one of several lawsuits filed in this Court challenging the siting and construction of the Horseshoe Casino in Baltimore, Maryland.[1]  This Court denied Plaintiffs' original Motion for Temporary Restraining Order and Preliminary and Permanent Injunctive Relief (ECF No. 4) on August 13, 2013.  Plaintiffs took no further action to pursue their claims until they twice amended their complaint at the end of 2013.  Plaintiffs now allege only federal equal protection and civil rights violations and a variety of state-law causes of action against the Maryland Department of the Environment, Secretary Robert Summers (Secretary of the Maryland Department of the Environment), the Baltimore Development Corporation, the Mayor and City Council of Baltimore City ("the City"), CBAC Gaming, LLC, and CBAC Borrower, LLC.  Noticeably, the Plaintiffs seek only a declaratory judgment on certain state-law issues and damages on their remaining claims; all claims for injunctive

---

[1] The other cases in this Court are *Sherrill et al. v. Mayor and City Council of Baltimore, et al.*, Civ. A. No. RDB-13-cv-2768, and *Richardson v. Mayor and City Council of Baltimore* (formerly *Myers v. Mayor and City Council of Baltimore*), RDB-13-cv-1924.

relief have been removed from the Second Amended Complaint.  In various filings which are now fully briefed by all parties, Defendants have moved to dismiss, arguing that Plaintiffs lack standing to pursue their claims and that the Second Amended Complaint fails to state any viable claim.  The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011).  For the reasons that follow, Defendants Maryland Department of the Environment and Secretary Robert Summers' Motion to Dismiss (ECF No. 65),  Defendants CBAC Gaming, LLC and CBAC Borrower, LLC's Motion to Dismiss (ECF No. 66), and Defendants Mayor and City Council of Baltimore's Motion to Dismiss (ECF No. 72) are GRANTED.

BACKGROUND

This Court accepts as true the facts alleged in the plaintiffs' complaint.  *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

## I.     The Named Plaintiffs

This case is essentially a challenge to the Horseshoe Casino ("the Casino" or "the Site") that is currently under construction in Baltimore, Maryland.  The Site is located in in the Camden-Carroll Industrial Area of Baltimore City on various adjacent properties around Russell and Warner streets.[2]   *Id.* ¶ 68.  Plaintiff James R. Robinson ("Robinson") was the original lead plaintiff in this case and has been joined in the suit by another fifty-three (53)

---

[2] The specific plots referenced in the Second Amended Complaint include 1501, 1525, and 1551 Russell Street (the "Russell Street Properties" or the "Gateway South Phase I Properties"); 1501, 1601, 1629, 1633, and 1645 Warner Street; 2119 Haines Street; 2104 Worcester Street; and 2102 Oler Street (the "Warner Street Properties").

named plaintiffs (collectively, the "Plaintiffs").[3]

The Plaintiffs allegedly live in the general vicinity of the Site, at distances ranging from a quarter-mile (.25 miles) to several miles.[4]  *See id.* ¶¶ 44, 39.  Plaintiffs assert that the Site is within 500 feet (or one-tenth of a mile) of three "residential properties"/"residential homes" located at 1573, 1575, and 1577 Ridgley Street.  *Id.* ¶¶ 69, 76.  Many of the Plaintiffs live in the neighboring Westport and Cherry Hill communities.  *Id.* ¶ 69.  It is alleged that the Westport community is eighty-six percent (86%) African-American and has an average annual household income of $27,414.  *Id.* ¶ 70.  The Plaintiffs further contend that the Cherry Hill community was originally designated as a black neighborhood by the Baltimore City "Segregation Ordinance."[5]  *Id.* ¶ 71.

## II.   The Site

The actual parcels making up the Site were developed for various industrial uses in the late nineteenth and early twentieth centuries.  *See id.* ¶¶ 88-99.  The City acquired the

---

[3] At this juncture, the named Plaintiffs are Duwain Heim, Rick Gardner, Vanessa Mack, Calvin Wilson, Maryetta Baquol, Ami Lawson, Kenneth McKenzie, Joseph Jordan, III, Quentin Sawyer, Mia Quattlebaum, John Quattlebaum, Jeff Link, Michael Hewlett, James Johnson, Larry Ford, Bridgette Hopkins, Ted Shin, Tyra Patterson, Tony McLamy, Jan Johns, Helen Partlow, Warren Bullock, Audrianne Hopkins, Arthur Washington, Fred Davis, Joann Owens, Lamonte Thomas, Jimmie and Laura Flythe, Bill Jones, Elmer Barnheart, Paul Johnson, Lisa Reeder, Jontae Cotton, Linwood J. Gray, Everett Montgomery, Mel Hill, Tyrone Wheeler, Roderick Robinson, Marc Fox, Dakwon Gilliam, Antonio Washington, Deborah Gaters, Brian Jacobs, Kelsey Scott, Donald Monroe, Merab Rice, Ruth Sherrill, James Leonard, Tim Bull, Richard Harris, AJ Robinson El, and Michael Gallagher.

[4] The distance between the individual Plaintiffs' residences and the Site has not been listed in every case.  *See, e.g.,* Pls.' Sec. Am. Compl. ¶ 40.

[5] In their Response brief, Plaintiffs explain that the "Segregation Ordinance" refers to Baltimore City Ordinance No. 692, enacted May 15, 1911.  The Ordinance "made it unlawful to black citizens (referred to in the Segregation Ordinance as "colored persons") from moving into white sections of the City."  Pls.' Resp. 20 (citing *State v. Gurry*, 121 Md. 534, 88 A. 546 (1913)).

Russell Street properties on September 28, 2005 and the remaining Warner Street properties on May 5, 2008.  *See id.* ¶¶ 77-78.  The Warner Street properties are adjacent to the Middle Branch of the Patapsco River and protected open-space wetland and wildlife habitat areas. *Id.* ¶ 79.  In addition, a portion of the Gwynns Falls Greenway recreational trail, used for biking and walking, runs through an area abutting the Site.  *Id.* ¶ 80.

### III.   The City's Preparations for Redevelopment

In 2008 and 2009, the City began to prepare the Site for development.  On April 25, 2008, the City filed an application to enter the Russell Street properties into Maryland's Voluntary Cleanup Program,[6] and filed a similar application with respect to the Warner Street properties on June 4, 2009.[7]  *Id.* ¶ 84.  These applications relied upon or referred to several different Environmental Site Assessments completed between 2000 and May 2009. *Id.* ¶ 85.  Allegedly, the contractor that conducted these assessments, KCI Technology, had been unable to access the entire site to complete all of the proposed testing.  *Id.* ¶ 102. However, the Environmental Site Assessments still identified wide-spread contamination of the soil at the Site, including arsenic, lead, chlorinated solvents (including trichloroethylene and vinyl chloride) and poly-aromatic hydrocarbons.  *Id.* ¶¶ 100, 101.  In addition, contaminated groundwater was detected, with concentrations of trichloroethene,

---

[6] The Voluntary Cleanup Program is administered by the Maryland Department of the Environment and was designed to help alleviate the problem of abandoned industrial properties that were contaminated by past activities and uses.  The program is codified at MD. CODE, ENVIR. § 7-503 *et seq.*

[7] Specifically, Plaintiffs allege that these applications were filed by the Baltimore Development Corporation, a "quasi-government entity."  *See* Pls.' Sec. Am. Compl. ¶ 56, 84.  The City has not contested that it would be liable for the actions of the Baltimore Development Corporation.  Accordingly, for purposes of these motions and this Memorandum Opinion, this Court treats the City and the Baltimore Development Corporation as synonymous.

tetrachloroethene, and dichloroethene exceeding Maryland's legal clean-up standards. *Id.* ¶¶ 103, 104. The assessments also indicated that the contaminated groundwater flowed through the Site and discharged into the Middle Branch of the Patapsco River. *Id.* ¶ 105.

The Maryland Department of the Environment published notice of the City's Voluntary Cleanup Program application, granted the City "Inculpable Person Status" with respect to both properties, and directed the City to develop a plan for remediating the Site (known as a "Response Action Plan" or "RAP"). *Id.* ¶ 107. The City submitted a combined Response Action Plan on May 2, 2011. *Id.* ¶ 108. The City published noticed of the Response Action Plan and the Voluntary Cleanup Program applications in the Baltimore Sun on May 14 and May 21, 2011. *Id.* ¶ 109. The Maryland Department of the Environment held a public information meeting on the City's Plan at the Harbor Hospital in Baltimore, Maryland on June 1, 2011. *Id.* ¶ 110.

The Plaintiffs allege that the City's Response Action Plan was deficient in a number of ways. Specifically, Plaintiffs contend that the Plan "contained an incomplete analysis of the contamination at the Properties, prematurely selected 'cleanup' methods which would be the least expensive and thus the most attractive to a future developer and failed to include an implementation schedule as mandated by § 7-508 of the Environment Article." *Id.* ¶ 111. Plaintiffs assert that, despite these deficiencies, the Maryland Department of the Environment issued a final Response Action Plan Approval Letter to the City on September 15, 2011. *Id.* ¶ 112. Plaintiffs contend that this approval was improper because, "[i]nconsistent with the requirements of the Environment Article §7-511(c), MDE's September 15, 2011 RAP Approval Letter erroneously stated that, among other things, 'no

5

further action will be required to accomplish the objectives set forth in the approved revised RAP other than those actions described therein.'" *Id.* ¶ 113.

## IV.    Development of the Site as a Casino by CBAC Gaming

In November of 2008, the voters of Maryland had approved Article XIX of the Maryland Constitution, which permitted the operation of video lottery facilities within the State and expressly allowed for such a facility within the City of Baltimore. *See id.* ¶¶ 174-75. On or about July 31, 2012, CBAC Gaming was awarded a video lottery operation license to develop the Casino at the Site.[8] *Id.* ¶ 114.  Accordingly, CBAC Gaming entered into a Ground Lease Agreement and Land Disposition Agreement with the City.  *Id.* ¶ 115.  Under the terms of those agreements, CBAC Gaming was required to participate in the Voluntary Cleanup Program and to negotiate any changes to the City's Response Action Plan with the Maryland Department of the Environment.  *Id.* ¶¶ 116, 117.  Those agreements also provided for a termination clause in the event that CBAC Gaming's costs exceeded $4 million.  *Id.* ¶ 119.

Thereafter, the Plaintiffs allege that the Maryland Department of the Environment allowed the City and CBAC Gaming to bypass various regulatory guidelines and statutory requirements and to begin construction of the Casino "prior to any public inspection or comments to the plans for the Site and prior to the implementation of a final RAP." *Id.* ¶ 121.  In July 2012, CBAC Gaming filed its Voluntary Cleanup Program application and proposed a Response Plan Amendment, which the Plaintiffs allege was less protective of the

---

[8] The State of Maryland Video Lottery Facility Location Commission oversees the development for casinos in the state.  *See* MD Code, State Government, § 9-1A-36.

environment and the surrounding communities and reduced CBAC Gaming's cleanup obligations.[9]  *Id.* ¶¶ 123, 129, 131, 132.  In addition, Plaintiffs assert that the Maryland Department of the Environment failed to notify the public of CBAC Gaming's application. *Id.* ¶ 124.  Plaintiffs also allege that the applications were defective and in violation of the Maryland Department of the Environment's Guidance Document because CBAC Gaming had submitted the same "defective" Environmental Site Assessments and sampling data that the City had used in its 2008 and 2009 applications.[10]  *Id.* ¶¶ 125, 127, 128.  Finally, Plaintiffs allege a laundry list of other specific deficiencies, including a failure to account for (1) "adverse impacts associated with groundwater flow, velocity or contaminants transported off-site through leaching, migration, or construction created pathways"; (2) the need for removal and excavation of hazardous substances and contaminated soil; and (3) the harmful effects caused by the installation of below-grade utilities.  *Id.* ¶¶ 133-40.  Plaintiffs allege that "[d]espite [having] no final RAP approval, CBAC Gaming began construction and soil disturbance at the Site in March 2013."[11]  *Id.* ¶ 126.

---

[9] Specifically, Plaintiffs allege that CBAC Gaming's Voluntary Cleanup Program and proposed Response Action Plan "intended to 'use' and 'build upon'" the City's previous approved submissions, but that CBAC Gaming "did not propose to implement" the City's Plan but rather submitted their own proposed plan.  Pls.' Sec. Am. Compl. ¶¶ 129-30.

[10] The Guidance Document calls for Environmental Site Assessments and sampling data that is no more than one (1) year old.  *Id.* ¶¶ 127-28.

[11] The Plaintiffs' allegations regarding the alleged premature commencement of construction and earth moving activities at the Site are a bit convoluted.  Specifically, as indicated above, Plaintiffs allege that "[d]espite no final RAP approval, CBAC gaming began construction and soil disturbance at the Site in March 2013."  Pls.' Sec. Am. Compl. ¶ 126.  However, Plaintiffs elsewhere allege that the Maryland Department of the Environment issued an approval letter for CBAC Gaming's Response Action Plan on November 27, 2012.  *Id.* ¶ 147.  Presumably, Plaintiffs' suggestion that construction was premature therefore arises from the Defendants alleged failure to provide an opportunity for further public comment.

On August 10, 2012, the Maryland Department of the Environment approved CBAC Gaming's Voluntary Cleanup Program application and granted it Inculpable Person status. *Id.* ¶ 142.  The Department also promised to review CBAC Gaming's proposed Response Action Plan and required CBAC Gaming to prepare and submit sampling to "evaluat[e] groundwater contamination for light non-aqueous phase liquids" and to conduct supplemental testing for heptachlor vapor emissions.  *Id.* ¶ 144.  Plaintiffs allege that the Maryland Department of the Environment failed to issue a public notice, hold a public information hearing, or allow for a public comment period with respect to CBAC Gaming's proposed Response Action Plan.  *Id.* ¶ 145.  Similarly, Plaintiffs allege that CBAC Gaming failed to publish notice of its proposed Response Action Plan.  *Id.* ¶ 148.  In August of 2012, the Department required CBAC Gaming to make several modifications to the Plan.  CBAC Gaming submitted a revised Plan in November 2012, which was approved on November 27, 2012.  *Id.* ¶¶ 146, 147.  Plaintiffs allege that this final, revised Plan was deficient because it "deviated substantially from professional standards, *id.* ¶ 159; failed to provide for sufficient testing or contamination controls, *id.* ¶ 160; suppressed "crucial data that is important to the extent of remediation needed at the Site by omitting factors from the body of the text of the [Response Action Plan] and us[ed] an incomprehensible appendix which generally requires professional training to sufficiently understand," *id.* ¶ 161; and inadequately accounted for the effects of the project on the environment and the potential for future environmental degradation, *id.* ¶¶ 162, 163.

On April 11, 2013, the Maryland Department of the Environment conducted what Plaintiffs characterize as a "sham public hearing" on CBAC Gaming's Response Action

Plan, which had already been approved. *Id.* ¶ 154. Plaintiffs assert that construction had already begun, *id.* ¶ 155, and that the meeting was cut short after officials declared the air conditioner would turn off automatically after two hours, which allegedly deprived the public and the Plaintiffs in attendance from fully voicing their opinions. *Id.* ¶ 156.

Moreover, Plaintiffs allege that the Maryland Department of the Environment's actions violated the Memorandum of Agreement that the Department had with the United States Environmental Protection Agency for the redevelopment of brownfields.[12] The Memorandum of Agreement formalizes the responsibilities of the Maryland Department of the Environment with respect to its oversight of the Voluntary Cleanup Program. *Id.* ¶¶ 169-71. Specifically, Plaintiffs allege that the Department violated the agreement by failing "to conduct any meaningful public discussions" regarding the Casino project. *Id.* ¶ 172.

## V.    The Pending Lawsuit

The original Plaintiffs[13] filed this suit on August 1, 2013, asserting eleven counts—claims for declaratory relief; violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; violation of 42 U.S.C. § 1983; violation of the Fourteenth Amendment; violations of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*; public nuisance; fraudulent misrepresentation; negligence; breach of contract; civil conspiracy; and requests for injunction relief. Plaintiffs named the following defendants: the Maryland Department of

---

[12] Brownfields are tracts of real estate contaminated by hazardous substances or pollutants where redevelopment or reuse is unlikely. *Cf.* 42 U.S.C.A. § 9601(39) ("The term "brownfield site" means real property, the expansion, redevelopment, or reuse of which may be complicated by the presence or potential presence of a hazardous substance, pollutant, or contaminant.").

[13] The originally named Plaintiffs included James R. Robinson, Duwain Heim, Rick Gardner, Vanessa Mack, Calvin Wilson, Maryetta Baquol, Ami Lawson, Kenneth McKenzie, Joseph Jordan, III, and Quentin Sawyer. *See* Pls.' Compl., ECF No. 1.

the Environment; Robert Summers, in his official capacity as Secretary of the Maryland Department of Environment;  the Mayor and City Council of Baltimore; Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore City; CBAC Gaming LLC; Baltimore Development Corporation; Whiting Turner Contracting Company; the United States Environmental Protection Agency; Urban Green Environmental LLC; and the United States Department of Agriculture, Natural Resources Conservation Services.

Plaintiffs also filed a Motion for Temporary Restraining Order (ECF  No. 4), seeking to enjoin Whiting Turner Contracting Co. and CBAC Gaming from continuing construction of the Casino at the Site until existing environmental contaminants at the site were thoroughly tested.  This Court held hearings on August 2, 2013, and August 9, 2013, and issued an order denying the Motion on August 12, 2013.

Following that initial flurry of activity, Plaintiffs took no further action to pursue their claims for several months.  On November 15, 2013, Plaintiffs filed an Amended Complaint that added several new individual plaintiffs and removed the federal government defendants, Whiting Turner Contracting Co., and Urban Green Environmental, LLC.  Thereafter, on December 26, 2013, Plaintiffs filed their Second Amended Complaint in order to add CBAC Borrower, LLC as a defendant.

Plaintiffs' Second Amended Complaint asserts six claims.[14]  Count I is a claim for declaratory judgment and seeks a declaration that (1) the Response Action Plan for the Site is

---

[14] In addition to the named Plaintiffs, the Second Amended Complaint asserts that this action is brought on behalf of the named Plaintiffs and "[a]ll residents that live in close proximity to the Site in the Westport and Cherry Hill Communities in Baltimore City where contaminants have been determined to exist."  Pls.' Sec. Am. Compl. ¶ 61.  However, Plaintiffs have not pursued the certification of a class action.

inadequate; (2) neither the City nor CBAC Gaming are "Inculpable Persons" under the Maryland Voluntary Cleanup Program; and (3) the Site fails to conform with Article XIX of the Maryland Constitution with respect to the siting of the Casino.  Count II asserts a violation of Title VI of the Civil Rights Act of 1964 with respect to the implementation of the Voluntary Cleanup Program and alleged intentional discrimination against predominantly African-American communities.  Count III alleges a violation of 42 U.S.C. § 1983 for alleged equal protection violations.  Count IV alleges a violation of the Fourteenth Amendment of the United States Constitution.  Count V alleges that the Site constitutes a public nuisance. Count VI alleges that the Maryland Department of the Environment breached its agreement with the U.S. Environmental Protection Agency regarding the administration of the Voluntary Cleanup Program.

<u>STANDARD OF REVIEW</u>

### I.      Rule 12(b)(1)

When a defendant moves to dismiss a plaintiff's claim for lack of standing, courts commonly address the motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Payne v. Chapel Hill North Properties, LLC*, 947 F. Supp. 2d 567 (M.D.N.C. 2013) ("Generally, challenges to standing are addressed under Rule 12(b)(1) for lack of subject matter jurisdiction."); *see also Nat'l Alliance for Accessibility, Inc. v. Rite Aid of N. Carolina, Inc.*, 1:10CV932, 2011 WL 4499294 (M.D.N.C. Sept. 27, 2011) ("Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may assert that a court lacks subject matter jurisdiction over a plaintiff's complaint, including by challenging a plaintiff's standing."); *Food & Water Watch v. United States Envtl. Prot. Agency*, CV 12-1639(RC), 2013 WL 6513826, at *5 (D.D.C. Dec.

13, 2013) ("[A] motion to dismiss for lack of standing constitutes a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure because the defect of standing is a defect in subject matter jurisdiction." (internal quotation marks omitted)).

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction challenges a court's authority to hear the matter brought by a complaint. *See Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). This challenge under Rule 12(b)(1) may proceed either as a facial challenge, asserting that the allegations in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted). With respect to a facial challenge, a court will grant a motion to dismiss for lack of subject matter jurisdiction "where a claim fails to allege facts upon which the court may base jurisdiction." *Davis*, 367 F. Supp. 2d at 799. When addressing such a facial challenge, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Where the challenge is factual, the district court may look beyond the pleadings and "decide disputed issues of fact with respect to subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see also Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003) ("[T]he court may look beyond the pleadings and 'the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'"). A plaintiff carries the burden of establishing subject matter jurisdiction. *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).

## II.      Rule 12(b)(6)

Where, as here, a party makes a facial challenge to the district court's jurisdiction pursuant to Rule 12(b)(1), the district court evaluates the jurisdictional allegations under the standard set forth in Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P 8(a)(2).   Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.   The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court's recent opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).   The Supreme Court's decision in *Twombly* articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss.   *Iqbal*, 556 U.S. at 678.   First, while a court must accept as true all the factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference.   *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept

13

legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)).

Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679. Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Although the plausibility requirement does not impose a "probability requirement," *id.* at 556, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) ("A complaint need not make a case against a defendant or *forecast evidence* sufficient to *prove* an element of the claim. It need only *allege facts* sufficient to *state* elements of the claim." (emphasis in original) (internal quotation marks and citation omitted)). In making this assessment, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Iqbal*, 556 U.S. at 679. "At bottom, a plaintiff must nudge [its] claims across the line from conceivable to plausible to resist dismissal." *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (internal quotation marks omitted).

<u>ANALYSIS</u>

## I.   <u>STANDING</u>

Under Article III of the United States Constitution, federal courts may only adjudicate "actual cases and controversies." *Allen v. Wright*, 468 U.S. 737, 750 (1984). The doctrine of standing is designed to give effect to this requirement by "ensur[ing] that a

plaintiff has a sufficient personal stake in a dispute to render judicial resolution appropriate." *Piney Run Preservation Ass'n v. Cnty. Com'rs of Carroll Cnty., Md.*, 268 F.3d 255, 262 (4th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 153 (4th Cir. 2000)).  In order to establish standing to sue, the plaintiff must demonstrate three basic elements: (1) the plaintiff must have suffered an "injury in fact," (2) the injury must be "fairly traceable" to the defendant's challenged conduct, and (3) it must be likely that the plaintiff's injury would be redressed by the requested relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  When assessing standing before a federal court, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

In this case, all Defendants argue that the Plaintiffs' allegations are inadequate to establish the jurisdiction of this Court.[15]  As such, the Defendants' Motions raise facial challenges, and this Court will determine whether the allegations in the Second Amended Complaint, when taken as true, are sufficient to establish standing under the plausibility standard of Rule 12(b)(6) and *Iqbal/Twombly*.  *See Davis*, 367 F. Supp. 2d at 799; *Zander v. U.S.*, 786 F. Supp. 2d 880, 883 (D. Md. 2011) (applying *Iqbal/Twombly* standard to motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)); *see also Kerns*, 585 F.3d at 192.

---

[15] Specifically, the Maryland Department of the Environment begins its legal argument with a section titled "Plaintiffs Lack Standing to Bring *this Lawsuit*."  *See* Def. MDE's Mem. Supp. Mot. Dismiss 8 (emphasis added).  Similarly, the City includes a section titled "This Court Lacks Subject Matter Jurisdiction Because Plaintiffs Lack Standing to Bring *This Action*."  *See* Def. City's Mem. Supp. Mot. Dismiss 7 (emphasis added).  CBAC Gaming noted that it incorporated "MDE's argument that Plaintiffs lack . . . Article III standing."  Def. CBAC's Mem. Supp. Mot. Dismiss 21.  Moreover, the Defendants' reply briefs reiterate the broad scope of their standing arguments.  *See* Def. MDE's Reply 10 ("Plaintiffs have not established Standing for Purposes of Title VI of the Civil Rights Act."); Def. City's Reply 2 ("The only claims based in federal law in the Complaint – Counts II-IV – claim violations of civil rights laws, but this Court lacks subjection [sic] matter jurisdiction over those claims.").

The Plaintiffs argue that they have met all three standing requirements[16]   In particular, they assert that they have adequately alleged injury-in-fact by alleging that (1) contamination from the Site discharges into the Middle Branch; (2) the Plaintiffs "use the trails and waterways, including the Middle Branch of the Patapsco River, adjacent to the Site," *id.* ¶ 184; (3) the contamination "*will* impact the Plaintiffs' health in raising the contamination in the fish in the Patapsco River that are eaten by the Plaintiffs," *id.* ¶ 195 (emphasis added); and (4) the contamination will "enter the groundwater and rise[] to the surface and the Plaintiffs using the path *will* be exposed to contamination," *id.* (emphasis added).   As such, it is important to note that Plaintiffs have identified only prospective harm—i.e., that the activities at the Site will lead to some future injury, rather than some currently-existing or past concrete harm.

Plaintiffs' brief is notably silent on the issue of redressability.   Plaintiffs seek a declaratory judgment on various questions of state law, and demand $100 million in damages with respect to their other claims.   As the Maryland Department of the Environment points out, a judgment in Plaintiffs' favor will only award them damages and will not stop the Casino from being built.   *See* Def.'s Mem. Supp. Mot. Dismiss 11 (hereinafter, "MDE's Mem. Mot. Dismiss"), ECF No. 65-1.   Indeed, Plaintiffs have failed to explain how an award

---

[16] As indicated above, *see supra* note 15, the Defendants clearly challenged Plaintiffs standing to pursue its federal claims in this Court.  Inexplicably, however, Plaintiffs appear to interpret the standing challenge as "limited to Count I for Declaratory Relief."  Pls.' Resp. 10; *see also id.* 10 ("Defendants have made no argument whatsoever that Plaintiffs' [sic] lack standing to maintain a suit for Declaratory Judgment and Defendants make no argument that the Plaintiffs' [sic] lack standing to bring their claims against Defendants under Counts II through VI.").  Nor did Plaintiffs attempt to clarify their arguments after receiving the Defendants' reply briefs.

of damages will remedy the prospective environmental harm identified as the injury undergirding their various claims.

Nor does Plaintiffs' claim for declaratory judgment save its case. *See Comite de Apoyo a Los Trabajadores Agricolas v. United States Department of Labor*, 995 F.2d 510, 514 (4th Cir. 1993) ("The fact that a declaratory judgment may have persuasive or even precedential weight in a subsequent proceeding will not alone suffice to confer standing upon a party seeking to invoke federal jurisdiction."). Notably, Plaintiffs originally requested temporary and permanent injunctive relief. After this Court denied a temporary restraining order and a preliminary injunction, Plaintiffs amended their complaint and removed all references to injunctive relief. *See id.* at 513 ("By itself, a declaratory judgment cannot be the redress that satisfies the third standing prong. Rather, plaintiffs must identify some further concrete relief that will likely result from the declaratory judgment. Otherwise plaintiffs with mooted claims of injury could gain federal jurisdiction simply by demanding declaratory relief."). Accordingly, Plaintiffs have failed to demonstrate that this action will provide redress for the alleged harm, and as such, Plaintiffs have not met their burden of demonstrating standing to pursue this action.[17] Alternatively, even if the Plaintiffs had adequately demonstrated standing, Plaintiffs have failed to demonstrate a valid claim as a matter of law.[18]

---

[17] This Court notes Plaintiffs' redressability issues are further complicated by the decision of the Circuit Court for Baltimore City in *Sherrill, et al. v. Maryland Department of the Environment, et al.*, No. 24-C-13-00100. *See* ECF No. 72-5. In that case, Ruth Sherrill, Merab Rice, and Tim Bull—who are plaintiffs in this action and *Sherrill v. Mayor and City Council of Baltimore*, Civ. A. No. RDB-13-2768, as well—brought claims against the Maryland Department of the Environment, the Mayor and City Council of Baltimore, and CBAC Gaming for mandamus (against the Department only), declaratory judgment, and public nuisance. The court dismissed as moot plaintiffs' claims based upon lack of opportunity to participate in the administrative process or provide comments on the Response Action Plan because the court found that plaintiffs had two opportunities to participate, and it also dismissed plaintiffs' public nuisance claim due to a lack of particularized harm or a

## II.   MARYLAND DEPARTMENT OF THE ENVIRONMENT'S ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment of the United States Constitution acts as a bar to certain actions against a State and the State's officials.  Specifically, the Eleventh Amendment states that:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.

U.S. CONST. Amend. XI.  Although not expressly stated in the text, the Eleventh Amendment is commonly understood to apply to state agents and other "arms of the state." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997).

Despite this general bar on suits against arms of the State, a State may nevertheless consent to suit in federal court; in addition, Congress may abrogate a State's sovereign immunity pursuant to its power under the Fourteenth Amendment.  *See Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1637-38 (2011).  In this case, Plaintiffs assert claims under Title VI, § 1983, and various provisions of state law.

---

special and distinct interest on behalf of the plaintiffs.  The Circuit Court's decision is now on appeal to the Court of Special Appeals of Maryland.

Plaintiffs argue that this Court should ignore this parallel litigation for the simple reason that it was not pled in the Second Amended Complaint.  *See* Pls.' Resp. 32.  Of course, it is well-established that Courts may take judicial notice of matters of public record, and this Court will take judicial notice of the decision of the Circuit Court for Baltimore City.

[18] Specifically, all of Plaintiffs' claims against the Maryland Department of the Environment, with the one exception of the Title VI claim, are barred by the Eleventh Amendment.  *See infra* Part II.  Additionally, Plaintiffs have failed to plead a plausible claim under *Iqbal* and *Twombly*.

With respect to Plaintiffs' Title VI claim, the Eleventh Amendment poses no bar.  As is well-established, Title VI of the Civil Rights Act abrogates Maryland's Eleventh Amendment Immunity.  *See* 42 U.S.C. § 2000d-7(a)(1) ("A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of . . . title VI of the Civil Rights Act of 1964.").

With respect to Plaintiffs' § 1983 claims, however, there is no applicable exception to the State's sovereign immunity.  *See* Md. Code, State Gov't § 12-103(2) (noting that the Maryland Tort Claims Act "does not . . . waive any right or defense of the State or its units, officials, or employees in an action in a court of the United States or any other state, including any defense that is available under the 11th Amendment to the United States Constitution"); *Thompson v. State of Maryland Dep't of Transp.*, Civ. A. No. AW-09-297, 2010 WL 2473269, at *3 (D. Md. June 14, 2010) (holding that Maryland has not consented to § 1983 claims in federal court); *Quern v. Jordan*, 440 U.S. 332, 338-45 (1979) (holding that § 1983 was not intended to abrogate states' Eleventh Amendment sovereign immunity).

With respect to Plaintiffs' state claims, the State of Maryland has not waived its sovereign immunity to suits brought against it in federal court.  *See Lindsey*, 2011 WL 454475, at *3 ("[T]he Eleventh Amendment immunizes states from suit brought in federal court absent waiver from the state or a clear congressional exercise of its power under the Fourteenth Amendment.  The State of Maryland has not expressly waived its immunity under the Eleventh Amendment to such suits." (internal citations omitted)).  Additionally, it is firmly established that a litigant may not invoke supplemental jurisdiction in order to avoid the Eleventh Amendment's bar to federal court jurisdiction over actions against states.  *See*

*Gray v. Maryland*, 228 F. Supp. 2d 628, 640 (D. Md. 2002) (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984)).

This same reasoning applies to the claims against Secretary Summers in his official capacities because, as explained above, Eleventh Amendment immunity extends to state officials sued in their official capacity for damages.   *See Gray*, 228 F. Supp. 2d at 640 (dismissing state-law claims against Maryland county sheriff in official capacity under Eleventh Amendment); *Strong v. Swaim-Stanley*, Civ. A. No. WMN-12-1924, 2012 WL 4058054, at *2 (D. Md. Sept. 13, 2012) (dismissing claims under the Americans with Disabilities Act against the Secretary of the Maryland Department of Transportation under the Eleventh Amendment); *see also Ex parte Young* (permitting suits against state officials for prospective injunctive relief only).   Accordingly, the only claim not barred by the Eleventh Amendment is the Title VI claim against the Maryland Department of the Environment.[19]

## III.   FEDERAL CLAIMS

As Plaintiffs premise jurisdiction on 28 U.S.C. § 1331, this Court first turns to Plaintiffs' federal claims.  Plaintiffs assert three claims arising under federal law: a Fourteenth Amendment claim, a § 1983 claim, and a claim under Title VI of the Civil Rights Act of 1964.   Assuming, *arguendo*, that Plaintiffs had met their burden of establishing standing to sue, this Court finds that Plaintiffs have failed to allege any plausible federal claim.

---

[19] While the Title VI claim against Secretary Summers is not technically barred by the Eleventh Amendment, the law does not recognize a Title VI cause of action against a state official as is explained below.

### A.  Fourteenth Amendment Claim (Count IV)

Plaintiffs' fourth claim asserts a cause of action directly under the Fourteenth Amendment of the United States Constitution and demands damages as a remedy. However, it is well established that there is no direct cause of action under the Equal Protection Clause against state or municipal entities or officials for damages.  *See Farmer v. Ramsay*, 41 F. Supp. 587, 591 (D. Md. 1999) (citing *Cale v. Covington*, 586 F.2d 311, 313 (4th Cir. 1978)).  To the extent that the Plaintiffs properly allege a violation of the Equal Protection clause, liability for that violation would arise under § 1983.[20]

### B.  § 1983 Claim (Count III)

Plaintiffs alternatively assert a § 1983 claim against all Defendants in order to pursue their allegations of racial discrimination.  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  Section 1983 does not create "substantive rights"; instead, the statute provides "a method for vindicating federal rights elsewhere conferred."  *Thompson v. Dorsey*,

---

[20] Plaintiffs' Second Amended Complaint does not name the CBAC Defendants in its Fourteenth Amendment claim.

Civ. A. No. ELH-10-1364, 2011 WL 2610704, at *3 (D. Md. June 30, 2011) (quoting *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).

In this case, Plaintiffs claim violations of their equal protection rights under the Fourteenth Amendment. The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. Amend. XI. The specific allegations of equal protection violations pertaining to the remaining Defendants—the City, CBAC Gaming, and CBAC Borrower[21]—arise out of (1) the City's siting of undesirable industry, Pls.' Sec. Am. Compl. ¶ 206; (2) the prevention of public comment or participation in the discussion of the Response Action Plan, *id.* ¶ 209; and (3) "[t]he submission of the deficient RAP by CBAC Gaming, in conjunction with and/or on behalf of CBAC Borrower," *id.* ¶ 211; (4) "[the] approval of the RAP by MDE and Baltimore City," *id.*; and (5) the "construction without sufficient investigation at the Site," *id.*[22]

---

[21] As noted above, Plaintiffs may not pursue their § 1983 against the Maryland Department of the Environment due to the bar posed by the Eleventh Amendment.

[22] Specifically, with respect to the § 1983 claim, Plaintiffs allege that:

219. The Defendants MDE, the City, CBAC Gaming and CBAC Borrower, by their regulations, custom and actions have failed and refused to terminate and abolish such discriminatory practices. The injury to Plaintiffs is continuous, great and irreparable; is calculated to affect and does affect, their health, rights and privileges as citizens of the United States.

220. By this suit and proceeding, Plaintiffs seek to redress the deprivation by Defendant Secretary Summers in his official capacity as director of MDE, and as an officer of the State of Maryland, Defendant Rawlings-Blake in her official capacity as Mayor, the City, CBAC Gaming and CBAC Borrower, under color of state law and of regulation, custom, or usage of Plaintiffs' civil rights, privileges, and immunities secured to them by the laws of the United States.

221. Defendants' aforementioned conduct is illegal and is in violation of Plaintiffs' rights and privileges as guaranteed by the Constitution of the United States and the Civil Rights Act, and in pursuance of their unlawful conduct to injure and oppress Plaintiffs herein in the free exercise and enjoyment of their rights and privileges as secured and guaranteed to them as

As a preliminary matter, this Court notes the black-letter rule that a § 1983 claim does

not lie against a private actor.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)

("To state a claim for relief in an action brought under § 1983, respondents must establish

that they were deprived of a right secured by the Constitution or laws of the United States,

and that the alleged deprivation was committed under color of state law. Like the state-

action requirement of the Fourteenth Amendment, the under-color-of-state-law element of §

1983 excludes from its reach merely private conduct, no matter how discriminatory or

---

citizens of the United States by the Constitution of the United States, as particularly
provided under the Fourteenth Amendment, and under the said Civil Rights Act. Plaintiffs
are entitled to such equal protections, advantages and privileges, and to equal treatment and
rights with other persons of the United States, in the use and enjoyment of lands and
waterways adjacent to the Site and near their community free from contamination and to the
equal protection of the laws in their use and enjoyment of said privileges as provided and
afforded to other persons.

Pls.' Sec. Am. Compl. ¶¶ 219-21.  Earlier in the Second Amended Complaint, with respect to the Title VI
claim, Plaintiffs allege that:

206. Baltimore City has a pattern of intentional discrimination in the siting of undesirable
industry that causes toxic contamination near predominantly African-American communities
within the boundaries of Baltimore City, such as the Site.
207. MDE, by approving and permitting RAPs for the VCP of such contaminated sites
within the boundaries of Baltimore City near predominantly African-American communities
without requiring proper investigation of the contaminated sites and remediation of the
contaminated sites is engaging in a pattern of intentional discrimination against those
predominantly African-American communities.
209. MDE and Baltimore City pursued a plan to prevent public comment and participation
of Plaintiffs in discussions concerning the RAP for the Site at a meaningful point in the
process.
210. The approval of the deficient RAP has a disparate impact on the predominantly
African-American communities of Westport and Cherry Hill and upon Plaintiffs and other
similarly situated members of the predominantly African-American communities of
Westport and Cherry Hill.
211. The submission of the deficient RAP by CBAC Gaming, in conjunction with and/or on
behalf of CBAC Borrower, approval of the RAP by MDE and Baltimore City, and
construction without sufficient investigation at the Site, as well as violating Article XIX of
the Maryland Constitution, constitute an ongoing intentional violation of Title VI of the
Civil Rights Act of 1964.

*Id.* ¶¶ 206-11.

wrongful." (internal quotation marks omitted)); *see also Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("The statutory color-of-law prerequisite is synonymous with the more familiar state-action requirement—and the analysis for each is identical."). A private actor may only be held liable under four specific circumstances:

> (1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen.

*DeBauche v. Trani*, 191 F.3d 499, 507 (4th Cir. 1999). Although the CBAC Defendants raised this issue in its papers, *see* Def. CBAC's Mem. Supp. Mot. Dismiss 24-26, ECF No. 66-1, Plaintiffs response is devoid of any argument on the point. Moreover, Plaintiffs' Second Amended Complaint contains no facts that would subject CBAC Gaming or CBAC Borrower to liability under one of the private actor exceptions. Accordingly, Plaintiffs claims must be dismissed as to the CBAC entities.

Plaintiffs' allegations as to Baltimore City are similarly unavailing. In particular, the Second Amended Complaint fails to allege sufficient facts to give rise to liability under Plaintiffs' various theories. Despite claiming that the City violated the Plaintiffs' rights by approving a deficient Response Action Plan, Plaintiffs elsewhere allege that the Maryland Department of the Environment administers the Voluntary Cleanup Program. *Id.* ¶ 205. There is no allegation whatsoever that the City had any influence or control over the Voluntary Cleanup Program or the Response Action Plan approval process.

With respect to the "pattern of siting of undesirable industry," Plaintiffs have not explained the City's role in picking the site for the Casino; rather, Plaintiffs' Second Amended Complaint suggests that the Site was actually selected by CBAC Gaming. *See* Pls.' Sec. Am. Compl. ¶ 177 ("CBAC Gaming and/or CBAC Borrower submitted a video lottery operation license application on September 23, 2011 to operate a [Video Lottery Facility] in Baltimore City at the [Site].").[23]  Even if Plaintiffs had explained the City's role in this process in its Second Amended Complaint,[24] Plaintiffs simply offer bald allegations that the City acted with racial animus and then attempt to insulate their claims from dismissal by contending that this Court should not determine the "sensitive inquiry" into racial animus at the motion to dismiss stage. *See* Pls.' Resp. 17.

Despite Plaintiffs' contentions, the Second Amended Complaint simply fails to plausibly allege purposeful racial discrimination on the part of the City.  In essence, Plaintiffs have asserted that the City's efforts at redevelopment—at a Site where contamination was pre-existing and wide-spread—was somehow intended to discriminate against the African-American residents in the nearby areas.  To permit Plaintiffs to pursue their claim in this context would expose Baltimore City (or any other municipality) to wide-spread, open-ended § 1983 liability for any redevelopment project in blighted areas that are in some proximity to

---

[23] Notably, Maryland Casinos must be approved by the State of Maryland Video Lottery Facility Location Commission, which is a state agency.  *See* MD Code, State Government, § 9-1A-36.

[24] Undoubtedly, the City played some role in the Siting decision.  Amendment XIX, for example, requires that the Casino be located on City-owned land.  Defendants' exhibits provide some further insight into this process.  *See* Def. CBAC's Reply Ex 3, ECF No. 81-5 (City documents voicing support for the Casino and noting properties on Russell street as potential location).  However, none of those facts are alleged in the Complaint.

neighborhoods with significant populations of racial minorities simply based upon bald allegations of purposeful discrimination.[25]

Nor does this Court find that Plaintiffs' argument pursuant to *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), changes this Court's conclusion.  In sum, Plaintiffs argue that:

> The totality of the circumstances of the approval of the RAP, the deficiencies in the RAP, the failure of the required public notice, the deviation from normal substantive standards, the historical race related policy making of Baltimore City, the location of this Site for the Casino and the disparate treatment of this Site as compared to other sites, all lead to the reasonable inference that there exists an invidious discriminatory purpose that was the motivating factor in the decision to select this Site for the Casino and to allow Defendant CBAC Gaming to begin and continue construction at the Site without proper testing of the groundwater and soil.

Pls.' Resp. 29.  As discussed to some degree above, this analysis fails to raise a plausible claim of purposeful racial discrimination with respect to the City.  The Plaintiffs jumble together a variety of unpled matters[26] and perceived state procedural improprieties allegedly committed by other entities—and many of these claimed improprieties have already been

---

[25] Defendants argue that Plaintiffs' allegations with respect to discriminatory intent should not be given credence because they fail to satisfy the pleading standards of *Iqbal* and *Twombly*.  *See* MDE's Mem. Supp. Mot. Dismiss 21-22, ECF No. 65-1 ("[T]o the extent Plaintiffs allege that MDE and Secretary Summers have 'engaged in a pattern of intentional discrimination against those predominantly African-American communities,' and 'approval of the RAP by MDE . . . constitute[s] an ongoing intentional violation of Title VI,' Plaintiffs have not presented a single fact, statistic, or evidence of a pattern to meet the plausibility standard of *Twombly*."); City's Reply 7, ECF No. 82 ("The unconstitutional discrimination claimed in this case is thus essentially set forth in two conclusory statements in the Complaint, unsupported by fact, that fail to meet the plausibility standard of Federal Rule 12(b)(6) and *Iqbal/Twombly*.").

[26] For example, the Second Amended Complaint fails to mention any other site that was treated differently despite their attempt to discuss the Harbor Point Development project in their papers.  *See* Pls.' Resp. 18.

rejected by the Circuit Court for Baltimore City.[27]   Their claims of a pattern of discriminatory siting of industry are only supported by references to the City's segregation of neighborhoods over a century ago, and Plaintiffs have not offered any explanation regarding the connection between the two.  As such, Plaintiffs have failed to allege any plausible theory under which the City or the CBAC entities could be liable, and Plaintiffs' § 1983 claim will be dismissed.

### C.  Title VI Claim (Count II)

Plaintiff's second count states a claim for violation of Title VI of the Civil Rights Act of 1964.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  "Under Fourth Circuit case precedent, a state actor's conduct violates Title VI only where this conduct constitutes purposeful discrimination in violation of the Equal Protection guarantees of the U.S. Constitution." *Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 348 F. Supp. 2d 398, 452 (D. Md. 2005) (citing *Peters v. Jenney*, 327 F.3d 307, 315 (4th Cir. 2003)).  Thus, there is no private right of action under Title VI for disparate impact discrimination. *See Alexander v. Sandoval*, 532 U.S. 275, 281 (2001); *see also Alexander v. Choate*, 469 U.S. 287, 293 (1985) (summarizing *Guardians Ass'n v. Civil Serv. Comm'n of New York City*, 463 U.S. 582 as holding that "Title VI itself directly reache[s] only

---

[27] For example, in *Sherrill v. Maryland Department of the Environment*, No. 24-C-13-001000,  the Circuit Court for Baltimore City found that the additional opportunity for public comment mooted any claim for procedural defect as public comment pursuant to § 7-509 of the Environmental Article of the Maryland Code. *See* Def. CBAC's Mem. Supp. Mot. Dismiss Ex 1, ECF No. 66-3.

instances of intentional discrimination"). Accordingly, to the extent Plaintiffs attempt to proceed on a purely disparate impact theory, their claim must be dismissed.

To the extent that Plaintiffs have alleged that the Defendants intentionally discriminated against Plaintiffs, their allegations fail to state a claim as well. This Court has already determined that Plaintiffs have failed to allege a constitutional violation with respect to the City, CBAC Gaming, and CBAC Borrower that would give rise to those entities' liability under § 1983. As such, Plaintiffs' allegations are insufficient for purposes of Title VI as well. *Accord Thompson*, 348 F. Supp. 2d at 452. With respect to the Maryland Department of the Environment,[28] this Court's reasoning as to the other Defendants is illuminative.[29] Moreover, it is well-established that a Title VI claim cannot lie against an individual acting in his or her official capacity, so the claim must also be dismissed with respect to Secretary Summers. *See Farmer v. Ramsay*, 41 F. Supp. 2d 587, 592 (D. Md. 1999).

## IV.   **STATE CLAIMS**

In addition to their federal claims, Plaintiffs assert a variety of claims arising under Maryland law. Count I is a claim for declaratory judgment and seeks a declaration that (1)

---

[28] The allegations pertaining to the Maryland Department of the Environment are that the Department (1) approved the Response Action Plan and Voluntary Cleanup Program application without sufficient investigation or remediation; (2) prevented public comment and participation in the discussions concerning the Response Action Plan at a meaningful time; and (3) permitted construction to begin without sufficient investigation. *See* Pls.' Sec. Am. Compl. ¶¶ 207-11.

[29] With respect to the Plaintiffs' allegations pertaining to the Department, *see supra* note 28, this Court does not find that any more plausible claim on which Plaintiffs' Second Amended Complaint could survive. Notably, the Circuit Court for Baltimore City found that the plaintiffs in *Sherrill v. Maryland Department of the Environment* had failed to allege that the Department had acted arbitrarily and capriciously because their allegations were too sparse and conclusory. *See* Def. CBAC's Mem. Supp. Mot. Dismiss Ex 1. Moreover, Plaintiffs' allegations are even more implausible in light of the fact that the Department had no role in picking the Site as the location for the Casino.

the Response Action Plan for the Site is inadequate; (2) neither the City nor CBAC Gaming are "Inculpable Persons" under the Maryland Voluntary Cleanup Program; and (3) the Site fails to confirm with Article XIX of the Maryland Constitution with respect to the siting of the Casino.  Count V alleges that the Site constitutes a public nuisance.  Count VI alleges that the Maryland Department of the Environment breached its agreement with the U.S. Environmental Protection Agency regarding the administration of the Voluntary Cleanup Program.

As noted above, this Court has already dismissed all of the federal claims against the Defendants.  As such, this Court declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims—particularly in light of the dismissal of the related action in the Circuit Court for Baltimore City and the pending appeal to the Court of Special Appeals of Maryland.[30]  Accordingly, those claims will be dismissed.

CONCLUSION

For the reasons stated above, Defendants Maryland Department of the Environment and Secretary Robert Summers' Motion to Dismiss (ECF No. 65),  Defendants CBAC Gaming, LLC and CBAC Borrower, LLC's Motion to Dismiss (ECF No. 66), and Baltimore Development Corporation, Stephanie Rawlins-Blake, and Mayor and City Council of Baltimore's Motion to Dismiss (ECF No. 72) are GRANTED.

A separate Order follows.

Dated:          May 16, 2014                        _____/s/_____

                                                                Richard D. Bennett
                                                                United States District Judge

---

[30] *See supra* note 17.